SINGER CASHMAN LLP
  Adam S. Cashman (Bar No. 255063)
  acashman@singercashman.com
  Doug Tilley (Bar No. 265997)
  dtilley@singercashman.com
601 Montgomery Street, Suite 1950
San Francisco, California  94111
Telephone:     (415) 500-6080
Facsimile:      (415) 500-6080
*Attorneys for Eventbrite, Inc.*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| SHERRI SNOW, ANTHONY PICENO and LINDA CONNER, as individuals, on behalf of themselves, the general public and those similarly situated, | CASE NO. 3:20-CV-03698-WHO |
| Plaintiffs, | **DEFENDANT EVENTBRITE, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| v. | |
| EVENTBRITE, INC., | Hearing Date:  October 7, 2020 |
| Defendant. | Hearing Time:  2:00 p.m. Courtroom 2, 17th Floor |

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on October 7, 2020 at 2:00 p.m., in Courtroom 2 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Eventbrite, Inc. ("Eventbrite") will and hereby does move for an Order (a) compelling arbitration of Plaintiffs Sherri Snow, Anthony Piceno, and Linda Conner's (collectively, "Plaintiffs") claims, pursuant to the Terms of Service between Eventbrite and each Plaintiff as well as the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., and (b) dismissing or, in the alternative, staying all claims in the above-entitled action in favor of arbitration.

Eventbrite's Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the supporting Declarations of Courtney Duhring, Antwonne Dacus, and Doug Tilley, and all exhibits attached to such Declarations; the accompanying Request for Judicial Notice; all other papers submitted in support of the Motion; the pleadings and other records on file in this case; all other evidence and argument as may be presented before or at the hearing on Eventbrite's Motion; and any other matter that the Court may properly consider.

Date:  August 31, 2020

Respectfully submitted,

SINGER CASHMAN LLP

By: _____
   Adam S. Cashman
   Doug Tilley
   *Attorneys for Defendant Eventbrite, Inc.*

## TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ..........................................................................................I

I.    INTRODUCTION ...................................................................................................................1

II.   RELEVANT BACKGROUND ..............................................................................................2

     A.   The Parties, Plaintiffs' Ticket Purchases, and Plaintiffs' Claims ........................................2

         1.   Eventbrite ....................................................................................................................2

         2.   Plaintiff Snow ............................................................................................................3

         3.   Plaintiff Piceno .........................................................................................................3

         4.   Plaintiff Conner .........................................................................................................4

         5.   Plaintiffs' Claims .......................................................................................................4

     B.   Plaintiffs Repeatedly Agreed To The Arbitration And Class Waiver Provisions In The TOS ..............................................................................................................................5

         1.   Eventbrite's Disclosures When Users Create Accounts And/Or Order Tickets ..........5

             a.   Desktop Web ......................................................................................................5

                 i.   Eventbrite's Dedicated "Sign Up" Page ...........................................5

                 ii.   Purchasing Tickets (And Creating Accounts Via Checkout Flow) .................6

             b.   Mobile Web.........................................................................................................7

             c.   Smartphone App .................................................................................................8

         2.   Plaintiffs' Agreements to Eventbrite's TOS .............................................................9

             a.   Plaintiff Snow ....................................................................................................9

             b.   Plaintiff Piceno ................................................................................................11

             c.   Plaintiff Conner ...............................................................................................12

         3.   The Relevant TOS Versions.....................................................................................12

III. LEGAL STANDARDS APPLICABLE TO MOTIONS TO COMPEL ARBITRATION.............................................................................................................. 14

IV. ARGUMENT ..................................................................................................................... 16

     A.   Plaintiffs' Claims Are Subject To Mandatory Individual Arbitration ...........................16

         1.   Eventbrite's TOS Constitute A Valid, Enforceable Agreement ..............................16

- ii -

DEFENDANT EVENTBRITE, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
CASE NO. 3:20-CV-03698-WHO

2.   The Parties Clearly And Unmistakably Delegated Questions of Arbitrability To The Arbitrator ........................................................................... 19

3.   The TOS's Arbitration Provision Covers This Dispute ............................ 21

B.   This Action Should Be Dismissed In Favor Of Arbitration ............................ 22

V.   CONCLUSION ........................................................................................................ 22



# TABLE OF AUTHORITIES

**CASES**

*Arena v. Intuit Inc.*,
444 F. Supp. 3d 1086 (N.D. Cal. 2020) ............................................................ 18

*AT&T Mobility LLC v. Concepcion*,
563 U.S. 333 (2011) ........................................................................................... 15

*Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*,
571 U.S. 49 (2013) ............................................................................................. 15

*Bloom v. ACT, Inc.*,
No. 18-cv-6749, 2018 WL 6163128 (C.D. Cal. Oct. 24, 2018)…………………….……….…… 21

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
207 F.3d 1126 (9th Cir. 2000)............................................................................. 16

*Chung v. Nemer*,
No. 12-cv-4608, 2012 WL 5289414 (N.D. Cal. Oct. 25, 2012) .......................... 20

*DeVries v. Experian Info. Sols., Inc.*,
No. 16-cv-2953-WHO, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017) ................... 16, 19, 20

*Dickey v. Ticketmaster LLC*,
No. 18-cv-9052, 2019 WL 9096443 (C.D. Cal. Mar. 12, 2019)............................ 18, 20, 21

*Dohrmann v. Intuit, Inc.*,
No. 20-15466, --- Fed.Appx. ---, 2020 WL 4601254 (9th Cir. Aug. 11, 2020).......................... 15, 17

*Erickson v. Nebraska Mach. Co.*,
No. 15-cv-1147, 2015 WL 4089849 (N.D. Cal. July 6, 2015)............................... 6

*Fteja v. Facebook, Inc.*,
841 F.Supp.2d 829 (S.D.N.Y. 2012)..................................................................... 19

*Graf v. Match.com, LLC*,
No. 15-cv-3911, 2015 WL 4263957 (C.D. Cal. July 10, 2015)............................. 19

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
139 S. Ct. 524 (2019) ......................................................................................... 16, 19

*In re Facebook, Inc. Sec. Litig.*,
405 F. Supp. 3d 809 (N.D. Cal. 2019) ................................................................ 6

*Johnmohammadi v. Bloomingdale's, Inc.*,
755 F.3d 1072 (9th Cir. 2014)............................................................................. 22

*Kinney v. Youtube, LLC*,
G054863, 2018 WL 5961898 (Cal. Ct. App. Nov. 14, 2018).............................. 15

*Lee v. Ticketmaster L.L.C.*,
No. 19-15673, --- Fed.Appx. ---, 2020 WL 3124256 (9th Cir. June 12, 2020) ............................ 15, 17

*Legnaioli v. Chrysler Capital, LLC*,
No. 15-cv-744, 2015 WL 12765468 (C.D. Cal. June 9, 2015) ........................................ 22

*Maynez v. Walmart, Inc.*,
No. 20-cv-23, 2020 WL 4882414 (C.D. Cal. Aug. 14, 2020) ......................................... 18

*Mims v. Davison Design & Dev., Inc.*,
No. 16-cv-92, 2016 WL 10771297 (C.D. Cal. Apr. 14, 2016) ........................................ 22

*Mohamed v. Uber Techs., Inc.*,
848 F.3d 1201 (9th Cir. 2016) ..................................................................................... 20

*Momot v. Mastro*,
652 F.3d 982 (9th Cir. 2011) ....................................................................................... 20

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
460 U.S. 1 (1983) ............................................................................................... 16, 22

*Moule v. UPS*,
No. 16-cv-102, 2016 WL 3648961 (E.D. Cal. July 7, 2016) .......................................... 19

*Nevarez v. Forty Niners Football Co., LLC*,
No. 16-cv-7013, 2017 WL 3492110 (N.D. Cal. Aug. 15, 2017) ..................................... 19

*Nguyen v. Barnes & Noble Inc.*,
763 F.3d 1171 (9th Cir. 2014) ..................................................................................... 15

*Peter v. DoorDash, Inc.*,
No. 19-cv-06098, --- F.Supp.3d ---, 2020 WL 1967568 (N.D. Cal. Apr. 23, 2020) ......... 18

*Peterson v. Lyft*,
No. 16-cv-7343, 2018 WL 6047085 (N.D. Cal. Nov. 19, 2018) ..................................... 22

*Rodriguez v. Experian Servs. Corp.*,
No. 15-cv-3553, 2015 WL 12656919 (C.D. Cal. Oct. 5, 2015) ...................................... 18

*Simula, Inc. v. Autoliv, Inc.*,
175 F.3d 716 (9th Cir. 1999) ....................................................................................... 16

*Swift v. Zynga Game Network, Inc.*,
805 F. Supp. 2d 904 (N.D. Cal. 2011) ......................................................................... 19

*Tompkins v. 23andMe, Inc.*,
No. 13-cv-5682, 2014 WL 2903752 (N.D. Cal. June 25, 2014) ..................................... 19

*Tuminello v. Richards*,
504 Fed.Appx. 557 (9th Cir. 2013) .............................................................................. 20

*United States ex rel. Hong v. Newport Sensors, Inc*,
728 Fed.Appx. 660 (9th Cir. 2018) ................................................................................ 6

*United States ex rel. Hong v. Newport Sensors, Inc.*,
No. 13-cv-1164, 2016 WL 8929246 (C.D. Cal. May 19, 2016) ...................................... 6p

singer
cashman LLP

*United States ex rel. Juan Hong v. Newport Sensors, Inc*,
713 Fed.Appx. 724 (9th Cir. 2018) ................................................................................. 6

**STATUTES**

9 U.S.C. § 2 ....................................................................................................................... 15

9 U.S.C. § 3 ....................................................................................................................... 14

**OTHER AUTHORITIES**

AAA Cons. R-14 ................................................................................................................ 21

AAA Comm. R-7 ............................................................................................................... 21

DEFENDANT EVENTBRITE, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION;
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
CASE NO. 3:20-CV-03698-WHO

## I.   INTRODUCTION

Plaintiffs Sherri Snow, Anthony Piceno, and Linda Conner, on behalf of themselves and a putative class of others (collectively, "Plaintiffs"), assert claims against Defendant Eventbrite, Inc. ("Eventbrite") arising out of their purchases of tickets to in-person events that were postponed or cancelled due to the COVID-19 pandemic.

Plaintiffs' claims fail for a host of reasons, including that neither California law, nor any contract between the parties, nor any purported representation by Eventbrite even arguably requires Eventbrite to provide the relief Plaintiffs demand.  On the contrary, Plaintiffs **admit** that Eventbrite discloses throughout its website that event organizers—not Eventbrite—are responsible for setting refund policies and providing relief to impacted consumers.  Eventbrite will address the legal and factual deficiencies in Plaintiffs' claims in due course.[1]  As a threshold matter, however, none of these issues may be litigated in this Court, because Plaintiffs **repeatedly** bound themselves to Eventbrite's Terms of Service ("TOS"), agreeing time and again that any and all claims arising out of or relating to Eventbrite's services or Plaintiffs' relationship with Eventbrite must be brought **exclusively** in arbitration.  Plaintiffs further agreed that any such claims could proceed **only** on an individual basis, and not as a class action.  What is more, Plaintiffs each clearly and unmistakably agreed that threshold matters of arbitrability— specifically, "any dispute or claim relating to this Section [governing arbitration], including without limitation, regarding the scope, enforceability and arbitrability of these Terms"—shall be decided by the arbitrator, rather than a court.

Plaintiffs first agreed to the arbitration and class waiver provisions set forth in the TOS when each created his or her Eventbrite account.  As it has done since well before the start of the putative "Class Period" alleged in the Complaint, Eventbrite conspicuously disclosed that by signing up for an account, each Plaintiff was confirming that "I agree to Eventbrite's terms of service …" or "I accept the Eventbrite terms of service …"  These unambiguous, hyperlinked disclosures appeared adjacent to the "SIGN UP, "Get Started," or other call-to-action buttons each Plaintiff clicked in order to create their Eventbrite account.

---

[1]   *See* Dkt. No. 16 (Aug. 10, 2020 Order entering stipulation under which the Court will address the instant Motion and, if necessary, the Parties will thereafter brief and argue Eventbrite's challenges to Plaintiffs' Complaint, including under Fed. R. Civ. P. 12).

Plaintiffs bound themselves *again* to the arbitration and class waiver provisions in the TOS by placing orders for tickets via Eventbrite's Platform, including to the events identified in the Complaint. Each time each Plaintiff placed an order, Eventbrite conspicuously advised him or her (and all other users who placed orders throughout the putative "Class Period") that by finalizing their purchases, each was confirming that "I accept the Terms of Service …" These prominent, hyperlinked disclosures appeared directly above the "Pay Now," "Place Order," "Register," and similar buttons each Plaintiff clicked in order to finalize their transactions. After each Plaintiff so bound himself or herself to the TOS, Eventbrite completed the transactions, issued credentials to the relevant events, and sent an order confirmation email reminding them that "[t]his order is subject to Eventbrite Terms of Service …"

The Ninth Circuit, federal and state courts throughout California, and appellate and trial courts across the nation have consistently held that disclosures such as Eventbrite's give consumers sufficient notice that they enter into binding legal contracts when they create online accounts or make online purchases. Accordingly, these courts routinely require plaintiffs to bring their claims in individual arbitration, and dismiss (or stay) court actions in favor of such proceedings.

Plaintiffs may not ignore the commitments each made and affirmed time and again. Nor, in light of binding precedent, may this Court relieve Plaintiffs of them. This matter must be dismissed in favor of individual arbitration pursuant to the parties' agreements.

## II. RELEVANT BACKGROUND

### A. The Parties, Plaintiffs' Ticket Purchases, and Plaintiffs' Claims

#### 1. Eventbrite

Eventbrite is a global leader in the field of event promotion, ticketing, and associated technology, powering live experiences in 170 countries around the world. *See* Declaration of Courtney Duhring in Support of Eventbrite's Motion ("Duhring Decl."), ¶ 2. Eventbrite developed and operates a technology Platform that allows concert, festival, and other event organizers to plan, promote, and produce live events, with reduced friction and costs, increased reach, and seamless ticket sales. *See id.* at ¶ 3. Eventbrite allows users to order tickets to free and paid events through a

1   website (available in both "desktop" and "mobile" formats) as well as a smartphone app.  *See id.* at

2   ¶ 4.  The processes for creating accounts through each channel—a necessary pre-requisite to order

3   tickets for any event—and ordering event credentials are set forth in more detail below.  *See* Section

4   II-B-1, *infra*.

5                   2.   Plaintiff Snow

6           Plaintiff Sherri Snow alleges that "[o]n or about February 11, 2020, [she] purchased four

7   tickets the [sic] Reggae Rise Up Musical Festival to take place in Las Vegas, Nevada … on April 18,

8   and 19."  Dkt. No. 1 ("Complt."), ¶ 34.  Eventbrite's records confirm that a user with the same email

9   address provided by Plaintiffs' counsel on Ms. Snow's behalf[2] created an Eventbrite account on or

10  around January 14, 2018 and, as alleged in the Complaint, purchased tickets to the Reggae Rise Up

11  Musical Festival on February 11, 2020.  Duhring Decl., ¶¶ 27, 31.  Eventbrite's records further

12  indicate that prior to that order, Plaintiff Snow placed 14 separate orders for event credentials via

13  Eventbrite.  *See id.* at ¶¶ 27-29.  After each such order, Eventbrite sent Plaintiff Snow an order

14  confirmation email reminding her that each was, like all orders, "subject to Eventbrite Terms of

15  Service," which were again called out in a blue hyperlink.  *Id.* at ¶¶ 28, 30, Exhs. M, N.

16                  3.   Plaintiff Piceno

17          Plaintiff Anthony Piceno alleges that "[o]n or about January 14, 2020, [he] purchased tickets

18  to the Barbara Mason concert and dinner to take place in Commerce, California … on March 23,

19  2020."  Complt., ¶ 38.  Eventbrite's records do not reveal any purchase of tickets to that event by any

20  user named Anthony Piceno or associated with the email address provided by Plaintiffs' counsel.

21  Duhring Decl., ¶¶ 33-34.  Eventbrite's records show that the only account associated with the email

22

23  _____

24  [2]      On August 12, 2020, defense counsel asked Plaintiffs' counsel to provide "all email addresses
    associated with all Eventbrite accounts used by Ms. Snow, Mr. Piceno, and Ms. Conner[.]"
25  Declaration of Doug Tilley in Support of Eventbrite's Motion ("Tilley Decl."), ¶ 2.  That same day,
    Plaintiffs' counsel provided one email address for each Plaintiff and, at defense counsel's request,
26  confirmed on August 18 that they were unaware of any additional email address used by any Plaintiff
    in connection with Eventbrite.  *Id.* at ¶¶ 2-4.  To protect Plaintiffs' privacy, Eventbrite does not
27  include those email addresses in this public filing but reserves the right to subsequently introduce
    such email addresses as may be necessary or appropriate.
28

1    address provided by counsel was created on April 16, 2020—over three months after the purchase

2    alleged in the Complaint.  *Id*. at ¶ 34.

3                    4.    Plaintiff Conner

4          Plaintiff Linda Conner alleges that "[o]n or about December 19, 2019, [she] purchased tickets

5    to the Tanya Tucker concert to take place in Sacramento, California … on June 5, 2020."  Complt.,

6    ¶ 41.  Eventbrite's records confirm that a user with the email address provided by Plaintiffs' counsel

7    created an Eventbrite account on August 13, 2019 and, as alleged in the Complaint, purchased tickets

8    to a Tanya Tucker concert on December 19, 2019.  Duhring Decl., ¶¶ 36-37.

9                    5.    Plaintiffs' Claims

10         Each Plaintiff claims that the event to which she or he purchased tickets was postponed or

11   rescheduled due to the global COVID-19 pandemic, and that each requested a refund from Eventbrite

12   but was refused.  *See* Complt., ¶¶ 35-43.[3]

13         Plaintiffs acknowledge, as they must, that Eventbrite repeatedly discloses that event

14   organizers—***not*** Eventbrite—are solely responsible for developing, implementing, and administering

15   customer refund policies.  *See* Complt. at ¶¶ 23-26.  Plaintiffs also recite that Eventbrite's

16   longstanding disclosures explain that organizers may elect to provide a "make good" experience,

17   such as a credit or tickets to a future event, in lieu of a cash refund.  *Id*. at ¶¶ 26, 30, 32.  Plaintiffs

18   admit that Eventbrite reiterated these established policies to consumers in the specific context of the

19   COVID-19 pandemic.  *Id*. at ¶¶ 30-31 (Eventbrite reminded consumers that, among other things,

20   (a) "[i]f an event is cancelled by the organizer, your entire purchase—the ticket price and any

21   Eventbrite fees, should be refunded to you by the organizer[,]" and (b) in the event of a

22   postponement, "we suggest connecting with the organizer of this event directly to address your

23   questions about rescheduled dates, possible refunds, or event details.").  Plaintiffs concede that

24   Eventbrite even committed to directly refund qualifying purchases in the event consumers requested

25   refunds or other relief from organizers but were unable to receive such relief.  *Id*.  To avail

26   themselves of Eventbrite's policy regarding accommodations for COVID-impacted events,

27

28   [3]      For clarity, Eventbrite disputes these allegations.

Eventbrite explained that affected ticketbuyers must, "[a]s a first step, check with your event creator to ask for a refund." *Id*. at ¶ 31.  These clear instructions notwithstanding, Plaintiffs do not claim to have sought relief from organizers before demanding refunds from Eventbrite.  *See id*. at ¶¶ 34-43.

Plaintiffs nevertheless assert that Eventbrite has violated various consumer protection statutes, breached its agreements with ticket purchasers, and made fraudulent misrepresentations on its website.  *See generally* Complt. at ¶¶ 52-110.  Plaintiffs purport to bring this action on behalf of a class of "[a]ll natural persons who between June 3, 2016 and the date of preliminary approval: (i) purchased tickets from Eventbrite to any event which was cancelled, postponed, or rescheduled and (ii) were not provided the opportunity to obtain a full refund for the event." *Id*. at ¶ 44.

**B.  Plaintiffs Repeatedly Agreed To The Arbitration And Class Waiver Provisions In The TOS**

1.  Eventbrite's Disclosures When Users Create Accounts And/Or Order Tickets

In order to place orders to paid or free events via Eventbrite, users are required to first create an Eventbrite account.  Duhring Decl., ¶ 5.  It is not possible to place an order to any event without first creating an account.  *Id*.  As stated above, Eventbrite offers multiple channels through which users may create an account and order event credentials:  Desktop Web, Mobile Web, and Smartphone App.  *Id*. at ¶ 4.  Through each channel, users may create accounts either (a) via a standalone Sign-Up page, or (b) as part of a check-out to obtain tickets or other credentials to a particular event.  *Id*. at ¶ 6.  As shown below, irrespective of the channel(s) they use to create accounts and/or purchase tickets, *all* users have at all relevant times been conspicuously advised— including through use of blue, typically underlined hyperlinks in close proximity to the "call-to-action" buttons—that by creating the account and/or purchasing tickets, they are agreeing to Eventbrite's TOS.

a.  Desktop Web

i.  Eventbrite's Dedicated "Sign Up" Page

Since at least as early as January 1, 2016, users seeking to create an account on Eventbrite's Desktop Web "Sign Up" page were specifically told that "[b]y signing up" or otherwise continuing, "I agree to Eventbrite's terms of service …" or substantially identical language.  Duhring Decl.,

¶¶ 10-11, Exhs. A, B (exemplary screenshots from Eventbrite.com, including via the Internet Archive's Wayback Machine[4], excerpts of which appear below):

**2016**                                **Present**



      ii.  Purchasing Tickets (And Creating Accounts Via Checkout Flow)

Where a user has not already set up an account via a standalone "Sign Up" page or a prior order, Eventbrite allows him or her to create an account as part of ordering tickets to a particular event.  Duhring Decl., ¶¶ 16-21.  In such case, the user is asked to enter their first and last names and contact information, in addition to payment information (for paid events).  *See id.* at Exhs. G, H (exemplary screenshots)  If the user already has an Eventbrite account and is logged in, need not re-enter contact information, and the remainder of the page is the same.  *See id.* at ¶ 17.  In any case,

---

[4]    The Court may properly consider all proffered screenshots obtained from the Wayback Machine, either as authenticated via Declaration by a competent witness or pursuant to Eventbrite's request for judicial notice.  *See, e.g.*, *United States ex rel. Hong v. Newport Sensors, Inc.*, No. 13-cv-1164, 2016 WL 8929246, at *3 (C.D. Cal. May 19, 2016) ("[D]istrict courts in this circuit have routinely taken judicial notice of content from the Internet Archive's Wayback Machine[.]"), *aff'd sub nom. United States ex rel. Juan Hong v. Newport Sensors, Inc*, 713 Fed.Appx. 724 (9th Cir. 2018), *and aff'd sub nom. United States ex rel. Hong v. Newport Sensors, Inc*, 728 Fed.Appx. 660 (9th Cir. 2018); *accord, e.g.*, *In re Facebook, Inc. Sec. Litig.*, 405 F. Supp. 3d 809, 829 (N.D. Cal. 2019) (taking judicial notice of "exhibit [] obtained using the Internet Archive's Wayback Machine."); *Erickson v. Nebraska Mach. Co.*, No. 15-cv-1147, 2015 WL 4089849, at *1 (N.D. Cal. July 6, 2015) (collecting cases and confirming that "[c]ourts have taken judicial notice of the contents of web pages available through the Wayback Machine as facts that can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned[.]").

1  Eventbrite's checkout page states users are advised that by proceeding, each confirms that "I accept

2  the terms of service …"  *Id*. at ¶¶ 18, 20-21, Exhs. G, H.

| **2016** | **Present** |
|---|---|
| I accept the terms of service and have read the privacy policy. I agree that Eventbrite may share my information with the event organizer.<br><br>**Pay Now** | By clicking "Place Order", I accept the Terms of Service and have read the Privacy Policy. I agree that Eventbrite may share my information with the event organizer.<br><br>Powered by eventbrite<br><br>Place Order |

8         b.   Mobile Web

9         As via Desktop Web, Eventbrite has consistently and conspicuously advised users via its

10  Mobile Web channel that by creating an account and/or ordering event credentials, such users

11  affirmatively "accept the Eventbrite Terms of Service[,]" with the TOS appearing in blue,

12  hyperlinked, and typically underlined font directly above the call-to-action button a user must click in

13  order to complete her or her purchase.  Duhring Decl., ¶¶ 12-13, Exhs. C, D.  From Eventbrite's

14  dedicated Mobile Web "Sign Up" Page:

| **2016** | **Present** |
|---|---|
| Sign up<br>Already have an account? Log in.<br><br>Email<br><br>Password<br><br>SIGN UP<br><br>By signing up, I agree to Eventbrite's terms of service, privacy policy, and cookie policy. |  |

26         Also as with Desktop Web, since at least as early as 2016, Eventbrite has advised users

27  seeking to order event credentials via Mobile Web (including those who need to first create an

28  account as well as those with a pre-existing account) that by completing such transaction, the user

expressly "accept[s] the Terms of Service[,]" with the TOS appearing in blue, hyperlinked, and

typically underlined font directly above the call-to-action button a user must click in order to

complete her or her purchase.  Duhring Decl., ¶¶ 18-19, 22-23, Exhs. I, J (exemplary screenshots).

|     **2016**     |     **Present**     |



c.   Smartphone App

Like the Company's Web channels, Eventbrite's Smartphone App has at all relevant times

conspicuously advised users that they assent to the TOS each time they create an account and/or

order event credentials.  Duhring Decl., ¶¶ 14-15, Exhs. E, F.  Eventbrite's Smartphone App discloses

this fact on its dedicated "Sign Up" Page, specifically notifying users that "[b]y continuing, I accept

the Eventbrite terms of service[,]" with the TOS appearing in hyperlinked blue font adjacent to the

call-to-action buttons a user must click in order to continue past this screen:

_____

[5]   Backwards-compatibility and other technical issues prevent Eventbrite's engineers from
running pre-2019 versions of Eventbrite's Smartphone App in the Company's current operating
environment, so as to generate screenshots from such versions.  Eventbrite has nevertheless

Eventbrite's Smartphone App similarly discloses to users (both those with pre-existing accounts as well as those who create an account as part of a particular order) that placing an order via the App constitutes their agreement to Eventbrite's TOS.  Specifically, Eventbrite notifies users that by completing their order, such user "accept[s] the Terms of Service[,]" which are highlighted in blue, hyperlinked, and typically underlined font.  Duhring Decl., ¶¶ 18-19, 24-25, Exhs. K, L.

| **2016** | **Present** |
|---|---|
|  |  |

2.   Plaintiffs' Agreements to Eventbrite's TOS

a.   Plaintiff Snow

Plaintiff Snow signed up for an Eventbrite account via Mobile Web on January 14, 2018, when she ordered tickets to an event via Eventbrite.  Duhring Decl., ¶ 27.  At that time, Plaintiff Snow was specifically advised that by proceeding, she confirmed that "I accept the terms of service…"  Duhring Decl., Exh. I.  Eventbrite directed her to the TOS via a conspicuous blue hyperlink located directly above the "Pay Now" button Plaintiff Snow clicked.



*Id.*  Eventbrite then sent Plaintiff Snow an order confirmation email, in which the Company reminded her that "[t]his order is subject to Eventbrite Terms of Service," which were again called out in a blue hyperlink.  *Id.* at Exh. M.

---

confirmed, including by review of code and interviewing knowledgeable personnel, that since at least as early as 2016, all versions of the Smartphone App Sign-Up have contained disclosures substantially identical to those shown here (including hyperlinks to the TOS in blue font) notifying users that they assented to the TOS by creating an Eventbrite account.  *See* Duhring Decl., ¶ 15.

Between that first order and the February 11, 2020 purchase referenced in the Complaint (*see* Complt., ¶ 34), Plaintiff Show ordered credentials to 13 additional events, all of which were placed via Mobile Web.  *See* Duhring Decl., ¶ 29.  Each time, Eventbrite notified Plaintiff Snow that by submitting her order, whether "[b]y clicking 'Place Order'" or otherwise, she was affirming that "I accept the <u>Terms of Service</u>…"



*Id.* at Exhs. I, J.   Plaintiff Snow proceeded to finalize and submit each of those 13 orders.  She also received a confirmation email after each of those 13 orders reaffirming that, like all orders, they were "subject to Eventbrite <u>Terms of Service</u>[.]"  *Id.* at Exh. N.  Thus, prior to placing the order at issue in this dispute, Plaintiff Snow was told on at least ***28 separate occasions*** that every order placed through Eventbrite was (and is) subject to the TOS.

After having repeatedly received those disclosures, Plaintiff Snow placed the February 11, 2020 order via Desktop Web.  Duhring Decl., ¶ 31.  Prior to submitting that order, Plaintiff Snow was shown the below disclosure notifying her that "[b]y clicking 'Place Order'," she was reaffirming that "I accept the <u>Terms of Service</u> …"  *Id.* at Exh. H.

By clicking "Place Order", I accept the <u>Terms of Service</u> and have read the <u>Privacy Policy</u>. I agree that Eventbrite may <u>share my information</u> with the event organizer.

Powered by **eventbrite**

Place Order

Plaintiff Snow proceeded to click "Place Order."  Indeed, she could not have completed her order without doing so.  *See* Duhring Decl., ¶ 17.

b.   Plaintiff Piceno

Crediting for instant purposes Plaintiff Piceno's allegations that he purchased tickets via Eventbrite "[o]n or around January 14, 2020" (Eventbrite's records reveal no such purchase), Plaintiff Piceno saw at least one of the below disclosures explaining that "[b]y clicking 'Place Order', I accept the Terms of Service" to which Eventbrite pointed him via a conspicuous blue, likely underlined hyperlink located directly above the "Place Order" or "Pay Now" button he was required to click:

**Desktop Web**                                                    **Mobile Web**



**Smartphone App**



Duhring Decl., Exhs. H, J, K.  If Plaintiff Piceno created an account via a standalone Sign Up page, he would *also* have seen at least one additional disclosure confirming that "[b]y continuing" or "[b]y clicking [identified buttons], I agree to Eventbrite's Terms of Service…"  Duhring Decl., Exhs. B, D, F.  That additional notice would have highlighted the binding TOS in a blue, likely underlined hyperlink adjacent to the call-to-action buttons Plaintiff Piceno clicked in order to create an account. *Id*.

Whether he saw all or only one of these disclosures, there is no dispute that Eventbrite conspicuously advised Plaintiff Piceno of the legal effect of his actions.  Indeed, it would not possible for him to create his account or place the order referenced in the Complaint without seeing and

1  assenting to be bound by Eventbrite's Terms of Service and other policies.  *See* Duhring Decl., ¶¶ 5,

2  7, 16-17.

3        c.  Plaintiff Conner

4        Plaintiff Conner signed up for an Eventbrite account on August 13, 2019 via the Smartphone

5  App.  Duhring Decl., ¶ 36.  She was shown the below disclosure notifying her that "[b]y continuing,"

6  she was affirming that "I accept the Eventbrite terms of service …"  *Id*. at Exh. F.



14        On December 19, 2019, Plaintiff Conner placed via Mobile Web the order over which she

15  brings suit.  Duhring Decl., ¶ 37.  As shown below, she was told that "[b]y clicking 'Place Order',"

16  Plaintiff Conner was confirming that "I accept the Terms of Service…"  *Id*. at Exh. J.



23        Plaintiff Conner clicked "Place Order," thus binding herself again to Eventbrite's TOS.  *See*

24  Duhring Decl., ¶¶ 17, 37.

25        3.  <u>The Relevant TOS Versions</u>

26        Since well prior to the putative Class Period, Eventbrite's TOS have contained provisions by

27  which users expressly agree (a) to submit to mandatory arbitration all claims arising out of or relating

28

singer cashman LLP

to Eventbrite's services or users' relationship with the Company, and (b) that they may pursue such claims *only* on an individual basis rather than as part of a class or other representative action.  *See* Declaration of Antwonne Dacus in Support of Eventbrite's Motion ("Dacus Decl."), Exhs. A-I (all TOS versions in effect since January 1, 2016).

At the time of each of the orders referenced in the Complaint, *i.e.*, December 2019 through February 2020, Eventbrite's TOS contained several provisions relevant to the instant Motion, such as:

- The second paragraph of the TOS admonishes users to "[p]lease read these Terms of Service (or Terms, as further described in Section 1.4) carefully as they contain important information about your legal rights, remedies and obligations. By accessing or using Eventbrite's Services, you agree to comply with and be bound by these Terms, as applicable to you."  Dacus Decl., Exh. I at pp. 1-2.

- Just beneath that admonition, in a box of contrasting color designed to draw the reader's attention, the TOS provides "**NOTE**: IMPORTANT NOTICE: Section 9 of these Terms of Service contains a binding arbitration provision and class action waiver that may affect your legal rights. Please read Section 9 very carefully." *Id*. at p. 2 (emphasis and caps in original).

- The referenced Section 9 opens with the following all-caps text:  "IMPORTANT: BINDING ARBITRATION AND CLASS ACTION WAIVER PROVISIONS." *Id*. at § 9.  That section provides:

    PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS. **ANY DISPUTE OR CLAIM UNDER THESE TERMS OR WITH RESPECT TO THE SERVICES WILL BE SETTLED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT (TO THE EXTENT THE CLAIM QUALIFIES) AND WILL TAKE PLACE ON AN INDIVIDUAL BASIS**; YOU AGREE THAT CLASS, CONSOLIDATED OR REPRESENTATIVE ARBITRATIONS AND CIVIL ACTIONS ARE NOT PERMITTED AND ANY RIGHTS TO BRING SUCH ACTIONS ARE WAIVED BY EACH PARTY.

    **The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial**…  They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than court…

    In the unlikely event that our customer support team is unable to resolve your concerns, **the parties (you and we) each hereby agree to resolve any and all disputes or claims under these Terms, with respect to the Services, or related to our relationship through binding arbitration or in small claims court (to the extent the claim qualifies) instead of in courts of general jurisdiction, and only on an individual basis**. In no event may either we or you seek to resolve a dispute with the other as part of any purported class, consolidated or representative proceeding….

These Terms evidence a transaction in interstate commerce and the interpretation and enforcement of this Section 9 is governed by the Federal Arbitration Act…

**Only the arbitrator appointed pursuant to this Section, and not any federal, state or local court will have the authority to resolve any dispute or claim relating to this Section including, without limitation, regarding the scope, enforceability and arbitrability of these Terms**….

This agreement to arbitrate is intended to be broadly interpreted as to legal disputes between you and us. It includes, but is not limited to: (i) all claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all claims that arose before this or any prior agreement (including, but not limited to, claims relating to advertising); and (iii) all claims that may arise after termination of these Terms and/or your use of the Services…

The arbitration will be governed by the Commercial Arbitration Rules, or, if the actions giving rise to the dispute or claim relate to your personal or household use of the Services (rather than business use), the Consumer Arbitration Rules (in each case, the "AAA Rules") of the American Arbitration Association ("AAA"), as modified by this Section 9, and will be administered by the AAA and settled by a single arbitrator.

Dacus Decl., Exh. I at §§ 9, 9(b), 9(c), 9(g) (caps in original; emphases added).  In a subheading entitled "No Class Actions[,]" Section 9 continues:

**YOU AND EVENTBRITE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, CONSOLIDATED OR REPRESENTATIVE PROCEEDING.** THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, MAY NOT PRESIDE OVER ANY FORM OF CLASS, CONSOLIDATED OR REPRESENTATIVE PROCEEDING AND MAY ONLY PROVIDE RELIEF IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF WARRANTED BY THAT PARTY'S INDIVIDUAL CLAIM.

*Id*. at § 9(e) (caps in original, emphasis added).

## III. LEGAL STANDARDS APPLICABLE TO MOTIONS TO COMPEL ARBITRATION

Parties may agree to refer any disputes between them to a specific forum, including arbitration.  Where one party initiates an action elsewhere, its counterpart may enforce the parties' contract through a motion to compel pursuant to the Federal Arbitration Act ("FAA").  9 U.S.C. § 3.

The Court looks to ordinary contract principles—offer, acceptance, and consideration—in determining whether parties have agreed to refer claims to arbitration or another other forum.  *See, e.g.*, *Dohrmann v. Intuit, Inc.*, No. 20-15466, --- Fed.Appx. ---, 2020 WL 4601254, at *1 (9th Cir.

singer
cashman LLP

Aug. 11, 2020) (reversing order from this District and compelling arbitration pursuant to TOS in light of disclosures substantially identical to those at issue here) (citing *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014)).  Under California law,[6] the "touchstone of contract" formation is "mutual manifestation of asset, whether by written or spoken work or by conduct."  *Dohrman*, --- Fed.Appx. ---, 2020 WL 4601254, at *1 (quotation omitted).  "Mutual assent does not require that the offeree have actual notice of the terms of an arbitration agreement.  Instead, an offeree is bound by an arbitration clause if a reasonably prudent Internet consumer would be put on inquiry notice of the agreement's existence and contents."  *Id*. (quotations omitted).  A user "cannot avoid the terms of [the] contract on the ground that he ... failed to read it before signing, especially when he had a legitimate opportunity to review it[.]"  *Lee v. Ticketmaster L.L.C.*, No. 19-15673, --- Fed.Appx. ---, 2020 WL 3124256, at *2 (9th Cir. June 12, 2020) (affirming order from this District and compelling arbitration based on TOS) (quotations omitted; first alteration in original).  Where, as here, an agreement to arbitrate exists and its language encompasses the dispute in issue, the matter must be pursued only in the specified forum "in all but the most exceptional cases."  *Atl. Marine Const. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013) (addressing forum selection clauses, of which arbitration provisions are a specialized form).

Arbitration agreements are subject to even greater deference where, as here, they invoke the FAA.  *See* 9 U.S.C. § 2 (directing that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.").  The FAA reflects Congress's intent to enforce agreements to arbitrate and affirms the "liberal policy favoring arbitration[.]"  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011).

In ruling on a motion to compel arbitration, the Court's role is "limited to determining (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue."  *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130

---

[6]      The TOS provide that California law governs the relationship between the parties.  Dacus Decl., Exh. I at § 23; *accord* Dacus Decl., Exh. A at § 6.9, Exh. B at § 6.9, Exh. C at § 6.9, Exh. D at 6.9, Exh. E at § 24, Exh. F at § 23, Exh. G at § 23, Exh. H at § 23.  California courts routinely bind users to website Terms.  *See, e.g.*, *Kinney v. Youtube, LLC*, No. G054863, 2018 WL 5961898, at *6 (Cal. Ct. App. Nov. 14, 2018) (collecting cases).

singer
cashman LLP

(9th Cir. 2000).  If the answer to both is yes, the matter must be dismissed or stayed pending arbitration.  *Id.*; *see also Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 719 (9th Cir. 1999) ("The standard for demonstrating arbitrability is not high," and agreements to arbitrate "are to be rigorously enforced."); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (directing that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.").

The Court's inquiry is even more limited where the parties have delegated questions of arbitrability to the arbitrator, whether explicitly or by invoking AAA Rules.  *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015).  In that case, the Court "possesses no power to decide the arbitrability issue" and must refer the matter to AAA in all instances, "even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless."  *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019); *see also, e.g.*, *DeVries v. Experian Info. Sols., Inc.*, No. 16-cv-2953-WHO, 2017 WL 733096, at *9 (N.D. Cal. Feb. 24, 2017) (holding that "issues of scope and enforceability[,]" including "whether the arbitration agreement violates public policy[,]" must be resolved by arbitrator in light of contract stating that "arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement…"), *reconsid. denied at* 2017 WL 2377777 (N.D. Cal. June 1, 2017).

## IV. ARGUMENT

### A. Plaintiffs' Claims Are Subject To Mandatory Individual Arbitration

#### 1. Eventbrite's TOS Constitute A Valid, Enforceable Agreement

Each Plaintiff expressly assented to Eventbrite's TOS each time she or he created an account or placed an order for event credentials via Eventbrite.  Throughout the entire putative Class Period and via all channels, Eventbrite conspicuously advised Plaintiffs (and all other users) that creating an account or ordering tickets constituted their affirmative assent to the TOS.  Eventbrite's standalone Sign Up pages notified Plaintiffs that "[b]y signing up[,]" "[b]y continuing[,]" or "[b]y clicking [identified buttons], I agree to Eventbrite's Terms of Service…"  Duhring Decl., Exhs. A-F.

Eventbrite's order submission pages similarly advised Plaintiffs that by submitting their order, they reaffirmed that "I accept the Terms of Service…"  Duhring Decl., Exhs. G-L.  In all such instances, Eventbrite directed Plaintiffs to the TOS via blue, typically underlined, and always hyperlinked font either directly above or below the call-to-action buttons each Plaintiff was required to click in order to complete their desired action.  Plaintiffs proceeded to click those buttons; they could not have created accounts or submitted the orders at issue without doing so.  *See* Duhring Decl., ¶¶ 16-25.

The Ninth Circuit, this Court, and others routinely hold that users bind themselves to website Terms by doing ***precisely*** what Plaintiffs did.  In fact, earlier this month, the Ninth Circuit compelled arbitration (reversing an order from this District) after finding that a user received fair notice of and assented to website TOS when he "click[ed] a 'Sign In' button, directly under which the following language appeared: 'By clicking Sign In, you agree to the Turbo Terms of Use, TurboTax Terms of Use, and have read and acknowledged our Privacy Statement.'"  *Dohrmann*, --- Fed.Appx. ---, 2020 WL 4601254, at *2.  Similarly, in June of this year, the Ninth Circuit affirmed an order from this District compelling arbitration, finding that a user "validly assented to Ticketmaster's Terms of Use, including the arbitration provision, each time he clicked the 'Sign In' button when signing into his Ticketmaster account, where three lines below the button, the website displayed the phrase, 'By continuing past this page, you agree to our Terms of Use,' as well as each time he clicked the 'Place Order' button when placing an order for tickets, where directly above the button, the website displayed the phrase, 'By clicking 'Place Order,' you agree to our Terms of Use,' where in both contexts, 'Terms of Use' was displayed in blue font and contained a hyperlink to Ticketmaster's Terms."  *Lee v. Ticketmaster L.L.C.*, --- Fed.Appx. ---, 2020 WL 3124256, at *2.

Eventbrite's above disclosures to Plaintiffs in this case are substantially ***identical*** to those that the Ninth Circuit held sufficient to provide the requisite notice and, therefore, to require arbitration:

| **From *Dohrman*[7]** | **From *Lee*[8]** |
|---|---|



Numerous other cases from this District and throughout the Ninth Circuit compel arbitration pursuant to TOS provisions in light of disclosures virtually identical to those here.  *See, e.g.*, *Maynez v. Walmart, Inc.*, No. 20-cv-23, 2020 WL 4882414, at *3 (C.D. Cal. Aug. 14, 2020) ("At the final stage of the Check Out Process, the customer is presented with a page that contains order details and the following sentence: 'By clicking Place Order, you agree to Walmart's Updated Privacy Policy and Terms of Use.'") (underline in original); *Peter v. DoorDash, Inc.*, No. 19-cv-06098, --- F.Supp.3d ---, 2020 WL 1967568, at *5 (N.D. Cal. Apr. 23, 2020) ("To complete the [sign-up] process and place an order, [users] clicked a 'Sign Up' button[,]" directly beneath which "was a statement reading: 'By tapping Sign Up, Continue with Facebook, or Continue with Google, you agree to our Terms and Conditions and Privacy Statement.'"); *Dickey v. Ticketmaster LLC*, No. 18-cv-9052, 2019 WL 9096443, at *7 (C.D. Cal. Mar. 12, 2019) ("[W]ith regard to the Sign Up Screen, the Disclosure above it states: '[b]y submitting, you agree to our Terms and Purchase Policy, and

---

[7]   While not set forth in the Ninth Circuit's reversal opinion, Judge Breyer's Order denying Intuit's motion to compel arbitration included screenshots of Intuit's TOS disclosures.  *Arena v. Intuit Inc.*, 444 F. Supp. 3d 1086, 1089 (N.D. Cal. 2020).

[8]   Although not included in either Judge Chhabria's Order compelling arbitration or the Ninth Circuit's opinion affirming the same, screenshots of the relevant disclosures appeared in Defendants' motion to compel.  *See* N.D. Cal. Case No. 3:18-cv-05987-VC, Dkt. No. 25 at 5.

1    understand your information will be used as described in our Privacy Policy.'"); *Rodriguez v.*

2    *Experian Servs. Corp.*, No. 15-cv-3553, 2015 WL 12656919, at *2 (C.D. Cal. Oct. 5, 2015)

3    ("[Defendants'] website contained a hyperlink to the Terms of Use at the bottom of every page and

4    included an express disclosure and acknowledgment, which stated, 'By clicking the button above ...

5    you agree to our Terms of Use.' This disclosure and acknowledgment is exactly the type of notice the

6    Ninth Circuit in *Nguyen* required and approved of when it said that more than a conspicuous

7    hyperlink was required."); *Graf v. Match.com, LLC*, No. 15-cv-3911, 2015 WL 4263957, at *4 (C.D.

8    Cal. July 10, 2015) ("[Users] clicked on a 'Continue' where it was explained that by clicking on that

9    button, the user was affirming that they would be bound by the Terms of Use, which were always

10   hyperlinked and available for review.").[9]

11       The myriad cases compelling arbitration (or reversing orders refusing to do so) leave no doubt

12   that Eventbrite's repeated disclosures to each Plaintiff put him or her on at least inquiry notice—and

13   perhaps even actual notice—sufficient to bind Plaintiffs to the arbitration and class waiver provisions

14   set forth in the TOS.  There is no reason in law or logic for this Court to depart from these authorities.

15           2.    The Parties Clearly And Unmistakably Delegated Questions of Arbitrability To
16                 The Arbitrator

17       Because Plaintiffs agreed to the TOS, the Court must send this case to arbitration before

18   AAA.  This is true even if Plaintiffs contend that their claims do not fall within the scope of the

19   arbitration provisions, or that the clause is unenforceable for any reason, because the arbitration

20   clause "clearly and unmistakably" refers such questions of arbitrability to the arbitrator rather than

21   the Court.  *See Schein*, 139 S. Ct. at 529, 531.

22       Indeed, the parties unambiguously agreed in several instances that the arbitrator, rather than

23   the Court, shall decide all matters relating to the existence, scope, and enforceability of their

24   agreement to arbitrate.

25   [9]    *See also, e.g.*, *Nevarez v. Forty Niners Football Co., LLC*, No. 16-cv-7013, 2017 WL
     3492110, at *7-*9 (N.D. Cal. Aug. 15, 2017); *DeVries*, 2017 WL 733096, at *6; *Moule v. UPS*, No.
26   16-cv-102, 2016 WL 3648961, at *5 (E.D. Cal. July 7, 2016); *Tompkins v. 23andMe, Inc.*, No. 13-cv-
     5682, 2014 WL 2903752, at *8 (N.D. Cal. June 25, 2014), *aff'd at* No. 14-16405, 2016 WL 6072192
27   (9th Cir. Oct. 13, 2016); *Fteja v. Facebook, Inc.*, 841 F.Supp.2d 829, 838-40 (S.D.N.Y. 2012); *Swift
     v. Zynga Game Network, Inc.*, 805 F. Supp. 2d 904, 911 (N.D. Cal. 2011).

singer
cashman LLP

<u>First</u>, the parties explicitly agreed that "***[o]nly the arbitrator*** appointed pursuant to this Section, ***and not any federal, state or local court***[,] will have the authority to resolve any dispute or claim relating to this Section, including without limitation, regarding the scope, enforceability and arbitrability of these Terms."  Dacus Decl., Exh. I at § 9(b) (emphases added).  It is well-settled that such language constitutes a "clear and unmistakable" agreement to arbitrate arbitrability.  *See, e.g.*, *Mohamed v. Uber Techs., Inc.*, 848 F.3d 1201, 1208-09 (9th Cir. 2016) (parties "clearly and unmistakably delegated the question or arbitrability to the arbitrator" via agreement calling for arbitration of "disputes arising out of or relating to interpretation or application of this Arbitration Provision, including the enforceability, revocability or validity of the Arbitration Provision or any portion of the Arbitration Provision."); *Tuminello v. Richards*, 504 Fed.Appx. 557, 558 (9th Cir. 2013) (clause providing that arbitrator "shall decide 'any and all controversies ... concerning … the construction, performance, or breach of this or any other Agreement' ... provides clear and unmistakable evidence that the parties intended the question of arbitrability to be decided in arbitration."); *Momot v. Mastro*, 652 F.3d 982, 988 (9th Cir. 2011) (parties "clearly and unmistakably agreed to arbitrate the question of arbitrability" via provision delegating to arbitrator issues concerning "the validity or application of any of the provisions of this Section 4 [governing arbitration.]"); *DeVries*, 2017 WL 733096, at *9 (parties delegated "issues of scope and enforceability[,]" including "whether the arbitration agreement violates public policy[,]" by agreeing that "arbitrator shall have exclusive authority to resolve any such dispute relating to the scope and enforceability of this arbitration provision or any other term of this Agreement, including, but not limited to any claim that all or any part of this arbitration provision or Agreement is void or voidable."), *reconsid. denied at* 2017 WL 2377777 (N.D. Cal. June 1, 2017).[10]

---

[10]     *See also, e.g.*, *Dickey*, 2019 WL 9096443, at *8 (agreement directed that "[t]he arbitrator, and not any federal, state or local court or agency, shall have exclusive authority to the extent permitted by law to resolve all disputes arising out of or relating to the interpretation, applicability, enforceability or formation of this Agreement, including, but not limited to any claim that all or part of this Agreement is void or voidable."); *Chung v. Nemer*, No. 12-cv-4608, 2012 WL 5289414, at *1 (N.D. Cal. Oct. 25, 2012) (agreement provided that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement[.]").

<u>Second</u>, the parties further agreed that any arbitration between them would proceed under AAA's Commercial or Consumer Rules, as applicable. Dacus Decl., Exh I at § 9(g). Those rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim[.]" AAA Comm. R-7; AAA Cons. R-14. There is "consensus" in this Circuit and others that invocation of AAA Rules "clearly and unmistakably" requires an arbitrator, rather than a court, to decide arbitrability. *Brennan*, 796 F.3d at 1130; *see also, e.g.*, *Bloom v. ACT, Inc.*, No. 18-cv-6749, 2018 WL 6163128, at *3-*4 (C.D. Cal. Oct. 24, 2018) (collecting cases and concluding that the "the overwhelming weight of authority" finds arbitrability delegation via incorporation of AAA Rules in consumer cases, "regardless of the contracting parties' sophistication.").

These provisions make "clear and unmistakable" the parties' desire to refer to the arbitrator all question of arbitrability. "[T]he Court therefore may not override the parties' choice to delegate questions of arbitrability to the arbitrator." *Dickey*, 2019 WL 9096443, at *8.

### 3.   The TOS's Arbitration Provision Covers This Dispute

Because Eventbrite's TOS is a valid agreement that clearly and unmistakably delegates questions of arbitrability to the arbitrator, the Court's analysis must end here. But even if the law permitted the Court to rule on arbitrability or if a "wholly groundless" exception survived *Schein*—neither is true—there is no debate that the parties' arbitration agreement covers this dispute. The parties agreed via the TOS "to resolve any and all disputes or claims under these terms, with respect to the Services, or related to our relationship through binding arbitration or in small claims court [] instead of in courts of general jurisdiction, and only on an individual basis." Dacus Decl., Exh. I at § 9(b).[11] Each of Plaintiffs' claims arises directly out of their use of the Services. Each Plaintiff claims that she or he ordered tickets to events via Eventbrite then was wrongfully denied a refund, and seeks relief exclusively on that basis. *See generally* Complt. Absent Plaintiffs' use of

---

[11]     Prior versions of the TOS contain substantially identical language. *See* Dacus Decl., Exh. A at § 6.10(b), Exh. B at § 6.10(b), Exh. C at § 6.10(b), Exh. D at § 6.10(b), Exh. E at § 9(b), Exh. F at § 9(b), Exh. G at § 9(b), Exh. H at § 9(b).

singer cashman LLP

Eventbrite's services (and accession to the TOS), no claims would have arisen. And, even if there were some ambiguity regarding the scope of the arbitration and class waiver provisions, the law ***still*** requires that "any doubt concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24-25.

### B. This Action Should Be Dismissed In Favor Of Arbitration

Although the Court may stay an action pending arbitration, it is authorized to "dismiss it outright when, as here, [] all of the claims raised in the action are subject to arbitration." *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1073-74 (9th Cir. 2014); *e.g.*, *Peterson v. Lyft*, No. 16-cv-7343, 2018 WL 6047085, at *6 (N.D. Cal. Nov. 19, 2018) (dismissing case); *Mims v. Davison Design & Dev., Inc.*, No. 16-cv-92, 2016 WL 10771297, at *4 (C.D. Cal. Apr. 14, 2016) (same); *Legnaioli v. Chrysler Capital, LLC*, No. 15-cv-744, 2015 WL 12765468, at *4 (C.D. Cal. June 9, 2015) (same).  The Court should dismiss this case because all of Plaintiffs' claims are subject to mandatory individual arbitration..

## V.  CONCLUSION

For the foregoing reasons, the case must be dismissed, and Plaintiffs directed to pursue their claims in individual arbitration.  Eventbrite's Motion should be granted in full.


Date:  August 31, 2020                    Respectfully submitted,

SINGER CASHMAN LLP

By: _____
     Adam S. Cashman
     Doug Tilley
     *Attorneys for Defendant Eventbrite, Inc.*