UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERRI SNOW, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>EVENTBRITE, INC.,<br><br>   Defendant. | Case No. 3:20-cv-03698-WHO<br><br>**ORDER DENYING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 18 |

  The plaintiffs in this putative class action allege that they purchased tickets to events through defendant Eventbrite, Inc. ("Eventbrite"). They claim that, after those events were cancelled or postponed due to the COVID-19 pandemic, Eventbrite unlawfully withheld refunds for them. Before me is Eventbrite's motion to compel arbitration. Eventbrite argues that when the plaintiffs signed up for Eventbrite accounts and made purchases, they assented to Eventbrite's Terms of Service ("TOS"), which require arbitration of their claims. But Eventbrite has not met its burden of showing that the plaintiffs assented to the TOS in the first place. I VACATE the hearing set for October 21, 2020 and DENY the motion to compel arbitration.

## BACKGROUND

  Plaintiffs Sherri Snow, Anthony Piceno, and Linda Conner brought this putative class action against defendant Eventbrite in June 2020. Complaint ("Compl.") [Dkt. No. 1]. Eventbrite is an online platform on which buyers can purchase tickets to events from those events' organizers. *Id.* ¶ 21; Declaration of Courtney Duhring ("Duhring Decl.") [Dkt. No. 18-1] ¶¶ 2–4. The plaintiffs allege that each purchased tickets through Eventbrite to events that were later cancelled or postponed because of the global COVID-19 pandemic and resulting public health measures. *See* Compl. ¶¶ 34–35, 38–39, 41–42. The plaintiffs alleged various causes of action

against Eventbrite, including breach of contract, conversion, unjust enrichment, violation of California's Consumer Legal Remedies Act, violation of California false advertising law, fraud, and violation of California's Unfair Competition Law. *Id*. ¶¶ 52–110. These claims were generally premised on the theory that Eventbrite has unlawfully withheld refunds for the cancelled or postponed events and has sought to shift responsibility to event organizers. *See id*. ¶¶ 3–4. Eventbrite disputes these allegations. Eventbrite's Motion to Compel Arbitration ("Mot.") [Dkt. No. 18] 4 n.3.[1]

The parties agreed that, prior to responding to the Complaint, Eventbrite would be permitted to move to compel arbitration. *See* Dkt. No. 16. It has now done so, arguing that the plaintiffs agreed to its TOS, which, it contends, require arbitration and prohibit class actions for these allegations. *See generally* Mot. I describe both the TOS and the methods by which the plaintiffs allegedly agreed to them below. As a general matter, Eventbrite asserts that consenting to the TOS is required to create an Eventbrite account—without which a user cannot purchase Eventbrite tickets—and each time someone purchases tickets on Eventbrite. Duhring Decl. ¶¶ 4–6. It also represents that the confirmation emails sent after each ticket purchase include a reminder that the TOS apply. *See id.* ¶ 30. There are three ways that users can interact with Eventbrite's platform: using its desktop website, mobile website, and smartphone application. *Id.* ¶ 6. Because each of these methods has its own stand-alone sign-up page and purchasing process, there are six distinct TOS agreements a user can assent to at any given time. See *id.* ¶¶ 4–6.

Eventbrite attests in a sworn declaration (and the plaintiffs do not dispute) that, during the pertinent time period, the TOS contained the following relevant provisions. Throughout this opinion, I preserve the original emphasis, capitalization, and stylization of all TOS provisions, unless I indicate otherwise. At or near the beginning, the TOS said:

> Please read these Terms of Service (or Terms, as further described in Section 1.4) carefully

---

[1] A sworn declaration attached to Eventbrite's motion shows that accounts associated with Snow and Conner exist but that the only account associated with Piceno was created several months after his claimed purchase. Duhring Decl. ¶¶ 27, 32–34, 36. That Declaration also shows that the accounts associated with Snow and Conner purchased the tickets they claimed, while the Piceno account did not. *Id.* ¶¶ 31, 33, 37. For purposes of this motion, however, Eventbrite credits Piceno's allegations. *See* Mot. 11.

> as they contain important information about your legal rights, remedies and obligations. By accessing or using Eventbrite's Services, you agree to comply with and be bound by these Terms, as applicable to you.
>
> **NOTE:** IMPORTANT NOTICE: Section 9 of these Terms of Service contains a binding arbitration provision and class action waiver that may affect your legal rights. Please read Section 9 very carefully.

*See* Declaration of Antwonne Dacus ("Dacus Decl.") Ex. I [Dkt. No. 18-4] at 235.

Section 9 contains a number of provisions. It begins: "IMPORTANT: BINDING ARBITRATION AND CLASS ACTION WAIVER PROVISIONS." *Id.* at 239. And it includes a preamble:

> PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS. ANY DISPUTE OR CLAIM UNDER THESE TERMS OR WITH RESPECT TO THE SERVICES WILL BE SETTLED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT (TO THE EXTENT THE CLAIM QUALIFIES) AND WILL TAKE PLACE ON AN INDIVIDUAL BASIS ONLY; YOU AGREE THAT CLASS, CONSOLIDATED OR REPRESENTATIVE ARBITRATIONS AND CIVIL ACTIONS ARE NOT PERMITTED AND ANY RIGHTS TO BRING SUCH ACTIONS ARE WAIVED BY EACH PARTY.
>
> The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court.

*Id.* at 239–240. Section 9 next includes an "Agreement to Arbitrate":

> In the unlikely event that our customer support team is unable to resolve your concerns, the parties (you and we) each hereby agree to resolve any and all disputes or claims under these Terms, with respect to the Services, or related to our relationship through binding arbitration or in small claims court (to the extent the claim qualifies) instead of in courts of general jurisdiction, and only on an individual basis. In no event may either we or you seek to resolve a dispute with the other as part of any purported class, consolidated or representative proceeding. Binding arbitration is subject to very limited review. Only the arbitrator appointed pursuant to this Section, and not any federal, state or local court will have the authority to resolve any dispute or claim relating to this Section including, without limitation, regarding the scope, enforceability and arbitrability of these Terms. This arbitration provision will survive termination of these Terms. These Terms evidence a transaction in interstate commerce and the interpretation and enforcement of this Section 9 is governed by the Federal Arbitration Act, notwithstanding the choice of law set forth in Section 9(h) below.

*Id.* It also makes clear that the arbitration agreement extends to, among other things, "all claims arising out of or relating to any aspect of the relationship between us, whether based in contract,

3

tort, statute, fraud, misrepresentation or any other legal theory." *Id.*

Another provision of section 9 is entitled "No Class Actions" and reads:

> YOU AND EVENTBRITE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, CONSOLIDATED OR REPRESENTATIVE PROCEEDING. THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, MAY NOT PRESIDE OVER ANY FORM OF CLASS, CONSOLIDATED OR REPRESENTATIVE PROCEEDING AND MAY ONLY PROVIDE RELIEF IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF WARRANTED BY THAT PARTY'S INDIVIDUAL CLAIM.

*Id.* at 240. Last, Section 9 provides that arbitrations under it will be governed by the "Commercial Arbitration Rules or the Commercial Arbitration Rules of the American Arbitration Association." *Id.*

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs the motion to compel arbitration. 9 U.S.C. §§ 1 *et seq*. Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted). If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

## DISCUSSION

"In determining whether a valid arbitration agreement exists, federal courts apply ordinary state law." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (internal

4

quotation marks omitted). The parties agree that California law governs whether the plaintiffs agreed to the TOS. Mot. 15 n.6; Plaintiffs' Opposition to the Mot. ("Oppo.") [Dkt. No. 19] 8. Under California law, a valid contract requires the "mutual consent of the parties," which is "generally achieved through the process of offer and acceptance." *DeLeon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012) (internal citations omitted). Whether there was mutual consent "is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings." *Id.* Although mutual consent is generally a question of fact, whether a certain set of facts is sufficient to establish a contract is a question of law. *Id.*; *Long v. Provide Commerce, Inc.*, 245 Cal. App. 4th 855, 863 (2016).

Even if an offeree does not know all of the terms of an offer, he "may be held to have accepted, by his conduct, whatever terms the offer contains" so long as there was a sufficient "outward manifestation or expression of assent." *Windsor Mills, Inc. v. Collins & Aikman Corp.*, 25 Cal. App. 3d 987, 992 (1972). But "when the offeree does not know that a proposal has been made to him this objective standard does not apply. Hence, an offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Id.* at 993 (internal citations omitted). These principles apply to all contracts, including arbitration agreements. *Nguyen*, 763 F.3d at 1175.

"While new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract." *Id.* (internal quotation marks and citation omitted). Internet-based contracts have historically "come primarily in two flavors." *Id.* "Clickwrap" (or "click-through") agreements require a website's users "to click on an 'I agree' box after being presented with a list of terms and conditions of use." *Id.* at 1175–76. "Browsewrap" agreements exist "where a website's terms and conditions of use are generally posted on the website via a hyperlink at the bottom of the screen." *Id.* Browsewrap agreements, unlike clickwrap agreements, do not require any affirmative manifestation of assent to terms; parties give assent by using the website. *See id.* A third type of internet contract, the "sign-in

wrap" agreement, has also developed and is sometimes regarded as a "blend" or "hybrid" of the two. *See Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75–76 (2d Cir. 2017) (collecting cases analyzing sign-in wrap agreements). Sign-in wrap agreements occur when "a website notifies the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advises the user that he or she is agreeing to the terms of service when registering or signing up." *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020) (internal quotation marks and alterations omitted).

For an internet contract to be valid, the website (or smartphone app, if applicable) must either place the user on actual notice of the agreement or "put[] a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. Courts have determined that inquiry notice existed when "the existence of the terms was reasonably communicated to the user." *Colgate*, 402 F. Supp. 3d at 763; *see Meyer*, 868 F.3d at 76 (collecting cases). Whether a particular website reasonably communicated the existence of the terms is a fact-intensive inquiry that "depends on the design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1177. As a result, courts have examined, among other aspects of the website and agreement, the visibility and obviousness of the notice of assent. *See id.* (collecting cases).

Under California law, Eventbrite, the party seeking to compel arbitration, "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017). Eventbrite does not attempt to show that any of the plaintiffs here had actual notice of the existence of the TOS and its arbitration agreement. Instead, Eventbrite argues that all were put on inquiry notice because of sign-in wrap agreements when they created their Eventbrite accounts and/or purchased event tickets. *See* Mot. 19. As explained, Eventbrite users can create accounts or purchase tickets on a desktop version of its website, a mobile version of its website, or via a smartphone app. Duhring Decl. ¶¶ 4–6. The sign-in wrap agreements that appear during these processes are sometimes materially similar, but are sometimes not. Consequently, it is not possible to determine that Eventbrite's sign-in wrap agreements are categorically valid or invalid; each must be evaluated separately.

6

## I. EVENTBRITE'S EVIDENCE

As a preliminary matter, I have concerns about Eventbrite's evidence of mutual assent.

### A. Eventbrite's Dating Problem

Eventbrite's first problem is broad and extends to all of its evidence. This motion turns on whether or not the plaintiffs were on inquiry notice based on online agreements. Yet the evidence Eventbrite offers does not demonstrate what versions of the sign-in wrap agreements the plaintiffs would have seen during the relevant time period. Throughout its Motion, Eventbrite's general practice is to include one image of the sign-in wrap agreement as it existed in January 2016 and one as it exists today. Eventbrite states that these images are "exemplary" of how the messages appeared from 2016 to the present. It also asserts that the agreements' layout is "substantially identical" for all of the messages. Below are two typical examples that Eventbrite places side-by-side, from 2016 and the present, respectively:

 

*See* Mot. 6.

Puzzlingly, Eventbrite does not state the date when the website first adopted its present appearance. Eventbrite also does not say—with several exceptions discussed below—which of the two images (if either) each plaintiff would have encountered on the date of his or her use of the platform. In fact, Eventbrite does not even make clear whether these were the only ways the page has appeared between 2016 and the present. The Declaration that authenticates these images states simply that they "depict[] versions of" the pages, not that they depict the *only* versions of the pages. Duhring Decl. ¶ 11. The plaintiffs allege that they signed up for accounts at various

7

times from January 2018 onward and made the purchases in question from December 2019 onward. Eventbrite does not, however, provide illustrations of what the sign-in wrap agreements looked like on those relevant dates.

Eventbrite attempts to remedy these problems by stating that "[a]lthough the look and feel of [the site] have changed slightly over time . . . such page has always contained language in close proximity to the" buttons and the disclosures "have contained blue, typically underlined hyperlinks" to the TOS. *Id.* ¶ 13. The language that a TOS message uses is, of course, important. But so is the overall look of the agreement. Eventbrite should know: The cases that it relies on regarding internet contracts often discuss whether the design of the page made the TOS message sufficiently obvious. Indeed, these cases have sometimes turned on seemingly small differences in design that courts have held did or did not place a reasonably prudent user on notice.

It is strange (at best) that Eventbrite does not simply show the sign-in wrap agreements as they existed on the dates of the plaintiffs' sign-ups and purchases. Additionally, if Eventbrite cannot produce those pages (despite being able to produce pages that date back to January 2016), it presumably would have said so. In fact, at one point it does just that, deviating from its pattern and displaying a page from May 2019. *See* Mot. 8. It explains that

> technical issues prevent Eventbrite's engineers from running pre-2019 versions of Eventbrite's Smartphone App in the Company's current operating environment, so as to generate screenshots from such versions. Eventbrite has nevertheless confirmed, including by review of code and interviewing knowledgeable personnel, that since at least as early as 2016, all versions of the Smartphone App Sign-Up have contained disclosures substantially identical to those shown here (including hyperlinks to the TOS in blue font) notifying users that they assented to the TOS by creating an Eventbrite account.

*Id.* 8 n.5. Eventbrite was, therefore, capable of conducting interviews and reviewing code to give some idea of what past versions of pages stated; but it has not done so for the only dates relevant to this case. Even in this instance, moreover, its representation is of little help because it only states that the *text* of the disclosures was identical, not the overall design.

To be sure, Eventbrite does at several points explicitly state that the website (or smartphone app) looked a certain way during the time each plaintiff would submit an order. Some of those examples have their own, more serious, problems, which I discuss below. But even these

8

1 representations come only from Eventbrite's Motion, not from the sworn declaration underlying it.

2 Because of these problems, Eventbrite would only be able to carry its burden if it could
3 show what the agreements looked like during the period when the plaintiffs would have actually
4 seen them.

### B. Contradictory Evidence

Second, Eventbrite has submitted at least one set of representations that is contradictory. In its Motion, Eventbrite states that Conner "signed up for an Eventbrite account on August 13, 2019" and "was shown the below disclosure." Mot. 12. The disclosure as it appears in Eventbrite's motion is:



*Id.* But Eventbrite's Reply states—in response to an argument the plaintiffs made about the "Continue with Apple" button—that "Eventbrite did not display the 'Continue with Apple' button in any Sign-Up flow until *April 20, 2020*—several months *after* the orders alleged in the Complaint." Reply 7 (citing Declaration of Roshni Jain [Dkt. No. 21-1] ¶ 3) (emphasis in original). Both cannot be true: Either the image above—"Continue with Apple" button and all—reflects what Conner saw or it does not. This issue is not peripheral; what precise webpages were viewed by the plaintiffs will determine whether or not they were on inquiry notice and, therefore, assented.

### C. Potentially Misleading Evidence

Last, Eventbrite appears to have submitted misleading evidence; when the plaintiffs pointed it out, Eventbrite's Reply included a carefully worded argument that ducked the question. Specifically, Eventbrite relies on the following two images:

9



*See, e.g.*, Mot 11.  Those images are portions of, respectively, a desktop and mobile webpage that is part of Eventbrite's current ticket purchasing process.  *Id.*  Eventbrite argues that the TOS notification is "located directly above the 'Place Order' . . . button [a plaintiff] was required to click."  *Id.*  Those images are drawn from the following images in one of Eventbrite's declarations:




Duhring Decl. Exs. H, J.  These images also support Eventbrite's argument that a user must scroll past the TOS message to place her order.

The plaintiffs' Opposition, however, asserts—albeit based on an unauthenticated screenshot—that Eventbrite's images omit a crucial aspect of the pages:  Everything on the page except for the "Place Order" button scrolls up and down, while the "Place Order" button always remains static at the bottom of the page.  Oppo. 13.  If the plaintiffs were correct, a user could fill in her personal details on this page and select "Place Order" without ever having seen the TOS

10

acceptance message at the bottom of the scrollbar section of the page. In other words, even though the "Place Order" button is at the bottom of the page (and therefore beneath the sign-in wrap agreement), the sign-in wrap agreement is part of a discrete area that requires scrolling to the bottom to see.

Eventbrite's Reply is telling. It argues that its evidence shows that "in each checkout flow since 2016, the TOS disclosure appears on the same screen as—and, indeed, adjacent to—the call-to-action button." Reply 9. The plaintiffs, Eventbrite contends, dispute this only with "attorney argument [and] unauthenticated, unexplained, post-hoc screenshots." *Id.* Absent from this response, however, is a denial that the "Place Order" button is not part of the scrollable portion of the page and that, therefore, it can be selected without ever having viewed the TOS sign-in wrap agreement. Eventbrite is correct that its images illustrate the Place Order button within the same view as the TOS acceptance message. But it failed to deny that there is a discrete scrollable area that excludes the Place Order button. I take judicial notice of the fact that some scrollbars fade from visibility when not in use. *See* FED. R. EVID. 201(b)(1). It would, consequently, be possible for Eventbrite to present these pages without scrollbars, even if they had them. I will also, solely for purposes of this Order, take judicial notice that Eventbrite's website in its current form *does* appear to work in the manner that the plaintiffs suggest, making Eventbrite's evidence misleading. Judicial notice is proper because how Eventbrite's own website functions currently "can be accurately and readily determined." *See id.* 201(b)(2).

With these problems in mind, I turn to the parties' arguments.

## II. WHETHER THE PLAINTIFFS ASSENTED TO ARBITRATE

As explained, Eventbrite bears the burden of proving by a preponderance of the evidence that each plaintiff assented—through being on inquiry notice—to the agreements. Eventbrite has not met that burden.

### A. Snow

Eventbrite asserts, supported by a sworn declaration, that its records indicate that Snow signed up for an Eventbrite account using its mobile web page on January 14, 2018. Mot. 3 (citing Duhring Decl. ¶ 27). She did so en route to ordering tickets. *Id.* When she did that, Eventbrite

11

1  states, she was required to eventually click a "Pay Now" button. *Id.* 9 (citing Duhring Decl. ¶ 27,
2  Ex. I). A sign-in wrap agreement notice appeared above that button, represented in context and
3  zoomed in, respectively:



17  *See* Duhring Decl. Ex. I.
18  If this sign-in wrap agreement is what Snow truly saw, it is sufficient to put her on notice.
19  The message that states "I accept the terms of service" is directly above that Pay Now button,
20  meaning that Snow had to scroll past it to press the button. It was also positioned close to the
21  button. The words "terms of service" appear as a hyperlink to the TOS itself. That hyperlink is
22  blue, while the text around it is gray. There is nothing about the text that would make it
23  inconspicuous or non-obvious. As courts have held with respect to similar messages, a reasonably
24  prudent user would be placed on inquiry notice by this particular sign-in wrap agreement. *See,*
25  *e.g.*, *Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393, 394–95 (9th Cir. 2020) (see image at district
26  court Dkt. No. 25); *Maynez v. Walmart, Inc.*, No. CV 20-0023, 2020 WL 4882414, at *3 & n.2
27  (C.D. Cal. Aug. 14, 2020); *Dickey v. Ticketmaster LLC*, No. CV 18-9052, 2019 WL 9096443, at
28  *7 & n.4 (C.D. Cal. Mar. 12, 2019).

The problem is that this is an image from January 2016.  *See* Duhring Decl. ¶ 22.  Because Eventbrite does not indicate when this image ceased being used, it is impossible to know whether Snow saw it.  Eventbrite's motion states that it is the image Snow would have seen in January 2018, but that assertion is not supported by the section of the Declaration it cites.  *See* Mot. 9.  Again, that Declaration simply states that this is the 2016 version of the webpage, without any information about changes made until the "present" version.  *See* Duhring Decl. ¶ 22; *see also id.* Ex. I.  These images therefore cannot help Eventbrite carry its burden.

Eventbrite also argues that Snow has made numerous other orders on its platform and that, therefore, she must have agreed using the following images:

 

Mot. 9–10; Duhring Decl. Exs. J, H.  As I explained above, Eventbrite's representation of these pages appears to be misleading.  In reality, because part of the page can scroll while the "Place Order" button is static, it is possible to enter all of someone's contact and payment details and press "Place Order" without seeing the TOS notification.

These agreements are, consequently, not well classified as sign-in wrap agreements.  Instead, they better resemble browsewrap because they are not placed directly next to the action button but are "posted on the website via a hyperlink at the bottom of the screen."  *Nguyen*, 763 F.3d at 1176.  However, they are also not pure browsewrap agreements where the user agrees to the TOS merely "by visiting the website—something that the user has already done."  *Id.* (internal quotation marks omitted).  Whatever label is attached to the agreements, the fundamental question is still whether they would place a reasonably prudent user on inquiry notice.  Here, I conclude that they would because the agreements are not "buried at the bottom of the page or tucked away in obscure corners of the website where users are unlikely to see it."  *Id.* at 1177.  Instead, although users are not absolutely guaranteed to see these agreements, they are likely to because the

1 agreements are close enough to the action buttons and are part of a page that a plaintiff is required
2 to scroll through a portion of. The plaintiffs have pointed to no case in which similarly
3 conspicuous agreements were found to be insufficient.

4 The problem remains, however, that these images are from the present day and Eventbrite
5 has not shown what the pages would have looked like when Snow saw them. Eventbrite has not
6 carried its burden to prove that Snow assented to the TOS.

### B. Piceno

Eventbrite's records do not indicate that Piceno ever purchased the tickets he claims—or even created an account prior to the alleged date he created the tickets—and, in their papers, plaintiffs do not shed any more light on why that would be. As of now, then, Piceno rests only on the allegations of the Complaint. Eventbrite nonetheless engages those allegations for the sake of argument. Because there is no record of Piceno's purchase, he could have used either the desktop website, mobile website, or smartphone app to make his purchase. Eventbrite represents that the purchase screens that Piceno would have seen would be the same ones that Snow would have used. Mot. 11. As I explained above with respect to Snow, that evidence is insufficient.

It is also possible, Eventbrite argues, that Piceno created an account using a stand-alone sign-up page unconnected to his purchase process. As an initial matter, even if Eventbrite's argument were true, it is still also possible that Piceno used the other process, creating an account en route to purchasing tickets. If Piceno did use a sign-up page, he could have done so on the desktop website, mobile website, or smartphone app. The following are the desktop versions of the sign-up page from 2016 and the present, respectively:




14

*See* Duhring Decl. Exs. A, B.  The 2016 and present mobile web version are substantially identical to these desktop version, just slightly narrowed to be seen on a mobile device.  *See* Duhring Decl. Exs. C, D.

These sign-in wrap agreements contain similar features to those that courts have upheld. *See, e.g.*, *Lee*, 817 F. App'x at 394–95 (see image at district court Dkt. No. 25); *Maynez*, 2020 WL 4882414, at *3 & n.2; *Dickey*, 2019 WL 9096443, at *7 & n.4.  Notably, the sign-in wrap agreement is adjacent to the buttons that signal acceptance, is in a font that contrasts with the background, and displays the phrase "terms of service" in hyperlink blue (and sometimes underlined as well).  If the first of these were the image that Piceno saw, it would have put him on notice, but Eventbrite has presented no evidence that it is what he saw.

The second image suffers from an additional problem concerning the "Continue with Apple" button.  The message states that a user accepts the TOS "[b]y clicking 'Get Started' or 'Continue with Facebook'"; it does not say that one accepts by clicking "Continue with Apple." As I explained above, Eventbrite's only response to this is that none of the plaintiffs would have seen this image because the "Continue with Apple" button was added after their purchases.  And as I explained above, Eventbrite's evidence on this point is self-contradictory.  It is also unclear why Eventbrite would have included these images if they were so irrelevant to the plaintiffs' claims.  It is not possible to conclude that Eventbrite has carried its burden based on contradictory evidence.

The *smartphone app* sign-up page is distinct from the other two:



Duhring Decl. ¶ 14, Ex. F.  Even aside from the "Continue with Apple" problem, a reasonably prudent user would not be put on adequate notice from this particular page.  While the text is close

to the sign-up button and "terms of service" is in a blue hyperlink, the message as a whole is inconspicuous. The background of the page is black (or very dark gray) while the text "By continuing, I accept the Eventbrite terms of service" is—except for the phrase "terms of service" itself—dark gray. The operative message that clicking the button "accept[s]" the TOS is easily missed because of the lack of contrast between it and the background. The buttons immediately above the text are either brightly colored and contrast starkly with the black background (as is the case for the Apple and Facebook buttons) or use large, white text against the black (as is the case for the email address button). All of those buttons also use large, clear fonts; the text of the disclaimer, in contrast, is small. The overall impression, consequently, would lead many consumers to click one of the vibrant buttons while never knowing—and reasonably so—that the low-contrast disclaimer subjects them to the TOS. *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 57, 62–63 (1st Cir. 2018) (finding dark gray text against black insufficient to put users on notice). *Cf. Colgate*, 402 F. Supp. 3d at 764–65 (finding low-contrast *hyperlinks* "not conspicuous enough"); *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 466–67 (S.D.N.Y. 2017) (same).

Eventbrite does provide a second image that it indicates looked as the sign-up page did from "May 2019" backwards; that second image does uses gray-on-white text. Piceno alleges, however, that he purchased his tickets in January 2020, Compl. ¶ 38, and does not allege creating an account via the stand-alone page prior to that date. Eventbrite is not clear about the exact date that it changed the look of its page to the gray-on-black version, but it presumably was approximately May 2019 or Eventbrite would not have chosen that—otherwise arbitrary—date to display the past image. Consequently, the most likely circumstance is that, of the two pages, Piceno used the post-May 2019 one.

In response, Eventbrite defends all of its TOS messages on the same grounds and cites numerous cases in which courts have found that sign-up wrap agreements put consumers on sufficient notice. Those cases illustrate that some of Eventbrite's other pages would adequately inform consumers that they are assenting to the TOS. But none of the cases Eventbrite cites in support examined the setup here: small, dark text against black beneath larger, bright action buttons. *See Dohrmann v. Intuit, Inc.*, No. 20-15466, 2020 WL 4601254, at *2 (9th Cir. Aug. 11,

2020) (image available in *Arena v. Intuit Inc.*, 444 F. Supp. 3d 1086, 1089 (N.D. Cal. 2020)); *Lee*, 817 F. App'x at 394–95 (see image at district court Dkt. No. 25); *Peter*, 445 F. Supp. 3d 580 (image available at Dkt. No. 22 at 7); *Maynez*, 2020 WL 4882414, at *3 & n.2; *Dickey*, 2019 WL 9096443, at *7 & n.4.  Indeed, some of Eventbrite's cases, in finding TOS messages adequate, specifically rely on the fact that the text contrasts with the background—usually gray or black text against white or off-white backgrounds.  *See, e.g.*, *Peter*, 445 F. Supp 3d ("[T]he text contrasts clearly with the background and is plainly readable."); *Dickey*, 2019 WL 9096443, at *7 ("[T]he dark gray and blue font of the Disclosure above the Sign Up button contrasted with the white background[.]").

As a result, Eventbrite has not shown by a preponderance of the evidence that Piceno assented to the TOS.

### C. Conner

Eventbrite has also failed to show that Conner assented to the TOS.  It asserts that Conner used the mobile web checkout process and that she created an account through the smartphone app.  As explained, there is no evidence that the versions of the 2016 and present mobile web checkout pages Eventbrite puts forward are the versions that would have existed at the relevant time.  When it comes to the smartphone app, this time, Eventbrite unambiguously represents that Conner would have seen the page with the gray-on-black font.  *See* Mot. 12.  As I discuss above with respect to Piceno, even if this page were shown to be from the correct date, Eventbrite has not demonstrated that it would put a reasonably prudent user on inquiry notice.  And, again, this contention of Eventbrite's contradicts its representation about that page in its Reply.

### D. Confirmation Emails

Finally, Eventbrite repeatedly references in passing that confirmation emails sent to the plaintiffs after they made purchases included a statement that the plaintiffs were bound by the TOS.  *E.g.*, Mot. 10.  In its substantive argument in its Motion, however, it cites no authority for the proposition that a person who did not agree to a contract can nonetheless be roped into that contract later by a unilateral communication that a contract was formed.  Its argument there hinged, instead, on the sign-in wrap agreements.

17

In its Reply, for the first time, Eventbrite relies on *Herkenrath v. Move, Inc.*, No. CV 18-4438, 2018 WL 10705782 (C.D. Cal. Aug. 21, 2018). There, the court held that an email sent after the user made a purchase that contained a link to TOS was sufficient to create a contract. *Id.*, at *3–*4. As an initial matter, both Eventbrite and the court in *Herkenrath* rely on *Ramirez v. Freescore, LLC*, No. 8:11-CV-0720, 2011 WL 3812608 (C.D. Cal. Aug. 30, 2011). Both characterize it as "compelling arbitration where the plaintiff was sent an email and 'needed only to click on the link "Terms and Conditions," which would have brought her to the page that included the arbitration clause'." *See id.*, at *4; Reply 7–8. *Ramirez* did not compel arbitration on that basis. The link to the TOS was on a *webpage* into which the plaintiff had to type her email address. *Ramirez*, 2011 WL 3812608, at *5. And *typing the email address* constituted assent. *Id.* Moreover, this theory runs counter to the most basic tenets of mutual assent that a party can take an action, not agree to a contract regarding that action, and yet still be bound by that contract solely on the basis that the other party later sends a note saying so. *See, e.g.*, *Windsor Mills*, 25 Cal. App. 3d at 992 (requiring an "outward manifestation or expression of assent" by the party).

Eventbrite does not put forward any other authority applying California law—or the law of another jurisdiction—that these after-the-fact emails constitute mutual assent.

## CONCLUSION

The motion to compel arbitration is DENIED.

**IT IS SO ORDERED.**

Dated: October 19, 2020

William H. Orrick
United States District Judge