1   SINGER CASHMAN LLP
      Adam S. Cashman (Bar No. 255063)
2     acashman@singercashman.com
      Doug Tilley (Bar No. 265997)
3     dtilley@singercashman.com
    601 Montgomery Street, Suite 1950
4   San Francisco, California  94111
    Telephone:      (415) 500-6080
5   Facsimile:       (415) 500-6080

6   *Attorneys for Eventbrite, Inc.*

7

8                    **UNITED STATES DISTRICT COURT**

9                    **NORTHERN DISTRICT OF CALIFORNIA**

10                    **SAN FRANCISCO DIVISION**

11   SHERRI SNOW, ANTHONY PICENO and        CASE NO. 3:20-CV-03698-WHO
     LINDA CONNER, as individuals, on behalf of
12   themselves, the general public and those    **DEFENDANT EVENTBRITE, INC.'S**
     similarly situated,                          **NOTICE OF MOTION AND SECOND**
13                                                 **MOTION TO COMPEL ARBITRATION;**
            Plaintiffs,                            **MEMORANDUM OF POINTS AND**
14                                                 **AUTHORITIES IN SUPPORT**

15             v.                                  Hearing Date:  December 23, 2020
                                                   Hearing Time:  2:00 p.m.
16   EVENTBRITE, INC.,                             Courtroom 2, 17th Floor

17          Defendant.

18

19

20

21

22

23

24

25

26

27

28

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on December 23, 2020 at 2:00 p.m., in Courtroom 2 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California 94102, Defendant Eventbrite, Inc. ("Eventbrite") will and hereby does move for an Order (a) compelling arbitration of Plaintiffs Sherri Snow, Anthony Piceno, and Linda Conner's (collectively, "Plaintiffs") claims, pursuant to the Terms of Service between Eventbrite and each Plaintiff as well as the Federal Arbitration Act, 9 U.S.C. § 1 *et seq*., and (b) dismissing or, in the alternative, staying all claims in the above-entitled action in favor of arbitration.

Eventbrite's Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the concurrently-filed Declaration of Nick Popoff and all exhibits attached thereto; the previously-submitted Declaration of Antwonne Dacus dated August 31, 2020 and all exhibits attached thereto (Dkt. Nos. 18-3 and 18-4); the concurrently-submitted Request for Judicial Notice; all other papers submitted in support of the Motion; the pleadings and other records on file in this case; all other evidence and argument as may be presented before or at the hearing on Eventbrite's Motion; and any other matter that the Court may properly consider.

Date:  November 16, 2020

Respectfully submitted,

SINGER CASHMAN LLP

By: _____

Adam S. Cashman
Doug Tilley
*Attorneys for Defendant Eventbrite, Inc.*

# **TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................ 1

II. RELEVANT BACKGROUND ................................................................................... 2

  A. Eventbrite's Terms of Service............................................................................ 2

  B. Eventbrite's Prior Motion To Compel ............................................................... 4

  C. The Court's Order On Eventbrite's Prior Motion .............................................. 6

  D. Factual Developments Since Issuance Of The Court's Prior Order ................... 7

  E. The Additional Evidence Collected By Eventbrite Confirms Each Plaintiff
    Accepted The TOS And Agreed To Mandatory Individual Arbitration ............. 9

    1. Plaintiff Snow .............................................................................................. 9

      a. The Checkout TOS Disclosures Shown To Ms. Snow On February 11,
        2020 ........................................................................................................ 9

      b. The Checkout TOS Disclosures Shown To Ms. Snow During Prior Orders ........ 10

    2. Plaintiff Piceno ......................................................................................... 10

      a. The Sign-Up TOS Disclosures Mr. Piceno Would Have Seen ............................ 11

      b. The Checkout TOS Disclosures Mr. Piceno Would Have Seen .......................... 12

    3. Plaintiff Conner ......................................................................................... 12

      a. The Sign-Up TOS Disclosure Shown To Ms. Conner On August 13, 2019 ........ 13

      b. The Checkout TOS Shown To Ms. Conner On December 19, 2019.................... 14

III. LEGAL STANDARDS ............................................................................................ 14

IV. ARGUMENT ........................................................................................................... 17

  A. Plaintiffs' Claims Are Subject To Mandatory Individual Arbitration ............. 17

    1. Plaintiffs Have Judicially Admitted They Accepted The Terms of Service .............. 17

    2. Plaintiffs Were On Inquiry Notice Of, And Assented To Be Bound By,
      Eventbrite's TOS................................................................................................ 17

      a. Sherri Snow .......................................................................................... 18

      b. Anthony Piceno..................................................................................... 19

      c. Linda Conner ........................................................................................ 19

  B. The Court Should Dismiss Plaintiffs' Claims .................................................. 20

V. CONCLUSION ........................................................................................................ 20

## TABLE OF AUTHORITIES

**CASES**

*Advanced Semiconductor Materials America, Inc. v. Applied Materials, Inc.*,
  922 F. Supp. 1439 (N.D. Cal. 1996) ................................................................. 16

*Am. Title Ins. Co. v. Lacelaw Corp.*,
  861 F.2d 224 (9th Cir. 1988) ............................................................................ 17

*Benson v. Casa de Capri Enterprises, LLC*,
  No. CV-18-00006, 2019 WL 2327630 (D. Ariz. May 31, 2019) ...................... 16

*Bernal v. Southwestern & Pacific Specialty Finance, Inc.*,
  No. C 12-05797, 2014 WL 1868787 (N.D. Cal. May 7, 2014) ......................... 16

*Brennan v. Opus Bank*,
  796 F.3d 1125 (9th Cir. 2015) .......................................................................... 18

*Chiron Corp. v. Ortho Diagnostic Sys., Inc.*,
  207 F.3d 1126 (9th Cir. 2000) ..................................................................... 2, 15

*City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*,
  254 F.3d 882 (9th Cir. 2001) ............................................................................ 15

*DeVries v. Experian Info. Sols., Inc.*,
  No. 16-cv-2953-WHO, 2017 WL 733096 (N.D. Cal. Feb. 24, 2017) .............. 18

*Dickey v. Ticketmaster LLC*,
  No. 18-CV-9052, 2019 WL 9096443 (C.D. Cal. March 12, 2019) .................... 5

*Dillon v. BMO Harris Bank, N.A.*,
  787 F.3d 707 (4th Cir. 2015) ........................................................................ 2, 15

*Dohrmann v. Intuit, Inc.*,
  823 Fed.Appx. 482 (9th Cir. 2020) ............................................................ 18, 19

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019) ........................................................................................ 18

*Ingle v. Circuit City Stores, Inc.*,
  328 F.3d 1165 (9th Cir. 2003) .......................................................................... 15

*Johnmohammadi v. Bloomingdale's, Inc.*,
  755 F.3d 1072 (9th Cir. 2014) .......................................................................... 20

*Khath v. Midland Funding, LLC*,
  334 F.Supp.3d 499 (D. Mass. 2018) ................................................................. 16

*KPMG LLP v. Cocchi*,
  565 U.S. 18 (2011) ............................................................................................ 17

*Lee v. Ticketmaster L.L.C.*,
  817 Fed.Appx. 393 (9th Cir. 2020) ......................................................... 5, 18, 19

*Lee v. Ticketmaster LLC*,
   No. 18-cv-05987, 2019 WL 9096442 (N.D. Cal. Apr. 1, 2019) ....................................... 5

*Legnaioli v. Chrysler Capital, LLC*,
   No. 15-cv-744, 2015 WL 12765468 (C.D. Cal. June 9, 2015) ...................................... 20

*Lifescan, Inc. v. Premier Diabetic Servs., Inc.*,
   363 F.3d 1010 (9th Cir. 2004).................................................................................... 15

*Lucas v. Hertz Corp.*,
   875 F. Supp. 2d 991 (N.D. Cal. 2012) ........................................................................ 16

*Marmet Health Care Center, Inc. v. Brown*,
   565 U.S. 530 (2012) .................................................................................................... 16

*Maxit Designs, Inc. v. Coville, Inc.*,
   No. 05-cv-1040, 2006 WL 2734366 (E.D. Cal. Sept. 25, 2006)............................ 2, 16

*Mims v. Davison Design & Dev., Inc.*,
   No. 16-cv-92, 2016 WL 10771297 (C.D. Cal. Apr. 14, 2016) ................................... 20

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
   460 U.S. 1 (1983) ........................................................................................................ 15

*Peterson v. Lyft*,
   No. 16-cv-7343, 2018 WL 6047085 (N.D. Cal. Nov. 19, 2018) ................................ 20

*Smith v. Rent-a-Center, Inc.*,
   No. 1:18-cv-01351, 2019 WL 3004160 (E.D. Cal. Jul. 10, 2019)............................... 16

*Toole v. Baxter Healthcare Corp.*,
   235 F.3d 1307 (11th Cir. 2000).................................................................................... 15

**STATUTES**

9 U.S.C. § 1 ........................................................................................................................ 14

9 U.S.C. § 4 ........................................................................................................................ 15

**RULES**

Civ. L.R. 7-9 ...................................................................................................................... 16

Civ. L.R. 7-9(b)(1) ............................................................................................................. 16

Civ. L.R. 7-9(b)(2) ............................................................................................................. 16

- iv -

DEFENDANT EVENTBRITE, INC.'S NOTICE OF MOTION AND SECOND MOTION TO COMPEL
ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
CASE NO. 3:20-CV-03698-WHO

## I.      INTRODUCTION

Eventbrite respectfully moves to compel arbitration on the grounds that Plaintiffs and each member of the proposed Class they purport to represent agreed to Eventbrite's Terms of Service ("TOS").  That contract provides that all claims arising out of or relating to Plaintiffs' use of Eventbrite's services may be pursued only through mandatory individual arbitration.

In ruling less than a month ago on Eventbrite's prior motion, the Court found that all but one of the sign-up and checkout flows (and associated TOS disclosures) adduced by Eventbrite were sufficient as a matter of law to put users on inquiry notice of the TOS, and therefore to bind such users to that contract's mandatory individual arbitration and class action waiver provisions.  The Court determined, however, that Eventbrite had not adduced evidence sufficient to show that those specific disclosures were displayed to the named Plaintiffs at the specific times they placed the orders alleged in the Complaint.  The Court accordingly denied Eventbrite's motion.

In the weeks since that Order, there have been two major changes to the factual landscape underlying these arbitration-related issues, each of which independently requires that Plaintiffs' claims be referred to individual arbitration and this action dismissed.

First, while previously a mere unanswered allegation subject to change at any time under Fed. R Civ. P. 15(a)(1)(B), it is now a ***judicially admitted and established fact*** that "[a] contract was formed between Plaintiffs and Class members [] and Defendant [] with respect to purchases made on [Eventbrite's] website" and that "[t]he contract that governs the transactions at issue in this case includes the Terms of Service Agreement[.]"  Complt., ¶¶ 53-54; *see also* Answer, ¶¶ 53-54.  That fact alone is dispositive here, and requires dismissal in favor of mandatory individual arbitration.

Second, through the extraordinary efforts of multiple Eventbrite engineers, product managers, data analysts, and other personnel across three continents, Eventbrite has been able to recreate and/or obtain from a third party the very evidence the Court previously found lacking.  This new evidence confirms that when they created their accounts and placed the orders at issue in the case, Plaintiffs were shown TOS disclosures that the Court has already determined as a matter of law were sufficient to provide inquiry notice of that contract and its mandatory arbitration and class waiver provisions.

Under settled precedent, where (as here) "a valid agreement to arbitrate exists and [] encompasses the dispute at issue … then the Act requires the court to enforce the arbitration agreement in accordance with its terms." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

Without any substantive defense on the merits, Plaintiffs would invite error by asking the Court to cover its ears to their own allegations and shut its eyes to the undisputed record. They assert that because the Court found a lack of evidence of an agreement some 30 days ago, that ruling is set in stone for all time regardless of how the factual record is impacted by Plaintiffs' own admissions or subsequent evidentiary developments. That position would nullify the strong federal policy favoring arbitration and is directly contrary to law. *See, e.g.*, *Dillon v. BMO Harris Bank, N.A.*, 787 F.3d 707, 715 (4th Cir. 2015) (reversing denial of renewed motion to compel and directing district court to address merits of motion where, as here, Defendants "attempted to cure the evidentiary deficiencies the court relied on and asked the court to determine whether Dillon actually agreed to submit his claims to arbitration."); *Maxit Designs, Inc. v. Coville, Inc.,* No. 05-cv-1040, 2006 WL 2734366 (E.D. Cal. Sept. 25, 2006) (granting second motion to compel where defendant provided evidence the Court identified as necessary and absent in earlier denial order). The facts and law make clear that Plaintiffs' claims may be pursued only in individual arbitration. This action must be dismissed with prejudice.

## II.     RELEVANT BACKGROUND

### A.     <u>Eventbrite's Terms of Service</u>

As previously noted by the Court, it is undisputed that at all times relevant to Plaintiffs' claims, Eventbrite's Terms of Service have required that all disputes relating to Eventbrite's services or the relationship between Eventbrite and its users be submitted to mandatory arbitration (or, if eligible, to small claims court) and only on an individual basis. *See* Dkt. No. 22 ("Order") at 2-3; *see also* Dkt. No. 18-4 at ECF pp. 235-48 (March 11, 2019 version of Eventbrite's TOS).

In pertinent part, Section 9 of Eventbrite's TOS—entitled "IMPORTANT: BINDING ARBITRATION AND CLASS ACTION WAIVER PROVISIONS"—stated:

- "PLEASE READ THIS SECTION CAREFULLY AS IT AFFECTS YOUR RIGHTS. ANY DISPUTE OR CLAIM UNDER THESE TERMS OR WITH RESPECT TO THE

SERVICES WILL BE SETTLED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT (TO THE EXTENT THE CLAIM QUALIFIES) AND WILL TAKE PLACE ON AN INDIVIDUAL BASIS ONLY; YOU AGREE THAT CLASS, CONSOLIDATED OR REPRESENTATIVE ARBITRATIONS AND CIVIL ACTIONS ARE NOT PERMITTED AND ANY RIGHTS TO BRING SUCH ACTIONS ARE WAIVED BY EACH PARTY."

- "The parties understand that, absent this mandatory provision, they would have the right to sue in court and have a jury trial. They further understand that, in some instances, the costs of arbitration could exceed the costs of litigation and the right to discovery may be more limited in arbitration than in court."

- "In the unlikely event that our customer support team is unable to resolve your concerns, the parties (you and we) each hereby agree to resolve any and all disputes or claims under these Terms, with respect to the Services, or related to our relationship through binding arbitration or in small claims court (to the extent the claim qualifies) instead of in courts of general jurisdiction, and only on an individual basis. In no event may either we or you seek to resolve a dispute with the other as part of any purported class, consolidated or representative proceeding. Binding arbitration is subject to very limited review. Only the arbitrator appointed pursuant to this Section, and not any federal, state or local court will have the authority to resolve any dispute or claim relating to this Section including, without limitation, regarding the scope, enforceability and arbitrability of these Terms. This arbitration provision will survive termination of these Terms. These Terms evidence a transaction in interstate commerce and the interpretation and enforcement of this Section 9 is governed by the Federal Arbitration Act, notwithstanding the choice of law set forth in Section 9(h) below."

- "This agreement to arbitrate is intended to be broadly interpreted as to legal disputes between you and us. It includes, but is not limited to: (i) all claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory; (ii) all claims that arose before this or any prior agreement (including, but not limited to, claims relating to advertising); and (iii) all claims that may arise after termination of these Terms and/or your use of the Services."

- "YOU AND EVENTBRITE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR ITS INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, CONSOLIDATED OR REPRESENTATIVE PROCEEDING. THE ARBITRATOR MAY NOT CONSOLIDATE MORE THAN ONE PERSON'S CLAIMS, MAY NOT PRESIDE OVER ANY FORM OF CLASS, CONSOLIDATED OR REPRESENTATIVE PROCEEDING AND MAY ONLY PROVIDE RELIEF IN FAVOR OF THE INDIVIDUAL PARTY SEEKING RELIEF AND ONLY TO THE EXTENT NECESSARY TO PROVIDE RELIEF WARRANTED BY THAT PARTY'S INDIVIDUAL CLAIM."

- "The arbitration will be governed by the Commercial Arbitration Rules, or, if the actions giving rise to the dispute or claim relate to your personal or household use of the Services (rather than business use), the Consumer Arbitration Rules (in each case, the 'AAA

Rules') of the American Arbitration Association ('AAA'), as modified by this Section
9…"

Dkt. No. 18-4 at ECF pp. 239-40.

### B.  Eventbrite's Prior Motion To Compel

Eventbrite originally moved to compel arbitration in accordance with these TOS on August
31, 2020.  *See* Dkt. No. 18 ("Prior Motion").  In connection with its Prior Motion, Eventbrite
presented screenshots and other evidence demonstrating the account sign-up flows and order
checkout flows displayed to users throughout the proposed class period pleaded in the Complaint.
That evidence demonstrated that in each instance, Eventbrite conspicuously advised users that by
signing up for an account or submitting an order, they affirmed that they "accept" or "agree to"
Eventbrite's "terms of service[.]"  *See id*. at 5-9.  These disclosures appeared adjacent or otherwise in
close proximity to call-to-action buttons that the user was required to click in order to create their
accounts and/or submit their orders, and the phrase "terms of service" always appeared in a blue
hyperlink.  *See id*.  Plaintiffs did not contest the authenticity, admissibility, or accuracy of any of
Eventbrite's evidence.

Eventbrite was experiencing a number of severe resource constraints at the time it was
marshaling evidence in support of its prior motion.  *See* Declaration of Nick Popoff ("Popoff Decl."),
¶¶ 19-22.  It had recently laid off some 45% of its workforce due to economic pressures imposed by
the COVID-19 pandemic, which has ravaged the live-events business.  *Id*. at ¶ 19.  That reduction-in-
force affected virtually every department within Eventbrite, including Engineering and Product
Management.  *Id*.  Moreover, dozens of additional Engineering and Product Management personnel
departed the Company for other reasons in the weeks and months following that reduction-in-force.
*Id*.  As a result, Eventbrite lost many of the individuals who, as a result of their institutional
knowledge and/or technical capabilities, were well-positioned to attempt to recreate or locate
depictions of the sign-up or checkout flows (and associated TOS disclosures) that users would have
seen at particular points in time.

Eventbrite's remaining Engineering personnel was stretched particularly thin, as Eventbrite
was in the process of building, testing, rolling out, and supporting an array of new functionalities to

support event organizers as they adapted to the new reality imposed by COVID-19, as well as offer

relief to consumers who purchased tickets to live events that were cancelled, rescheduled, or

postponed due to the pandemic. *See* Popoff Decl., ¶ 22. For example, in addition to continuing to

service and support more routine technical needs of the Company, Eventbrite's engineers were

focused on business-critical initiatives in building, implementing, and supporting new functionalities

to (a) enable organizers to issue credits, bulk refunds, and other relief to consumers impacted by

COVID-19 and otherwise; (b) allow organizers to promote and convene online events on Eventbrite;

(c) integrate Eventbrite's platform with Zoom to support such online events; and (d) execute a

complex migration of all users to a new event creation and permissions system. *Id.* It was essential

to Eventbrite's business that it complete these initiatives promptly and successfully. *Id.* These tasks

therefore dominated the time and attention of much of the Company's personnel, and substantially all

of its Engineering resources, in Summer and early Fall 2020. As a result, Eventbrite was unable to

dedicate Engineering personnel to attempt to recreate each Plaintiff's individual sign-up and/or

checkout experiences as alleged in the Complaint.[1] *Id.*

    Unable to secure assistance from Engineering teams, Eventbrite's Product Management and

Platform personnel searched through Company records, including old emails and other internal

communications, feature release logs and announcements, and customer transaction data in an effort

to generate screenshots that would be relevant to Eventbrite's initial motion. *See* Popoff Decl., ¶¶ 20-

21. While they were able to locate screenshots depicting the sign-in flows, checkout flows, and

Terms of Service disclosures as they existed at certain points in time—and confirm via feature release

logs and other internal documentation that the TOS disclosures were not changed in any way that

would make them less conspicuous during the proposed class period—such personnel were unable to

---

[1]     Eventbrite reserves, and does not waive, its position that the factual showing of inquiry notice
it made in connection with its original motion was sufficient to compel these claims to arbitration.
*See, e.g.*, *Lee v. Ticketmaster LLC*, No. 18-cv-05987, 2019 WL 9096442, at *1 (N.D. Cal. Apr. 1,
2019) (granting motion to compel arbitration based on, *inter alia*, declaration that included averment
that "the look and feel of [Ticketmaster's] website has changed slightly over time") (declaration at
Dkt. No. 26), *aff'd,* 817 Fed.Appx. 393 (9th Cir. 2020); *Dickey v. Ticketmaster LLC*, No. 18-cv-9052,
2019 WL 9096443 (C.D. Cal. March 12, 2019) (same) (declaration at Dkt. No. 21). That question
need not be resolved now, however, given Plaintiffs' judicial admissions and the further
developments to the factual record.

1  locate or reproduce the specific flows and disclosures displayed on the order dates identified by

2  Plaintiffs, or to conduct the review and comparison of source code necessary to link screenshots they

3  did obtain to those specific dates.  *Id.* at ¶ 21.  To do so would have required substantial dedicated

4  Engineering resources, which were simply not available at that time.  *Id.*

5       **C.  <u>The Court's Order On Eventbrite's Prior Motion</u>**

6       On October 19, 2020, the Court issued an Order finding that all but one of the sign-up and

7  checkout flows (and associated TOS disclosures) adduced by Eventbrite were sufficient as a matter of

8  law to put users on inquiry notice of the TOS, and thus to bind such users to that contract's

9  mandatory individual arbitration and class action waiver provisions.  *See* Order at 11-17.  The Court

10  concluded that where they appeared as dark text against a white background, Eventbrite's sign-in

11  flows are "sign-in wrap agreements [that] contain similar features to those that courts have upheld."

12  *Id.* at 15 (concluding that if a user saw such a disclosure, "it would have put him on notice" of the

13  TOS).  The Court similarly held that Eventbrite's checkout flows are sufficient as a matter of law to

14  put users on inquiry notice of the TOS.  *See id.* at 12 (concluding that one order flow constituted a

15  "sign-in wrap agreement [] sufficient to put [Plaintiff Snow] on notice."), 13-14 (approving another

16  order flow, while not a full sign-in wrap agreement, as sufficient "because the agreements are not

17  'buried at the bottom of the page or tucked away in obscure corners of the website where users are

18  unlikely to see it.' [A]lthough users are not absolutely guaranteed to see these agreements, they are

19  likely to because the agreements are close enough to the action buttons and are part of a page that a

20  plaintiff is required to scroll through a portion of.").

21       The Court determined, however, that Eventbrite had not sufficiently demonstrated that the

22  named Plaintiffs saw the specific checkout flows and TOS disclosures the Court approved.  *See* Order

23  at 11-17.  In other words, while Eventbrite had established that its disclosures confer inquiry notice

24  and thus bind users to the TOS as a matter of *law*, Eventbrite had failed as a matter of *fact* to

25  sufficiently link the named Plaintiffs to such disclosures.

26

27

28

DEFENDANT EVENTBRITE, INC.'S NOTICE OF MOTION AND SECOND MOTION TO COMPEL
ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
CASE NO. 3:20-CV-03698-WHO

### D. <u>Factual Developments Since Issuance Of The Court's Prior Order</u>

In the weeks since the Court's October 19 Order, the factual record has changed in two fundamental, dispositive ways.

<u>First</u>, Eventbrite has answered Plaintiffs' Complaint. Dkt. No. 25 ("Answer"). Eventbrite admitted Plaintiffs' allegations that "[a] contract was formed between Plaintiffs and Class members [] and Defendant [] with respect to purchases made on [Eventbrite's] website" and that "[t]he contract that governs the transactions at issue in this case includes the Terms of Service Agreement[.]" Complt., ¶¶ 53-54; *see also* Answer, ¶¶ 53-54. As set forth below, it is now a judicially admitted and established fact, rather than a mere allegation subject to change, that Plaintiffs and each member of the proposed Class they seek to represent acceded to Eventbrite's TOS.

<u>Second</u>, through the substantial efforts of a dozen employees (including newly available Engineering personnel) on three continents, Eventbrite has been able to recreate or obtain from third party sources precisely the evidence the Court previously found missing. *See* Popoff Decl., Exhs. A-I, ¶¶ 23-24, 28-35, 39-51, 54-67.

Among other steps, previously-unavailable Engineering personnel, including a Director of Engineering, sought at length to restore and/or rebuild the Desktop Web and Mobile Web checkout disclosures that were displayed to each named Plaintiff when they placed the orders at issue. *See* Popoff Decl., ¶¶ 23-24, 43-51, 61-67. Due to inherent limitations in Eventbrite's systems and storage capabilities, including that those channels rely on third party systems and external resources beyond Eventbrite's control, Eventbrite's engineers have confirmed it is impossible to reliably recreate from scratch the specific disclosures displayed to Plaintiffs at the times they created their accounts, signed in, and/or placed their orders. *See id.* at ¶¶ 12-17.

Other Eventbrite personnel, however, were able to obtain from a third party (a former vendor) videos showing the Desktop Web and Mobile Web checkout flows as they existed less than a week prior to the orders alleged by Mr. Piceno and Ms. Conner. *See* Popoff Decl., Exhs. E-H, K-L, ¶¶ 43-51, 61-67. Eventbrite's Director of Engineering and two additional engineers each reviewed the source code in effect for each such channel on the dates of those videos and the dates of Mr. Piceno's

and Ms. Conner's orders, and confirmed that those videos accurately depict the content, location, and appearance of the TOS disclosures Eventbrite displayed to Plaintiffs at the times they submitted their orders.  *See id.* at ¶¶ 49, 51, 67.

Eventbrite personnel also confirmed the specific checkout flows displayed to Ms. Snow on February 11, 2020, as well as on 13 prior occasions.  *See* Popoff Decl., Exhs. A-B, ¶¶ 28-35.  To do so, Eventbrite Engineering and other personnel reviewed internal data logs to determine the precise date on which Eventbrite transitioned its Desktop Web and Mobile Web channels to a new "embedded" checkout flow, and performed additional investigation to identify circumstances in which the old flow would nevertheless have been displayed to users even after that transition.  *See id.* at ¶ 28.  Such personnel then reviewed the event-specific settings configurations for the "Reggae Rise Up" festival to which Ms. Snow ordered tickets, and confirmed that because the organizer of that event had enabled a specific feature that prohibited display of the embedded checkout flow (i.e., allowance of payment using a service called "Affirm"), Ms. Snow saw and completed the old checkout flow to place her order.  *See id.* at ¶¶ 28-29.  Multiple Eventbrite engineers then reviewed Eventbrite source code and other documentation relating to each iteration of the old checkout flow and confirmed that the content, appearance, and location of Eventbrite's TOS disclosures has not changed since September 29, 2016.  *See id.* at ¶¶ 30-33.

Finally, Eventbrite was able to capture the specific sign-up flow and TOS disclosures displayed to Ms. Conner when she created her account on August 13, 2019 via Eventbrite's Smartphone App.  *See* Popoff Decl., Exhs. I-J, ¶¶ 54-60.  To do so, multiple Eventbrite employees searched for, isolated, and aggregated all sessions (sign-ups, log-ins, and purchases) associated with the user ID that was assigned to the email address associated with Ms. Conner, then reviewed the transaction-level information associated with such sessions.  *See id.* at ¶ 55.  Those efforts revealed that Ms. Conner created her account using version 7.0.1 of Eventbrite's native iOS Smartphone App. *See id.* at ¶ 54.  An Eventbrite product manager then obtained an iPhone capable of running that deprecated version of Eventbrite's App, installed v7.0.1 on that device, completed the account sign-

up flow, and generated screenshots of the screens displayed to users of that version of Eventbrite's App.  *See id.* at Exhs. I-J, ¶¶ 56-60.[2]

**E.   The Additional Evidence Collected By Eventbrite Confirms Each Plaintiff Accepted The TOS And Agreed To Mandatory Individual Arbitration**

1.   Plaintiff Snow

Plaintiff Sherri Snow alleges that "[o]n or about February 11, 2020, [she] purchased four tickets the [sic] Reggae Rise Up Musical Festival to take place in Las Vegas, Nevada … on April 18, and 19."  Complt., ¶ 34.  Eventbrite's records confirm that Ms. Snow placed that order via Eventbrite's Desktop Web channel.  *See* Popoff Decl., ¶ 26.

a.   The Checkout TOS Disclosures Shown To Ms. Snow On February 11, 2020

When placing the order over which she brings suit, Ms. Snow was shown the following disclosure directly above the "Pay Now" button advising that by submitting that order, she affirmed that "I accept the terms of service[:]"



Popoff Decl., Exh. A, ¶¶ 28-32.[3]  It was necessary for Ms. Snow to scroll through that page to populate the fields necessary to place her order, including her name, email, and payment and billing

---

[2]     At the time of Eventbrite's Prior Motion, the personnel tasked with collecting screenshots depicting Smartphone App sign-up flows believed that the appropriate way to generate such screenshots was to mount prior versions of the Company's Smartphone App source code into Eventbrite's current operating environment.  *See* Prior Motion at 8 fn.5.  Upon further investigation, including the input of previously-unavailable Engineering personnel, Eventbrite has determined that the more reliable way to generate such screenshots is to obtain an iPhone capable of running the relevant version of the Smartphone App, install that version on that iPhone, run and interact with the App as any consumer would, and take screenshots of the user experience.  *See* Popoff Decl., ¶¶ 18, 56-58.

[3]     Eventbrite's Prior Motion incorrectly asserted that Ms. Snow completed a different checkout flow in placing the order over which she brings suit.  *See* Prior Motion at 10.  At the time of that order, Eventbrite had transitioned its Desktop Web checkout flow from its "old" flow to a new "embedded" checkout flow.  *See* Popoff Decl., ¶ 28.  Eventbrite generally displayed that new

1   information, as well as to view and click the "Pay Now" button in order to submit her order.  *See*

2   Popoff Decl., Exh. A.  It was not possible for Ms. Snow to view the "Pay Now" button without first

3   scrolling past the TOS disclosure shown immediately above it.  *See id*. at ¶ 33.

4            b.   <u>The Checkout TOS Disclosures Shown To Ms. Snow During Prior Orders</u>

5        Eventbrite's records show that Ms. Snow placed 14 orders via Eventbrite prior to the February

6   11, 2020 order at issue here.  *See* Popoff Decl., ¶ 34.  She placed all of those orders via Mobile Web.

7   *Id*.  She completed the old Mobile Web checkout flow for 13 of those 14 orders.  *Id*. at ¶¶ 34-35.[4]  On

8   each of those occasions, Ms. Snow saw the following disclosure advising that by submitting her

9   order, she "accept[ed] the terms of service[:]"

10
11
12   
13

14   *Id*., Exh. B, ¶¶ 35-36.  While Ms. Snow was required to scroll on that page in order to provide the

15   required information and submit her order, it was not possible for Ms. Snow to view the "Pay Now"

16   button without first scrolling past the TOS disclosure shown immediately above it.  *See id*. at ¶ 35.

17            2.   <u>Plaintiff Piceno</u>

18        Plaintiff Anthony Piceno alleges that "[o]n or about January 14, 2020, [he] purchased tickets

19   to the Barbara Mason concert and dinner to take place in Commerce, California … on March 23,

20   _____

21   checkout flow to users seeking to purchase tickets via Desktop Web after September 16, 2019.  *See
    id.*  For that reason, counsel previously understood that Ms. Snow was shown and completed that new

22   flow on February 11, 2020.  However, Eventbrite has confirmed that in February 2020 (and still
    today), the old flow was displayed on Desktop Web for a given event where an event-specific setting

23   rendered that event ineligible for the embedded checkout flow.  *See id*.  Here, Eventbrite's
    investigation confirms that the Reggae Rise Up event to which Ms. Snow purchased tickets was at all

24   times subject to such a disqualifying event, namely, that the event organizer specified AFFIRM as an
    accepted payment method.  *See id*. at ¶ 29.  As such, Ms. Snow saw and was required to complete the

25   old flow (depicted above) rather than the new embedded flow.  *See id*. at ¶¶ 28-33.

26   [4]   In placing her October 25, 2019 order, Ms. Snow was shown and completed the new

27   embedded checkout flow.  Eventbrite has been unable to recreate the appearance of that flow on that
    date for the reasons explained above, or to locate a screenshot, video, or other evidence reliably

28   depicting that flow at or near that date.  *See* Popoff Decl., ¶¶ 12-17.

singer
cashman LLP

1  2020."  Complt., ¶ 38.  He declares under oath that he did so "from the Eventbrite website[,]" i.e.,

2  Desktop Web or Mobile Web.  *Id.* at ECF p. 26, ¶ 3.  Eventbrite's records do not reveal any purchase

3  of tickets to that event by any user named Anthony Piceno or associated with the email address

4  provided by Plaintiffs' counsel.  Popoff Decl., ¶ 37.  Eventbrite's records show that the only account

5  associated with the email address provided by counsel was created on April 16, 2020—over three

6  months after the purchase alleged in the Complaint.  *Id.* at ¶ 38.

7              a.   The Sign-Up TOS Disclosures Mr. Piceno Would Have Seen

8         Accepting Mr. Piceno's allegation that he ordered tickets to the Barbara Mason concert on

9  January 14, 2020, it is conceivable (albeit unsupported by any Eventbrite record) that he created an

10 Eventbrite account on that date.  Based on his declaration that he interacted with "the Eventbrite

11 website[,]" Mr. Piceno would have seen one of the following disclosures advising that "[b]y

12 continuing, I accept the Eventbrite terms of service[:]"

13 | **Desktop Web Sign-Up Flow** | **Mobile Web Sign-Up Flow** |



23 Popoff Decl., Exhs. C-D, ¶¶ 40-42.  It would not have been possible for Mr. Piceno to create an

24 account via the Desktop Web or Mobile Web sign-up flow without seeing one of these disclosures.

25 *See id.* at ¶ 42.

DEFENDANT EVENTBRITE, INC.'S NOTICE OF MOTION AND SECOND MOTION TO COMPEL
ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
CASE NO. 3:20-CV-03698-WHO

1

    b. <u>The Checkout TOS Disclosures Mr. Piceno Would Have Seen</u>

2       Accepting his allegation that he ordered tickets to the Barbara Mason concert on January 14,

3  2020 "from the Eventbrite website[,]" i.e., Desktop Web or Mobile Web, Mr. Piceno would have

4  seen a statement advising him that by submitting his order, he affirmed that "I accept the terms of

5  service[.]"  Popoff Decl., Exhs. E-H, ¶¶ 43-51.

6       Had he placed his order via Desktop Web on January 14, 2020, Mr. Piceno would have seen

7  the following disclosure:

8

9  

10

11

12  Popoff Decl., Exhs. E-F, ¶¶ 47-49.  He would not have had to scroll within the checkout flow in order

13  to see the disclosure depicted above.  *See id*. at ¶ 48.

14       Had Mr. Piceno placed his order via Mobile Web on January 14, 2020, he would have seen

   the following disclosure:

15

16  

17

18

19

20  Popoff Decl., Exhs. G-H, ¶¶ 47, 50-51.  The foregoing disclosure is visible only if the user scrolls

21  within the Mobile Web checkout, but it would have been necessary for Mr. Piceno to scroll through

22  at least a portion of that checkout flow in order to populate the fields necessary to place his order.

23  *See id*. at ¶ 50.

24       3. <u>Plaintiff Conner</u>

25       Plaintiff Linda Conner alleges that "[o]n or about December 19, 2019, [she] purchased tickets

26  to the Tanya Tucker concert to take place in Sacramento, California … on June 5, 2020."  Complt.,

27  ¶ 41.  Eventbrite's records show that Ms. Conner placed that order via Mobile Web.  *See* Popoff

28

Decl., ¶ 61.  Eventbrite's records further show that Ms. Conner created her Eventbrite account via a standalone sign-up on August 13, 2019, using version 7.0.1 of the Company's native iOS Smartphone App.  *Id*. at ¶¶ 53-55.

          a.   <u>The Sign-Up TOS Disclosure Shown To Ms. Conner On August 13, 2019</u>

    When she created her Eventbrite account on August 13, 2019, Ms. Conner saw the following screen notifying her that "[b]y continuing," she affirmed that "I accept the Eventbrite terms of service[:]"



Popoff Decl., Exh. I, ¶¶ 55-57.[5]  In order to create an account using her email address, Ms. Conner was required to enter her email address and tap "Get Started[.]"  *See id.* at ¶ 57.  It would not have

---

[5]    The Sign-Up screenshot Eventbrite provided in its Prior Motion (*see* Dkt. No. 18-2 at ECF p. 14) was generated after December 2019 and using a more recent version of Eventbrite's iOS Smartphone App than that used by Ms. Conner.  The flow depicted in that screenshot differed in two material respects from the screens Eventbrite has since confirmed were displayed to Ms. Conner. <u>First</u>, the prior screenshot included a "Continue With Apple" feature that was not available in December 19, 2019 and thus was not displayed to Ms. Conner.  *See* Declaration of Roshni Jain in support of Eventbrite's Prior Motion (Dkt. No. 21-1), ¶ 3.  <u>Second</u>, the prior screenshot was created on an iOS device with "dark mode" enabled.  That feature of Apple's iOS, which inverts image color schemes (e.g., renders an otherwise white background as black and otherwise dark font as bright), was not supported by v7.0.1 of Eventbrite's iOS Smartphone App.  *See* Popoff Decl., ¶¶ 61.  As such, the Sign-Up flow Ms. Conner created would have appeared as a white background with black and blue font.  *Id*.

1  been possible for Ms. Conner to create her account without continuing past this screen.  *Id.*  Upon

2  entering her email address (which would not have been recognized by Eventbrite's systems since she

3  did not previously register an account), Ms. Conner also saw the below screen advising her for a

4  second time that "[b]y signing up," she confirms that "I agree to Eventbrite's terms of service[:]"



12  *Id.* at Exh. J, ¶ 58.  It would not have been possible for Ms. Conner to create her account without

13  populating the fields shown above and tapping "Sign Up[.]"  *See id.* at ¶ 59.

14          b.  <u>The Checkout TOS Shown To Ms. Conner On December 19, 2019</u>

15          As explained above, Eventbrite's records confirm that Ms. Conner placed the order at issue in

16  this case on December 19, 2019 via Eventbrite's Mobile Web channel.  *See* Popoff Decl., ¶ 61.

17  Before placing that order, Ms. Conner saw the below disclosure explaining that by submitting her

18  order, she acknowledged that "I accept the terms of service[:]"



24  *Id.* at Exhs. K-L, ¶¶ 62-67.

25  **III.  LEGAL STANDARDS**

26          The Federal Arbitration Act ("FAA") governs this motion.  9 U.S.C. § 1, *et seq.*  The Court's

27  role in adjudicating a motion to compel arbitration brought under the FAA is limited to determining

28

(i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004); *see also, e.g.*, *Chiron Corp.*, 207 F.3d at 1130 (where both questions are answered in the affirmative, "then the Act requires the court to enforce the arbitration agreement in accordance with its terms.").

"To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted).  If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

As an interlocutory order, the Court's denial of Eventbrite's Prior Motion remains subject to review, revision, or amendment at any time prior to final judgment.  *See, e.g.*, *City of Los Angeles, Harbor Div. v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (observing the "general rule" that "as long as a district court has jurisdiction over the case, then it possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient."); *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1315 (11th Cir. 2000) (when a district court issues "an interlocutory order, the district court has plenary power over it and this power to reconsider, revise, alter or amend the interlocutory order").

Here, new developments to the underlying factual record provide good cause to revisit the evidence demonstrating the parties' agreement to arbitrate.  Contrary to Plaintiffs' unsupported assertion (*see* Dkt. No. 26 at 6-8), revisiting this issue on a changed evidentiary record is not by necessity a request for reconsideration of Eventbrite's Prior Motion, because (among other things) "no authority—not the FAA, the Federal Rules of Civil Procedure, or any other source of law of which we are aware—limits a party to only one motion under §§ 3 or 4 of the FAA." *Dillon,* 787

F.3d at 715-16 (reversing order construing renewed motion to compel arbitration as one for reconsideration, and directing district court to consider newly presented evidence and decide motion on its merits); *see also Khath v. Midland Funding, LLC*, 334 F.Supp.3d 499, 510 (D. Mass. 2018) (rejecting claim that renewed motion to compel arbitration should have been decided as motion for reconsideration).[6]

For that reason, Courts frequently adjudicate without issue a subsequent motion to compel following development of the factual record, even where an initial motion is denied for failure to prove an agreement to arbitrate.  *See, e.g., Maxit Designs*, 2006 WL 2734366 (granting second motion to compel arbitration based on supplementation of record demonstrating all claims were subject to mandatory arbitration); *Smith v. Rent-a-Center, Inc.*, No. 1:18-cv-01351, 2019 WL 3004160 (E.D. Cal. Jul. 10, 2019) (granting second motion to compel arbitration shortly after denying original motion where second motion was based on "substantial documentation not included with [the] first motion."); *Lucas v. Hertz Corp.*, 875 F. Supp. 2d 991 (N.D. Cal. 2012) (granting renewed motion to compel arbitration following supplementation of record to address evidentiary deficiency); *Bernal v. Southwestern & Pacific Specialty Finance, Inc.*, No. C 12-05797, 2014 WL 1868787 (N.D. Cal. May 7, 2014) (granting second motion to compel arbitration where first motion was denied for insufficient evidentiary showing); *Benson v. Casa de Capri Enterprises, LLC*, No. 18-cv-06, 2019 WL 2327630 (D. Ariz. May 31, 2019) (allowing second motion to compel arbitration based on changes in pleadings); *see also Advanced Semiconductor Materials America, Inc. v. Applied Materials, Inc.*, 922 F. Supp. 1439, 1442 (N.D. Cal. 1996) (granting renewed motion for summary judgment brought after new evidence was obtained, and rejecting claim that renewed motion was non-compliant motion for reconsideration of prior summary judgment order).  In so doing, Courts not only comport with the holding in *Dillon* that no rule precludes a subsequent motion to compel, but also recognize and advance the sound judicial policy of resolving the issue correctly on the merits and in light of the "emphatic federal policy in favor of arbitral dispute resolution."

[6] Even if the Court were to construe this Motion as a request for leave to move for reconsideration under Local Civil Rule 7-9—and it should not, for the reasons set forth herein—the standards for granting leave to bring such a motion under L.R. 7-9(b)(1) and (2) are amply satisfied here.

DEFENDANT EVENTBRITE, INC.'S NOTICE OF MOTION AND SECOND MOTION TO COMPEL ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
CASE NO. 3:20-CV-03698-WHO

1   *Marmet Health Care Center, Inc. v. Brown,* 565 U.S. 530, 533 (2012) (*quoting KPMG LLP v.*

2   *Cocchi,* 565 U.S. 18 (2011)).

3   **IV.   ARGUMENT**

4        **A.   <u>Plaintiffs' Claims Are Subject To Mandatory Individual Arbitration</u>**

5             1.   <u>Plaintiffs Have Judicially Admitted They Accepted The Terms of Service</u>

6        Plaintiffs affirmatively allege that Eventbrite's TOS "govern[] the transactions at issue in this

7   case[.]"  Complt., ¶¶ 53-54.  With Eventbrite's admission of that allegation (*see* Answer, ¶¶ 53-54), it

8   has become an established fact, not subject to conflicting proof or further debate.  "Judicial

9   admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from

10  issue and dispensing wholly with the need for proof of the fact." *Am. Title Ins. Co. v. Lacelaw Corp*.,

11  861 F.2d 224, 226 (9th Cir. 1988) (quotation omitted).  Such admissions are "conclusively binding on

12  the party who made them."  *Id*.  With the pleadings now settled, Plaintiffs' judicial admission that

13  their purchases were governed by Eventbrite's TOS is "conclusive[]" evidence on this issue.

14  Eventbrite's motion should be granted based on this judicial admission alone.

15            2.   <u>Plaintiffs Were On Inquiry Notice Of, And Assented To Be Bound By,</u>
16                 <u>Eventbrite's TOS</u>

17       Even if Plaintiffs could somehow sidestep the judicial admission that is "conclusively

18  binding" on them (they cannot), the record evidence admits of only one conclusion:  Plaintiffs were

19  each shown multiple disclosures that the Court has already determined are sufficient as a matter of

20  law to provide inquiry notice that their use of Eventbrite's services and the transactions at issue are

21  governed by Eventbrite's TOS.  *See* Order at 11-15 (and authorities cited therein).  Having seen these

22  disclosures and proceeded to complete the transactions at issue, each Plaintiff manifested his or her

23  assent to those TOS.  Accordingly, under black letter law, the Court must enforce those terms by

24  dismissing this case and compelling Plaintiffs to individual arbitration in accordance with the TOS.[7]

25  _____

26  [7]   Any questions of arbitrability must be decided by the arbitrator in the first instance because
    the arbitration clause "clearly and unmistakably" refers such questions of arbitrability to the arbitrator
    both explicitly and by invoking AAA Rules.  *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales,*

27  *Inc.*, 139 S. Ct. 524, 529, 31 (2019); *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015);
    *DeVries v. Experian Info. Sols., Inc.*, No. 16-cv-2953-WHO, 2017 WL 733096, at *9 (N.D. Cal. Feb.

28  24, 2017).

1    *See, e.g.*, *Dohrmann v. Intuit, Inc.*, 823 Fed.Appx. 482, 483-85 (9th Cir. 2020); *Lee*, 817 Fed.Appx. at

2    394-95; Prior Motion at 18-19 (collecting cases enforcing TOS in light of substantially identical

3    disclosures).

4                                    a.    <u>Sherri Snow</u>

5            Eventbrite's records reflect that Ms. Snow created an account "en route to ordering tickets,"

6    rather than through a standalone sign-up process.  Order at 11; *accord* Popoff Decl., ¶ 27.

7    Accordingly, the question of whether Ms. Snow assented to Eventbrite's TOS focuses on (1) the

8    disclosure that she saw before submitting her order on February 20, 2020; and (2) any other prior

9    disclosures that could have put her on inquiry notice.

10           With respect to the former, the record is clear and conclusive that the disclosure Ms. Snow

11   saw before placing the order at issue here was sufficient as a matter of law to confer inquiry notice.

12   *See* Section I-E-1-a, *supra*; Order at 12 (finding same disclosure sufficient because "the message 'I

13   accept the Terms of Service' is directly above that Pay Now Button, meaning that Snow had to scroll

14   past it to press the button[,]" the disclosure was "positioned close to the button[,]" and "the words

15   'terms of service' appear as a hyperlink [in] blue, while the text around it is gray."); *see also, e.g.*,

16   *Dohrmann*, 823 Fed.Appx. at 484; *Lee*, 817 Fed.Appx. at 394-95; Prior Motion at 18-19 (collecting

17   cases).  Accordingly, the disclosure Ms. Snow saw before placing the order over which she brings

18   suit gave her fair notice that the TOS governed her purchase and use of Eventbrite's services.

19           Moreover, prior to placing the order at issue here, Ms. Snow placed 14 prior orders for

20   credentials to other events.  She submitted at least 13 of those prior orders after viewing disclosures

21   this Court has already approved as sufficient as a matter of law to bind her to the TOS (Eventbrite

22   was unable to obtain satisfactory visual evidence of the final disclosure).  *See* Section I-E-1-b, *supra*;

23   Order at 12.  That Ms. Snow was repeatedly notified of the TOS and affirmatively assented to them

24   provides an additional basis on which to hold her to that contract here.

25

26

27

28

1

### b.  Anthony Piceno

2          The record similarly demonstrates beyond debate that Mr. Piceno (assuming he placed the

3    order he alleges) also saw multiple disclosures that this Court has already held sufficient to provide

4    inquiry notice that the TOS governed his purchase of tickets and use of Eventbrite's services.

5          If Mr. Piceno created an Eventbrite account "through the Eventbrite website" on January 14,

6    2020 (Dkt. No. 1 at ECF p. 26, ¶ 3), the Desktop Web and Mobile Web disclosures he would have

7    seen are more than sufficient to have placed him on inquiry notice.  *See* Section I-E-2-a, *supra*; Order

8    at 14-15 (approving substantially identical sign-up flows as "sign-in wrap agreements [that] contain

9    similar features to those that courts have upheld.  [Citations]  … If the first of these were the image

10   that Piceno saw, it would have put him on notice[.]"); *see also Dohrmann*, 823 Fed.Appx. at 484;

11   *Lee*, 817 Fed.Appx. at 394-95; Prior Motion at 18-19.

12         With respect to Mr. Piceno's alleged purchase "through the Eventbrite Website" of tickets to

13   the Barbara Mason event (of which Eventbrite has no record), the record again permits only one

14   conclusion.  Whether he placed that alleged order through Desktop Web or Mobile Web, the

15   disclosures Mr. Piceno would have seen are sufficient under settled law and this Court's prior Order

16   to put him on inquiry notice that Eventbrite's TOS governed that purchase.  *See* Section I-E-2-b,

17   *supra*; Order at 12-13; *Dohrmann*, 823 Fed.Appx. at 484; *Lee*, 817 Fed.Appx. at 394-95; Prior

18   Motion at 18-19.

### c.  Linda Conner

19

20         Finally, the evidence confirms that the disclosures Ms. Conner saw in creating her account

21   and placing the order at issue are sufficient as a matter of law to bind her to the TOS.

22         As a necessary condition of creating her account on August 13, 2019 via Eventbrite's

23   Smartphone App, Ms. Conner saw two separate disclosures advising her that "[b]y continuing" or

24   "[b]y signing up," she affirmed that "I accept" and "I agree to Eventbrite's terms of service[.]"  *See*

25   Section I-E-3-a, *supra*; Order at 14-15 (approving substantially identical sign-up flow in connection

26   with Mr. Piceno).  In each case, the Terms of Service disclosure was presented next to "the buttons

27

28

singer
cashman LLP

1  that signal acceptance, in a font that contrasts with the background," and with "the phrase 'terms of

2  service' in hyperlink blue[.]" Order at 15; *see also* Prior Motion at 18-19.

3      Ms. Conner reaffirmed her assent to the TOS when she ordered tickets to the Tanya Tucker

4  event on December 19, 2019. *See* Section I-E-3-b, *supra*. In placing that order, she saw a disclosure

5  containing all of the elements this Court previously found sufficient to demonstrate inquiry notice:

6  (a) the statement "I accept the terms of service" disclosure appears in close proximity to the "place

7  order" button; (b) the "terms of service" appear in blue and are a hyperlink to the TOS itself; (c) there

8  is nothing about the text that would make it inconspicuous or "non-obvious[;]" and (d) while some

9  scrolling is required to view the TOS disclosure, that disclosure is "close enough to the action buttons

10  and [is] part of a page that a plaintiff is required to scroll through a portion of." Order at 12-14 (and

11  authorities cited therein). Accordingly, the record demonstrates beyond dispute that Ms. Conner was

12  on inquiry notice of the TOS and affirmatively agreed that that contract would govern the purchase

13  over which she brings suit.

14      **B.   The Court Should Dismiss Plaintiffs' Claims**

15      Although the Court may stay an action pending arbitration, it is authorized to "dismiss it

16  outright when, as here, [] all of the claims raised in the action are subject to arbitration."

17  *Johnmohammadi v. Bloomingdale's, Inc.*, 755 F.3d 1072, 1073-74 (9th Cir. 2014); *e.g.*, *Peterson v.*

18  *Lyft*, No. 16-cv-7343, 2018 WL 6047085, at *6 (N.D. Cal. Nov. 19, 2018) (dismissing case); *Mims v.*

19  *Davison Design & Dev., Inc.*, No. 16-cv-92, 2016 WL 10771297, at *4 (C.D. Cal. Apr. 14, 2016)

20  (same); *Legnaioli v. Chrysler Capital, LLC*, No. 15-cv-744, 2015 WL 12765468, at *4 (C.D. Cal.

21  June 9, 2015) (same). The Court should dismiss this case because all of Plaintiffs' claims are subject

22  to mandatory individual arbitration..

23  **V.   CONCLUSION**

24      For the foregoing reasons, the case must be dismissed, and Plaintiffs directed to pursue their

25  claims in individual arbitration. Eventbrite's Motion should be granted in full.

1    Date:  November 16, 2020          Respectfully submitted,

2                                SINGER CASHMAN LLP

3                                By: _____

4                                  Adam S. Cashman

5                                  Doug Tilley
                                  *Attorneys for Defendant Eventbrite, Inc.*

DEFENDANT EVENTBRITE, INC.'S NOTICE OF MOTION AND SECOND MOTION TO COMPEL
ARBITRATION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
CASE NO. 3:20-CV-03698-WHO