# EXHIBIT A

**REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED**

1           IN THE UNITED STATES DISTRICT COURT

2     IN AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4

5   SHERRI SNOW and LINDA CONNER,
    as individuals, on behalf of
6   themselves, the general public,
    and those similarly situated,

7

8             Plaintiffs,

9   v.                No. 3:20-CV-03698-WHO

10  EVENTBRITE, INC.,      **HIGHLY CONFIDENTIAL**

11            Defendant.
   _____/

12  Zoom Remote Deposition of

13     NICK POPOFF

14  Thursday, June 3, 2021

15    **CERTIFIED COPY**

16

17     TRANSCRIPT DESIGNATED HIGHLY CONFIDENTIAL

18        (ATTORNEYS' EYES ONLY)

19

20

21  REPORTED BY:  CINDY TUGAW, CSR #4805

22

23         NOGARA REPORTING SERVICE
24         5 Third Street, Suite 415
        San Francisco, California 94103
25          (415) 398-1889

1                          I N D E X

2                                          Page Number

3          EXAMINATION BY MR. KENNEDY              4

4          EXAMINATION BY MR. TILLEY              55

5                          ---o0o---

6                       E X H I B I T S

7      Plaintiffs'

8      Exhibit 1   Declaration of Nick Popoff         8
                   in Support of Eventbrite,
9                  Inc.'s Second Motion to
                   Compel Arbitration
10                         ---o0o---

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       BE IT REMEMBERED that, pursuant to Notice of

2  Taking Deposition and on Thursday, the 3rd day of June,

3  2021, commencing at the hour of 10:04 o'clock a.m.

4  thereof, via Zoom videoconference, before me, CINDY

5  TUGAW, a Certified Shorthand Reporter in the State of

6  California, personally appeared,

7                       NICK POPOFF,

8  called as a witness by the Plaintiffs, having been by

9  me first duly sworn, was examined and testified as

10  hereinafter set forth.

11                       ---o0o---

12                  APPEARANCES OF COUNSEL

13  For the Plaintiffs
        GUTRIDE SAFIER, LLP
14      100 Pine Street, Suite 1250
        San Francisco, California 94111
15      BY: TODD KENNEDY, Attorney at Law
        BY:  TEKESHA GEEL, Attorney at Law
16      (415) 639-9090

17

18  For the Defendant
        SINGER CASHMAN, LLP
19      601 Montgomery Street, Suite 1950
        San Francisco, California 94111
20      BY:  DOUG TILLEY, Attorney at Law
        (415) 500-6080

21

22  Also Present:  Jeneva Toolajian, Zoom host; Lisa
    Gorman, Eventbrite general counsel
23                       ---o0o---

24

25

1    THE REPORTER:  Good morning.  At this time, I will

2   ask counsel to stipulate on the record that there is no

3   objection to this deposition officer administering a

4   binding oath to the witness via Zoom, starting with the

5   noticing attorney.

6    MR. KENNEDY:  No objection from plaintiff.

7    MR. TILLEY:  No objection from defendant.

8    (Whereupon, the Witness was duly sworn by the

9    Reporter.)

10    EXAMINATION BY MR. KENNEDY

11    MR. KENNEDY:  Q.  Good morning, Mr. Popoff.

12    A.  Good morning.

13    Q.  Thanks for spending some time with us today.

14   Would you please just state and spell your name for the

15   record.

16    A.  Sure.  My name is Nick

17   Popoff, N-i-c-k, P-o-p-o-f-f.

18    Q.  And do you understand that you're under oath?

19    A.  I do.

20    Q.  Do you understand that your testimony has the

21   same weight, force and effect as if you were testifying

22   in court before a jury?

23    A.  I do.

24    Q.  And do you understand that my questions and

25   your answers will be taken down by the court reporter

1  and then may be read to the jury at the trial of this

2  case?

3      A.  I do.

4      Q.  And have you been deposed before?

5      A.  I have not.

6      Q.  Okay.  So I'd just like to go briefly over

7  some deposition rules.  And the first one is that it's

8  important that we don't talk over each other.  So when

9  I'm asking a question, just for the court reporter's

10 benefit, just make sure that I finish before you speak.

11 And then, vice versa, when you're speaking, I'll make

12 sure that I wait until you're done talking.  Okay?

13          Is that okay?

14     A.  That's okay.

15     Q.  Okay.  And that was the next --

16     A.  I was trying to practice your guidance by just

17 listening.

18     Q.  And, yeah, please just answer audibly instead

19 of nodding your head so that the court reporter can

20 actually take down an answer.

21     A.  Okay.

22     Q.  If I ask a question and you don't understand

23 it, just ask for clarification and I'll try to clarify

24 the best I can.  Is that okay?

25     A.  That's okay.

1    Q.  Do you understand that you'll be given an

2    opportunity to read the transcript of this deposition

3    and then make any changes to your answer?

4    A.  Yes.

5    Q.  And you understand that if you do make any

6    changes, I'll have the opportunity to comment on those

7    changes at trial, so it's important that you give the

8    most accurate testimony today that you can.

9    A.  Okay.

10    Q.  Your attorney may object to some of my

11    questions.  But even if he does object, it's important

12    that you respond to the question unless he instructs

13    you not to answer.

14        Do you understand?

15    A.  Okay.

16    Q.  And if you ever need a break, just let me know

17    and we'll take a break.  And the only thing that I ask

18    is that you don't ask for a break while a question is

19    pending.  Just answer the question, and then we can

20    take the break.

21        Does that sound fair?

22    A.  Yeah.  That's fine.

23    Q.  Okay.  Great.  Do you have any understanding

24    of what this case is about?

25    A.  I do.

1      Q.  And what is your understanding?

2      MR. TILLEY:  Nick, if you have an understanding

3  that came from a source other than counsel, meaning

4  myself or anyone internal at Eventbrite, you can

5  provide that.  But if any understanding you had came

6  from us, I would caution you not to provide that

7  answer.

8      THE WITNESS:  Yeah, I believe it's accurate that

9  my understanding of this case has come from the

10  attorneys that I've been working with.

11      MR. KENNEDY:  Q.  When was the first time that you

12  learned about this case?

13      A.  I don't remember the exact date.

14      Q.  Do you have an approximation?

15      A.  I think it was earlier this year.  I honestly

16  don't remember exactly when.

17      Q.  And how did you come to learn of the case?

18      A.  Conversation with one of the attorneys.

19      Q.  And is that outside counsel or -- you said one

20  of the attorneys.  Which attorney are you referring to?

21      A.  I think I was involved in a meeting with both

22  internal and external counsel.

23      Q.  And have you had any conversations with anyone

24  at Eventbrite outside the presence of counsel about

25  this case?

1      A.  In preparing my declaration, I did -- in

2 gathering the information to include in the

3 declaration, I did -- in gathering the information

4 necessary for my declaration, I did discuss with some

5 Eventbrite employees.

6      Q.  And other than conversations where counsel

7 were present or conversations in preparing for your

8 declaration, have you had any conversations with anyone

9 at Eventbrite about this case?

10      A.  No.

11      MR. KENNEDY:  Could I have the court reporter mark

12 that exhibit that I sent as -- we can just mark it as

13 Exhibit 1.

14           (Plaintiffs' Exhibit 1 marked for

15           identification.)

16      MR. KENNEDY:  And could we display that on the

17 screen.

18      I don't see an exhibit.  Are you able to put

19 the exhibit up on the screen?

20      ZOOM HOST:  Yes.  Just one moment.

21      MR. KENNEDY:  All right.

22      Q.  Okay.  Mr. Popoff, I'm showing you what's been

23 marked as Exhibit 1.  And the document is titled --

24 first of all, can you see that on your screen?

25      A.  I can.

1     Q.  The document is titled "Declaration of Nick

2  Popoff in Support of Eventbrite, Inc.'s Second Motion

3  to Compel Arbitration."

4     Are you familiar with this document?

5     A.  Yes.

6     Q.  And is this the declaration you were referring

7  to earlier?

8     A.  Yes.

9     THE REPORTER:  Todd, can we stop for just one sec?

10    MR. KENNEDY:  Sure.

11     (Brief recess.)

12    MR. KENNEDY:  Can we please turn to page 21.  I'm

13  sorry, it's actually page 20 of the declaration.  By

14  page 20, I mean the numbers at the top of the page.

15    ZOOM HOST:  Okay.  Just one moment.

16    MR. KENNEDY:  Yes, that's it.  And if you could

17  scroll down to paragraph 66.

18     Q.  Mr. Popoff, would you please just take your

19  time to read paragraph 66 just to refresh your

20  recollection.

21     A.  Okay.  I've got it.

22     Q.  And then if we could please continue -- the

23  paragraph continues on the next page.  And could you

24  please finish the paragraph.

25     A.  Are you referencing just paragraph 66?

1      Q.  Yes.

2      A.  Okay.  I've got it.

3      Q.  Okay.  And so the image that's displayed at

4   the end of paragraph 66 is a screenshot, correct?

5      A.  Yes.

6      Q.  Is that a screenshot that you took personally?

7      A.  No.

8      Q.  Okay.  Who took the screenshot, do you know?

9      A.  I don't know.

10     Q.  Do you have an understanding of what that

11  screenshot is of?

12     A.  Yes.

13     Q.  And what is your understanding?

14     A.  It's the terms of service of our checkout

15  flow.

16     Q.  But that screenshot, that image itself, wasn't

17  actually taken of a live Eventbrite service, correct?

18     MR. TILLEY:  Objection.  Vague.

19     THE WITNESS:  I don't understand your question.

20     MR. KENNEDY:  Q.  Well, when you take a

21  screenshot, you're taking an image from a screen,

22  correct?

23     A.  Possibly.

24     Q.  And, let's see.  Do you see in paragraph 66 --

25  well, I'll just read it to you.  Your declaration says,

1   "Attached hereto as Exhibit L, and excerpted below, is

2   a true and correct screenshot showing the screen

3   visible at 9:00 of that video."

4          So would you agree that that screenshot is of

5   a video, is that correct, the Rainforest video?  And

6   it's the Rainforest video in particular, is that

7   correct?

8          A.  Correct.

9          Q.  Have you reviewed the Rainforest video?

10         A.  Yes.

11         Q.  So that's not a screenshot of a live

12  Eventbrite service that was taken, correct?  It was a

13  screenshot of a video of an Eventbrite service?

14         MR. TILLEY:  I'm going to object as vague with

15  respect to live.

16         THE WITNESS:  I don't understand your question.

17         MR. KENNEDY:  Q.  The Rainforest video in

18  question, according to your declaration, was dated

19  December 11, 2019, is that your understanding?

20         A.  Yes.

21         Q.  So is it possible for you today to restore the

22  Eventbrite service exactly as it was displayed on

23  December --

24         (Reporter interruption.)

25         MR. TILLEY:  So the objection -- can we read back

1    the question?

2         MR. KENNEDY:  So I'll just ask the question again.

3         Q.  Is it possible for you today to restore the

4    Eventbrite service as it was displayed on December 11,

5    2019?

6         MR. TILLEY:  Objection with respect to restore and

7    service.  Vague, I should have said, sorry.

8         THE WITNESS:  No, it's not.

9         MR. KENNEDY:  Q.  Okay.  So I would like to just

10   kind of run through the process by which someone makes

11   an HTTP request to Eventbrite and then receives a

12   response.  Okay?

13         And when I'm asking these questions, unless I

14   say otherwise, I'm asking about this time period around

15   December 11 -- let's just say December 2019.  Okay?

16   Does that make sense?

17         A.  I'm not sure.

18         Q.  Okay.  Well, if you need any clarification,

19   just let me know.  But I just want to say, before I

20   start this line of questioning, that when I'm asking

21   about the Eventbrite service, I'm really going to be

22   focusing on the period of December 2019.  Okay?  If it

23   becomes confusing, just let me know.

24         Does that sound fair?

25         A.  Sure.

1    Q.  Okay.  So in December 2019, if a consumer were

2  to go to Eventbrite and they -- I guess that would be

3  at Eventbrite.com, correct?

4    A.  I'm not sure I understand your question.

5    Q.  Let's say a consumer enters Eventbrite.com

6  into their browser in December of 2019.  Is that

7  request going to be handled by a load balancer?

8    MR. TILLEY:  Objection.  Vague.  Lacks foundation.

9      But if you know and understand the question,

10  please go ahead.

11    THE WITNESS:  I don't understand your question.  I

12  guess the way I should say is that that doesn't seem

13  like an accurate understanding.

14      (Discussion off the record.)

15  ███████████████ ██ █████████████████████████

16  ████████████████████████████████████████████

17  ███████████████████

18    ██ ███████████████████████████████

19  █████████████ ███████████████████████████

20  ██████████████████████████████████

21  ██████████████████████████████████████

22  ███████████████████████

23    ██ █████ █████████████████████████████

24  █████████████████

25    █████████ ███████████████











16    MR. TILLEY:  Same objections.

17    THE WITNESS:  I mean, as you are stating the

18 question, I don't know how to answer that question.  I

19 wouldn't know how to provide that.

20    MR. KENNEDY:  Q.  Eventbrite sells tickets to

21 events, correct?

22    A.  Yes.







1

2

3

4

5

6

7

8

9     MR. KENNEDY:  Q.  Is there something about that

10    question that's confusing?

11         A.  Yes.

12         Q.  And what about the question is confusing or

13    needs clarification?

14

15

16

17

18

19

20

21

22

23

24

25



1

2

3

4

5

6        MR. KENNEDY:  Q.  Your declaration describes a

7    video that Rainforest took of the Eventbrite website,

8    correct?

9        A.  Correct.

10       Q.  And so Rainforest obviously visited the

11   Eventbrite website in order to take its video, is that

12   right?

13       MR. TILLEY:  Object to form.

14       THE WITNESS:  I'm not sure I understood the

15   question.

16       MR. KENNEDY:  Q.  When Eventbrite took its

17   video -- I'm sorry, when Rainforest took its video of

18   the Eventbrite website, then Rainforest obviously

19   visited the Eventbrite website, correct?

20       MR. TILLEY:  Object to form.

21       THE WITNESS:  Yeah, I'm not -- I'm not totally

22   sure I get your question.

23       MR. KENNEDY:  Q.  What about the question do you

24   not understand?

25       A.  Just the phrase "visited the Eventbrite

1    website."

2         Q.  How did Rainforest take the video of the

3    Eventbrite website?

4         MR. TILLEY:  Objection.  Lacks foundation.  Calls

5    for speculation.

6         THE WITNESS:  I'm not sure I understand your

7    question.

8         MR. KENNEDY:  Q.  Did someone at Rainforest, for

9    example, actually go to a browser and type in

10   "Eventbrite.com" to take the video, or were they taking

11   the video of some code that was separately provided by

12   Eventbrite?

13        MR. TILLEY:  Objection.  Lacks foundation.  Calls

14   for speculation.

15        THE WITNESS:  The answer is I don't know.  I don't

16   know exactly how Rainforest implemented it.

17        MR. KENNEDY:  Q.  So you don't know whether or not

18   Rainforest took a video of the Eventbrite website?

19        MR. TILLEY:  Objection.  Vague.  Some other

20   issues, but I'll stand there.

21        THE WITNESS:  So I know that they took a video,

22   but, again, I don't understand your question when you

23   talk about "of the Eventbrite website."

24        MR. KENNEDY:  Q.  Sitting here today, do you know

25   whether or not Rainforest took a video of the

1    Eventbrite website in December 2019?

2         MR. TILLEY:  Object to form.

3         THE WITNESS:  Yeah, again, I'm not sure how to

4    answer that question.

5         MR. KENNEDY:  Q.  What do you know about the

6    Rainforest video that was taken of the Eventbrite

7    website or -- let me just strike that.

8              What do you know about the Rainforest video?

9         MR. TILLEY:  Objection.  Vague.

10             And to the extent, Nick, that any

11   understanding you have comes from a source other than

12   counsel, that's fair game, but stuff that came from us,

13   I ask you not to share that.

14             I'm sorry, you're hearing my dog bark in the

15   background.

16        THE WITNESS:  So my understanding -- my

17   understanding of it is that it's a video and it's a

18   video of our purchase experience.

19        MR. KENNEDY:  Q.  And how do you know that to be

20   true?

21        A.  My understanding of that video came from

22   talking with the engineering team that is responsible

23   for our checkout experience and they explained what it

24   was to me.

25        Q.  Okay.  And who at the engineering team did you

1    speak with about the Rainforest video?

2        A.   The product manager for the checkout

3    engineering team.

4        Q.   And what's his or her name?

5        A.   Stephanie Pi.

6        Q.   Is that P-i?

7        A.   Yes.

8    ████ ████████████████████████████████████

9    ██████████████████████████████████████████████

10   █████████████████████████████

11   ████████████ ██████████ ████████ ███████████████

12   ██████████████████████

13   █████████████████ ███████████████████████████████

14   ████████████████

15   ███████████████ ███ █████████████████████

16   ██████████████████████████████████████████████

17   ███████████████

18           (Reporter power supply interruption.)

19       MR. KENNEDY:  Q.  So the testimony that was

20   missed, Mr. Popoff, I'm just going to try to

21   characterize it fairly, and let me know if I do it

22   incorrectly.  Okay?

23       MR. TILLEY:  Objection.

24       MR. KENNEDY:  Q.  But my understanding of -- and

25   Doug will help, but my understanding of what we

1  established or what we discussed is I asked about the

2  screenshot in your declaration in paragraph 66, and

3  whether there were any source code files that were

4  produced that may have been relevant to how that

5  screenshot was shown, is that right?

6       MR. TILLEY:  Nick, you're on mute.

7            I think that that is a slight

8  mischaracterization, so I'll object on that basis.

9            But, Nick, you're the master of your own

10  destiny.

11      THE WITNESS:  Could you repeat what you said.

12      MR. KENNEDY:  Q.  Yes.  What we were discussing

13  earlier is whether or not there were any files in the

14  source code that Eventbrite produced that are relevant

15  to how the disclaimer in your declaration was shown to

16  consumers.  Is that right?

17      A.  I don't think that's what you said.

18      Q.  Okay.  Well, I'm just going to have to start

19  over.  And, again, I'm referring to the screenshot in

20  paragraph 66 of your declaration.

21            Do you understand that?

22      A.  Yes.

23      Q.  And you understand that Eventbrite produced

24  source code in this case, correct?

25      A.  Yes.





1

2

3

4

5

6

7

8

9      MR. KENNEDY:  Q.  What does it mean for a link to

10   have a blank target?

11      MR. TILLEY:  Same objections.

12      THE WITNESS:  Are you asking me to explain like

13   web development?  I don't understand that question.

14      MR. KENNEDY:  Q.  Do you have any understanding of

15   what the word blank means in this file?

16      MR. TILLEY:  Same objections.

17      THE WITNESS:  I'm not sure how to answer your

18   question, like what do you mean by my understanding?

19      MR. KENNEDY:  Q.  Well, yes or no.  Do you have

20   any understanding of what the term blank means in this

21   file?

22      A.  Yes.

23      Q.  And what is that?  What is your understanding?

24      A.  So in the HTML standard, the use of that blank

25   term typically means that if a user clicks that link,



it will open in a new window.











1

2

3

4

5

6

7

8

9          MR. KENNEDY:  Q.  Okay.  There's a -- again, I'm

10   talking about December 2019, around that period.  The

11   terms of use that -- well, first of all, do you

12   understand what I'm referring to when I say terms of

13   use?

14          A.  I'm not sure.

15          Q.  Okay.  In your declaration, the screenshot

16   that we just looked at says, "I accept the terms of

17   service," correct?

18          A.  Yes.

19          Q.  And terms of service, as we saw earlier, that

20   was a link that if you clicked on the link, it would

21   take you to the terms of service.  Is that your

22   understanding?

23          A.  Yes.

24          Q.  And that would cause your -- as a consumer,

25   that would cause your web browser to load a file that

1   contained the terms of service, right?

2       MR. TILLEY:  Objection.  Lacks foundation.  Calls

3   for speculation.  Incomplete hypothetical.

4       THE WITNESS:  Yeah, I don't understand your

5   question.

6       MR. KENNEDY:  Q.  Okay.  When you click on the

7   terms of service link, it takes you to the terms of

8   service, right?

9       A.  Yes.

10      Q.  And that terms of service is stored somewhere

11  on the Internet by Eventbrite, right?

12      MR. TILLEY:  Object to form.

13      THE WITNESS:  No.

14      MR. KENNEDY:  Q.  Okay.  Where is it stored?

15      A.  At -- I don't -- I don't understand your

16  question.

17      Q.  When a web browser displays the terms of

18  service, the web browser is actually loading a file, is

19  that right?

20      A.  No.

21      Q.  Okay.  What is the browser doing?

22      MR. TILLEY:  Object to form.

23      THE WITNESS:  I'm not -- I don't feel able to

24  answer that question.

25      MR. KENNEDY:  Q.  Okay.  Do you know what an HTML

1  file is?

2      A.  Yes.

3      Q.  Is there an HTML file that can change the

4  terms of service for Eventbrite?

5      MR. TILLEY:  Object to form.

6      THE WITNESS:  I don't believe so.

7      MR. KENNEDY:  Q.  Okay.  And so then where is the

8  terms of service?  Is there any file that contains the

9  terms of service?

10     MR. TILLEY:  Object to form.

11     THE WITNESS:  I'm not sure I understand your

12  question.

13     MR. KENNEDY:  Q.  Okay.  I don't know what's

14  confusing here, but let me just be straight with where

15  I'm coming from.  I have scoured the source code that

16  Eventbrite produced and I have not been able to find

17  the terms of service.  So what I would like you to do

18  is find the terms of service in this source code.

19         Are you able to do that?

20     A.  I'm not sure.

21     Q.  Okay.  Would it help if we took a break?  We

22  could take a 20-minute break if you want to and you can

23  look in your source code and try to find the terms of

24  service.  Would that be helpful?

25     A.  I don't believe that would be helpful because

1    I don't understand your question at this point.

2        Q.  What is it that you don't understand, because

3    I'd like to help you understand?

4        A.  Like are you asking -- are you asking me to

5    find a file?

6        Q.  Yes, I'm asking you to find the file that

7    contains the terms of service that allegedly was shown

8    to the plaintiffs.

9        MR. TILLEY:  I'm going to object to form,

10   particularly vague as to time and scope.

11       THE WITNESS:  So if you're asking me to look for a

12   file that contains the terms of service, I could

13   attempt to do that, but still I'm not sure I understand

14   how to do that in a way that satisfies the question

15   because I'm still not totally sure I understand your

16   question.

17       MR. KENNEDY:  Q.  Okay.  Well, when a consumer

18   clicks on the terms of service link, it leads to

19   something, right?

20       MR. TILLEY:  Object to form.

21       THE WITNESS:  I don't understand your question.

22       MR. KENNEDY:  Q.  You know, let's just go -- let's

23   pull up my web browser here.  Okay.  So we're on

24   Eventbrite.com, correct?

25       A.  Correct.

1    Q.  Okay.  Now, where -- how do I get to the terms

2  of service?

3    A.  I'm not -- I'm not sure I understand your

4  question.

5    Q.  Okay.  Sir, I feel like you're being just a

6  little difficult.  I'm asking a very simple question.

7  I'm on the Eventbrite.com website and I'm asking you

8  how do I get to the terms of service, and you don't

9  understand that question?

10    I just want you to answer the questions unless

11  there's something that is legitimately confusing about

12  them.

13  MR. TILLEY:  Objection.  Argumentative.  He's

14  trying, Todd.  I appreciate that, you know, engineering

15  minds work differently than lawyers and we're all

16  different from normal people, but if you'd like to try

17  your best, and Nick is going to try his best, too.

18  MR. KENNEDY:  Q.  Okay.  How do you get to the

19  terms of service from that website?

20    And just for the record, the Eventbrite.com

21  website is displaying on the screen, and I have

22  scrolled all the way to the bottom of the screen.  And

23  I'm asking the witness how do I get to the terms of

24  service.

25    A.  So I see there's something at the bottom that

1  says "terms."

2      Q.  Great.  So I'm going to click on that link.

3  And now there's another page, it's

4  "Eventbrite.com/l/legal terms."  And do you see on this

5  page where there's another link that says "Terms of

6  Service?"

7      A.  Yes.

8      Q.  I'm going to click on that now.  Okay.  And

9  here I'm at a page that has at the top the title

10  "Eventbrite Terms of Service."  Do you see that?

11      A.  Yes.

12      Q.  Okay.  And do you see this language here that

13  says "Last Updated April 14th, 2021"?

14      A.  I do.

15      Q.  Okay.  And this page is the Eventbrite terms

16  of service as it exists today, right?

17      MR. TILLEY:  Object to form.

18      THE WITNESS:  I believe so.

19      MR. KENNEDY:  Q.  Okay.  So where is this terms of

20  service stored?

21      MR. TILLEY:  Objection.  Vague.  Lacks foundation.

22  Calls for speculation.

23      THE WITNESS:  I'm not sure how to answer that

24  question.

25      MR. KENNEDY:  Q.  Well, my web browser is pulling

1   this terms of service from Eventbrite's website,

2   correct?

3        MR. TILLEY:  Object to form.

4        THE WITNESS:  Yes.

5        MR. KENNEDY:  Q.  And so I assume that this terms

6   of service must be stored somewhere by Eventbrite,

7   right?

8        MR. TILLEY:  Are you asking him what your

9   assumption is?

10       MR. KENNEDY:  No.

11       Q.  Is it your understanding that Eventbrite

12  stores the terms of service somewhere?

13       MR. TILLEY:  Object to form.

14       THE WITNESS:  I'm not sure how to answer that

15  question.

16       MR. KENNEDY:  Q.  Okay.  Is there a file that

17  contains the language of this terms of service?

18       MR. TILLEY:  Object to form.

19       THE WITNESS:  I -- I don't know how to answer that

20  question.

21       MR. KENNEDY:  Q.  Okay.  What about the question

22  is confusing?

23       A.  You're asking me questions which are sort of

24  founded on assumptions and probably misunderstanding

25  things.  And so it's difficult for me to answer your

1    question.

2        Q.  And what do you think I'm assuming or

3    misunderstanding that makes it difficult for you to

4    engage with this question?

5        MR. TILLEY:  Object to form.

6        THE WITNESS:  I don't understand what you mean by

7    the word store.

8        MR. KENNEDY:  Q.  And what is confusing or

9    ambiguous about the word store?

10       MR. TILLEY:  Object to form.

11       THE WITNESS:  You're -- you're asking me a

12   technical question, and when you use the word store, I

13   don't know how to apply that in answering the technical

14   question.

15       MR. KENNEDY:  Q.  You don't know what the word

16   store means as a technical matter?

17       A.  You're asking me the question, like where is

18   it stored, and -- and in that question I don't

19   understand what you mean by that word, like in order to

20   answer your question.

21       Q.  Okay.  Do you have an understanding of where

22   the terms of service is posted?

23       MR. TILLEY:  Objection.  Vague as to time.

24       THE WITNESS:  Yeah, I've done the -- what's on

25   your screen right now was produced by a number of

1    different systems.  There isn't a singular system or a

2    singular file which is stored in a singular place,

3    which is the reason why it's difficult for me to answer

4    the question that way.

5         MR. KENNEDY:  Q.  Okay.  Would you be able to

6    look at the source code that Eventbrite produced and

7    identify any files that contain any of the language of

8    the terms of service that was displayed to consumers in

9    December 2019?

10        MR. TILLEY:  Object to form.

11        THE WITNESS:  So you're asking me in this

12   deposition to do like a technical research to answer

13   that question?  Like at this time I don't know the

14   answer to your question.

15        MR. KENNEDY:  Q.  Okay.  So sitting here right

16   now, you are not aware of any way to identify any files

17   that Eventbrite produced that contain any of the

18   language of the terms of service as it was displayed to

19   consumers in December 2019?

20        MR. TILLEY:  Objection.  Mischaracterizes

21   testimony.

22        THE WITNESS:  So I still don't understand your

23   request.  Like I -- I see on the screen in front of me

24   a web browser that's showing a web page.  And I -- like

25   I -- I fundamentally don't understand what you're

1  asking me to attempt to do.

2       MR. KENNEDY:  Q.  Okay.  Well, as I explained

3  earlier, I have reviewed the source code that

4  Eventbrite produced and I have not been able to find

5  the terms of use anywhere in that code.  I'm asking you

6  if, sitting here today, you have any -- any way of

7  doing that.

8       MR. TILLEY:  Object to form.  Is that a question?

9       MR. KENNEDY:  Yes.

10       THE WITNESS:  Again, I'm not sure I can answer

11  this question.  You're showing me a web page right now,

12  and I'm not sure how -- like how your request relates

13  to this page you're showing me.

14       MR. KENNEDY:  Okay.

15       THE WITNESS:  And I'm not sure how to complete

16  this answer that you're discussing.

17       MR. KENNEDY:  Q.  Let's forget about the web page

18  for now because that web page was from today.  And what

19  I'm talking about is the terms of service as it was

20  displayed to consumers in December 2019.  Okay?

21            Do you understand that?

22       A.  Actually, I'm not sure I understand that

23  question.

24       Q.  Okay.  I'm just trying to clarify.  I'm

25  referring to the terms of service as it was displayed

1    to consumers in December of 2019.

2         A.  And I'm still not sure how to answer that

3    question.

4         MR. TILLEY:  I don't think it was a question.  He

5    was just saying forget the website he was just showing

6    you because that's from today.  He's saying put

7    yourself in the line of space of someone in December

8    2019, I think.

9         THE WITNESS:  The line of space of like whom and

10   what are they doing on our site?  That's what I find

11   confusing.

12        MR. KENNEDY:  Q.  What I'm clarifying is I'm

13   talking about the website as it existed in December

14   2019.  Okay?  Just trying to clarify.  That's it.

15        Do you understand now?

16        A.  Yes.

17

18

19

20

21

22

23

24

25

1  ████████████████  ████████████████

2      A.  Sorry, I think I understand your question,

3  but -- but, again, I don't -- I don't know how to say

4  yes or no to your request to find those files unless I

5  do a kind of technical investigation during this

6  deposition.

7      MR. KENNEDY:  Okay.  And, I mean, that's why we're

8  here.  So I would like you to do a technical

9  investigation during the deposition, and I have all

10  day.  So would you like to do that during a break or --

11  I mean, it seems to me that might be the easiest way to

12  do it so that you'll have a little bit of time to look

13  at the code and then we can come back.

14          I mean, I'm open to suggestions, too, Doug.  I

15  mean, I just want to get to the bottom of this because

16  I don't see the terms of service anywhere in the code.

17  And if it's there, I want to identify it right now

18  today.

19      MR. TILLEY:  Okay.  So I think, in any event, we

20  should take a break because we've been going.  I will

21  just note that the idea of having all day, I think that

22  was probably a colloquialism, but we had stipulated

23  previously to time limits on this deposition.

24          And, broadly, I mean, Nick is very familiar

25  with the code, but asking him, like as we sit here

1   today, please tell me the location of a file that I

2   didn't ask you about until today is a little bit

3   unfair.  So why don't we take a break, let everybody

4   cool their jets, and we'll come back in a couple of

5   minutes.

6        MR. KENNEDY:  Okay.  So what do you want, like a

7   ten-minute break?  Does that sound good?

8        MR. TILLEY:  Yeah, I think so.  I mean, it's good

9   for starters.  I don't know -- I am not nearly as good

10   with the code as Nick is, so I don't understand how

11   much looking this might take.  So let us just have a

12   couple of minutes -- let's take ten minutes, we'll come

13   back and we can reassess then.

14        MR. KENNEDY:  Okay.  Sounds good.  So be back on

15   at 11:50.

16        MR. TILLEY:  Okay.  Sounds good.

17        MR. KENNEDY:  Thank you.

18        MR. TILLEY:  Thank you.

19        (Brief recess.)

20        MR. KENNEDY:  Let's just go on the record and kind

21   of recount what you just told me and then we can

22   probably finish for the day.

23        MR. TILLEY:  Okay.  Are we back on, Cindy?

24        THE REPORTER:  Yes.

25        MR. TILLEY:  So, Todd and I just had an exchange

1   off the record.  We were trying to work, during a

2   break, over some of the confusion over the last line of

3   questioning.  We've discussed that Todd's questions

4   were asking about ███████████████████

5   ████████████████████████████████████████

6   ██████████████████████████████  ████████

7   ████████████████████████████████████████

8   █████████████████████████████████████████

9   ███████████

10         ████████████████████████████████████

11  ████████████████████████████████████████

12  ███████████████████████████████████████

13  ████████████████████████████████████

14  ████████████████████████████████████

15  █████████████████████████████████████████

16  ████████████████████████████████████████

17  ████████████████████

18        MR. KENNEDY:  Okay.  I understand that.

19        Q.  And, Mr. Popoff, do you understand and agree

20  with how your counsel just characterized it?

21        A.  Yes.

22    ████  ██████  ██████████████████████████

23  ███████████████████████████████████████

24  ██████████████████████████████

25    ████  ████████



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    Q.  Okay.  Have you done anything to collect the

24    terms of service ████████████████████████████ in

25    connection with this case?

1     MR. TILLEY:  Objection.  Vague.

2     THE WITNESS:  Yeah, I've -- the way you frame that

3 question, I'm not able to answer.

4     MR. KENNEDY:  Q.  Okay.  Well, have you -- in

5 connection with this case, have you accessed █████

6 ████████████████████████████

7     MR. TILLEY:  Objection --

8     THE WITNESS:  The way you've frame that question,

9 I can't answer it.

10     MR. KENNEDY:  Q.  Well, I mean, we just

11 established that the contents of the terms of service

12 ██████████████████████████████████████

13     A.  Yes.

14     Q.  So I'm asking have you ever downloaded or

15 saved or accessed the contents of the terms of service

16 with respect to this case?

17     A.  I have not, no.

18     Q.  And do you know if anyone at Eventbrite has

19 done that?

20     MR. TILLEY:  Object to form.

21     THE WITNESS:  I don't know the answer to that.

22     MR. KENNEDY:  Q.  Do you know if Eventbrite has

23 produced the terms of service ██████████████████████

24 ████████████  in connection with this case?

25     MR. TILLEY:  Object to form.

1    THE WITNESS:  Yeah, maybe I'll just say it, which

2  is, you're using the word ██████████ and I just don't

3  understand what you mean by that or what the question

4  is.

5    MR. KENNEDY:  Q.  Okay.  So what would you -- what

6  would you refer to it as?  I just said ██████████

7  ██████████ , but would you say ██████████████████

8  ██████████████████████  I mean, I don't know.  What

9  would you call it?

10    A.  Again, I truly don't mean to be stumbling, but

11  like I -- like I don't know how -- I don't know how to

12  provide you the language to answer the question.  Like

13  is there another way you could frame this question?

14    MR. KENNEDY:  Well, can I ask the court reporter

15  to read back the last question, actually.  I just want

16  to refresh how I phrased it.

17        (Record read by Reporter.)

18    MR. KENNEDY:  Yeah, sorry, can you repeat the

19  question prior to that.

20        (Record read by Reporter.)

21    MR. KENNEDY:  Okay.  Thank you.  So let me just

22  ask a different question.

23    Q.  Do you know whether Eventbrite has produced

24  the terms of service in connection with this case?

25    A.  I don't know the answer to that.

1    Q.  Did you do any work to produce the terms of

2  service in connection with this case?

3    A.  No.

4    Q.  And you don't know whether anyone else at

5  Eventbrite had done any work to produce the terms of

6  service in connection with this case?

7    A.  I don't know.

8    Q.  In the process of preparing your declaration,

9  did you access the terms of service?

10    MR. TILLEY:  Objection.  Vague.

11    THE WITNESS:  I don't recall.  Like my focus was

12  on the actual display of the disclaimer in the checkout

13  flow.  There was not like, you know, any other part of

14  it, like clicking any other links or other parts of

15  our, you know, experiences.  So I produced the code

16  that relates to the display of the disclaimer in our

17  checkout flow.

18    MR. KENNEDY:  Q.  If I asked you to collect all

19  versions and backups of the terms of service ██████

20  ████████, how would you go about trying to do that?

21    MR. TILLEY:  Object to form.  Vague and incomplete

22  hypothetical.

23    THE WITNESS:  Yeah, my answer would be I don't

24  know because I'm not a ████████ expert.

25    MR. KENNEDY:  Q.  And who at Eventbrite would be

1  the most appropriate person to try to collect prior

2  versions of the terms of service from ██████████████

3  ██████

4      MR. TILLEY:  Object.  Lacks foundation.  Calls for

5  speculation.

6          But, Nick, if you have a basis to --

7      THE WITNESS:  I'm not -- I'm not that familiar

8  with our -- ██████████████████████, so I don't know

9  the name of a particular person.

10     MR. KENNEDY:  Okay.  That's all the questions that

11 I have.

12         Do you have anything, Doug?

13     MR. TILLEY:  Just a small clarification.

14              EXAMINATION BY MR. TILLEY

15     MR. TILLEY:  Q.  Nick, you had said a moment ago

16 that your work focused on just the checkout flow.  And

17 if you take a look at your declaration -- you don't

18 need to take a look at it, but there's some discussion

19 of a signup flow as well that you described Plaintiff

20 Connor as having gone through.

21         Does that refresh in any respect your

22 recollection about the scope of your work as being

23 something broader than just checkout flow?

24     A.  Yes, sorry, I missed that.  It's the checkout

25 and signup experiences and how the terms of service

1  disclaimer is displayed in those experiences.

2      MR. TILLEY:  Okay.  I don't have anything further.

3  Thank you, Nick.

4      MR. KENNEDY:  Okay.  And, Mr. Popoff, again, thank

5  you for your time.

6      THE WITNESS:  Sure.  Thank you.

7      MR. TILLEY:  All right.  Thank you for your time.

8  I hope you have a wonderful rest of your day.

9          (Whereupon, the deposition

10          concluded at 12:13 o'clock p.m.)

11              ---o0o---

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 CERTIFICATE OF WITNESS

2                    ---o0o---

3

4        I, NICK POPOFF, hereby declare under

5 penalty of perjury that I have read the foregoing

6 deposition testimony; and that the same is a true

7 and correct transcription of my said testimony

8 except as corrected pursuant to my rights under

9 Rule 30(e) of the Federal Rules of Civil

10 Procedure.

11

12               _____

13                     Signature

14               _____

15                       Date

16

17

18

19

20

21

22

23

24

25

1    STATE OF CALIFORNIA      )
                              )
2    COUNTY OF SAN FRANCISCO )

3            I, CINDY TUGAW, a Certified Shorthand Reporter

4    of the State of California, duly authorized to

5    administer oaths pursuant to Section 8211 of the

6    California Code of Civil Procedure, do hereby certify

7    that

8                        NICK POPOFF,

9    the witness in the foregoing deposition, was by me duly

10   sworn to testify the truth, the whole truth and nothing

11   but the truth in the within-entitled cause; that said

12   testimony of said witness was reported by me, a

13   disinterested person, and was thereafter transcribed

14   under my direction into typewriting and is a true and

15   correct transcription of said proceedings.

16           I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   caption.

21           Dated the 9th day of June, 2021.

22

23

24
                        CINDY TUGAW
25                      CSR No. 4805 (California)

1  Nick Popoff
   c/o Singer Cashman, LLP
2  601 Montgomery Street, Suite 1950
   San Francisco, California 94111
3  Attn: DOUG TILLEY, Attorney at Law

4  Date:  June 9, 2021
   Re:  Sherri Snow, et al., vs. Eventbrite, Inc.
5  Deposition Date:  Thursday, June 3, 2021

6  Dear Mr. Popoff,

7       Please be advised the original transcript of
   your deposition is ready for your review.
8       Pursuant to FRCP Rule 30(e), you have 30 days
   following the date of this notice to read, correct if
9  necessary, and sign your transcript unless the
   attending parties and the deponent agree on the record
10 or otherwise in writing to a longer or shorter time
   period.  The deponent may change the form or the
11 substance of the answer to a question, and may either
   approve the transcript of the deposition by signing it,
12 or refuse to approve the transcript by not signing it.
   You are not required by law to read and sign your
13 deposition transcript.  All parties will be informed of
   the corrections.  The original transcript will then be
14 sealed and sent to the examining attorney pursuant to
   the applicable law.
15      You may either come to our office to read and
   sign the original transcript, or you may contact your
16 attorney or the attorney who arranged for you to be
   present at your deposition.  If they have ordered a
17 copy of the transcript, you may review their copy and
   make corrections by submitting, signing and returning
18 the attached form.  If you choose to review your
   transcript at our office, please call first to make an
19 appointment.  Should you have any question regarding
   these instructions, please call.
20
   Sincerely,
21


22
   NOGARA REPORTING SERVICE
23 5 Third Street, Suite 415
   San Francisco, California 94103
24 (415) 398-1889

25 cc:  All counsel, original deposition