UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHERRI SNOW, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>EVENTBRITE, INC.,<br><br>    Defendant. | Case No. 3:20-cv-03698-WHO<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. Nos. 27, 50, 55, 58, 59, 61 |

Plaintiffs Sherri Snow and Linda Conner bought tickets to events through defendant Eventbrite, Inc. ("Eventbrite") that were cancelled or postponed because of the COVID-19 pandemic. They allege, on behalf of themselves and a proposed class, that Eventbrite was required to reimburse them. I previously denied Eventbrite's motion to compel arbitration and identified specific evidentiary deficiencies in the showing it made. It now brings a renewed motion, which is granted. Eventbrite has produced an agreement that each plaintiff would have seen when she signed up for the events in question. Those agreements put the plaintiffs on notice that they were agreeing to arbitrate their claims under standard contract principles.

Even though I grant its motion, Eventbrite's conduct in this litigation, and that of and its attorneys, has been troubling. Among other problems, I previously found that Eventbrite made entirely contradictory factual assertions to try to win its motion. Not only did Eventbrite make no attempt to defend or explain those inconsistencies in its briefs here, it compounded the problem by putting forward *other* contradictory factual assertions on the same issues. It tried to slough off the previous assertions (though not acknowledge the contradictions in them) in footnotes by claiming its attorneys were simply misinformed—an excuse that seems difficult to square with the specific representations it made and statements filed under penalty of perjury. Though I will not order

Eventbrite and its attorneys to show cause why they should not be sanctioned, I record the conduct here.

**BACKGROUND**

Plaintiffs Sherri Snow and Linda Conner allege that they purchased tickets to events through Eventbrite's online ticket marketplace. Complaint ("Compl.") [Dkt. No. 1] ¶¶ 34–43. Those events were cancelled or rescheduled due to the COVID-19 pandemic. *Id.* The plaintiffs allege that Eventbrite owed them refunds for those tickets but refused to provide them. *Id.* ¶¶ 60–110.

When a consumer creates an Eventbrite account or purchases tickets on Eventbrite, they go through (respectively) a sign-up or checkout process—sometimes called a "flow" by the parties. *See* Order Denying Motion to Compel Arbitration ("Prior Order") [Dkt. No. 22] 2. As a general matter, Eventbrite argues that, when the plaintiffs created accounts and bought tickets, they would have to, as a necessary part of the process, assent to Eventbrite's Terms of Service ("TOS"). *Id.* 2–4. As described in the Prior Order, the TOS contains arbitration provisions that require consumers to arbitrate claims individually with Eventbrite. *See id.*

The plaintiffs filed suit in June 2020 and Eventbrite moved to compel them to arbitration in August. *See* Dkt. No. 18. In October 2020, I denied that motion. The relevant portions of that Prior Order are described in more detail below. As a general matter, I denied the motion because Eventbrite did not demonstrate what online agreements the plaintiffs would have seen. *See* Prior Order 7–9, 11–17. Instead, without explanation, it provided those webpages from (with one exception) January 2016 and the present day—neither of which was when the plaintiffs created accounts or made orders. *Id.* Those webpages changed markedly in appearance in that time. *Id.* Eventbrite also did not state whether there were other versions of the webpages in between or what they would have looked like. *Id.* All this aside, I found that Eventbrite submitted contradictory factual assertions in its motion and reply and submitted misleading evidence. *Id.* 9–11.

Eventbrite brought a renewed motion to compel arbitration in November 2020. *See* Second Motion to Compel Arbitration ("Mot.") [Dkt. No. 27]. But the parties stipulated to (and I approved) arbitration-related discovery and paused the briefing schedule to accommodate it. Dkt.

2

No. 37. I repeatedly extended the schedule at the parties' request. Dkt. Nos. 44, 45, 47, 49. After discovery ended, briefing continued. Several days before the hearing, the plaintiffs moved to file a sur-reply and attached that brief. Dkt. No. 58.[1] I held a hearing on August 18, 2021.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs motions to compel arbitration. 9 U.S.C. §§ 1 *et seq*. Under the FAA, a district court determines: (i) whether a valid agreement to arbitrate exists and, if it does, (ii) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003) (internal quotation marks and citation omitted). If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4. "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

## DISCUSSION

### I.   MOTION TO COMPEL ARBITRATION

Eventbrite once again argues that the plaintiffs assented to online agreements that committed them to the TOS and its arbitration provision.[2] *See* Mot. 17–20. The motion is GRANTED.

"In determining whether a valid arbitration agreement exists, federal courts apply ordinary state law." *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175 (9th Cir. 2014) (internal quotation marks omitted). The parties previously applied California law and neither argues there is any reason it should not still apply. *See* Prior Order 5. Under California law, a valid contract

---

[1] The unopposed motion for leave to file a sur-reply (Dkt. No. 58) is GRANTED.

[2] It also argues, for the first time, that the plaintiffs' Complaint shows that they assented. Because I grant the motion on other grounds, there is no need to determine whether Eventbrite is correct.

1  requires the "mutual consent of the parties," which is "generally achieved through the process of
2  offer and acceptance." *DeLeon v. Verizon Wireless, LLC*, 207 Cal. App. 4th 800, 813 (2012)
3  (internal citations omitted).  Whether there was mutual consent "is determined under an objective
4  standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable
5  meaning of their words and acts, and not their unexpressed intentions or understandings." *Id.*
6  Although mutual consent is generally a question of fact, whether a certain set of facts is sufficient
7  to establish a contract is a question of law.  *Id.*; *Long v. Provide Commerce, Inc.*, 245 Cal. App.
8  4th 855, 863 (2016).

9  Even if an offeree does not know all of the terms of an offer, he "may be held to have
10  accepted, by his conduct, whatever terms the offer contains" so long as there was a sufficient
11  "outward manifestation or expression of assent." *Windsor Mills, Inc. v. Collins & Aikman Corp.*,
12  25 Cal. App. 3d 987, 992 (1972).  But "when the offeree does not know that a proposal has been
13  made to him this objective standard does not apply.  Hence, an offeree, regardless of apparent
14  manifestation of his consent, is not bound by inconspicuous contractual provisions of which he
15  was unaware, contained in a document whose contractual nature is not obvious." *Id.* at 993
16  (internal citations omitted).  These principles apply to all contracts, including arbitration
17  agreements.  *Nguyen*, 763 F.3d at 1175.

18  "While new commerce on the Internet has exposed courts to many new situations, it has
19  not fundamentally changed the principles of contract." *Id.* (internal quotation marks and citation
20  omitted). Internet-based contracts have historically "come primarily in two flavors." *Id.*
21  "Clickwrap" (or "click-through") agreements require a website's users "to click on an 'I agree'
22  box after being presented with a list of terms and conditions of use." *Id.* at 1175–76.
23  "Browsewrap" agreements exist "where a website's terms and conditions of use are generally
24  posted on the website via a hyperlink at the bottom of the screen." *Id.*  Browsewrap agreements,
25  unlike clickwrap agreements, do not require any affirmative manifestation of assent to terms;
26  parties give assent by using the website.  *See id.*  A third type of internet contract, the "sign-in
27  wrap" agreement, has also developed and is sometimes regarded as a "blend" or "hybrid" of the
28  two.  *See Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 763 (N.D. Cal. 2019); *see also Meyer*

4

*v. Uber Techs., Inc.*, 868 F.3d 66, 75–76 (2d Cir. 2017) (collecting cases analyzing sign-in wrap agreements). Sign-in wrap agreements occur when "a website notifies the user of the existence of the website's terms of use and, instead of providing an 'I agree' button, advises the user that he or she is agreeing to the terms of service when registering or signing up." *Peter v. DoorDash, Inc.*, 445 F. Supp. 3d 580, 585 (N.D. Cal. 2020) (internal quotation marks and alterations omitted).

For an internet contract to be valid, the website (or smartphone application, if applicable) must either place the user on actual notice of the agreement or "put[] a reasonably prudent user on inquiry notice of the terms of the contract." *Nguyen*, 763 F.3d at 1177. Courts have determined that inquiry notice existed when "the existence of the terms was reasonably communicated to the user." *Colgate*, 402 F. Supp. 3d at 763; *see Meyer*, 868 F.3d at 76 (collecting cases). Whether a particular website reasonably communicated the existence of the terms is a fact-intensive inquiry that "depends on the design and content of the website and the agreement's webpage." *Nguyen*, 763 F.3d at 1177. As a result, courts have examined, among other aspects of the website and agreement, the visibility and obviousness of the notice of assent. *See id.* (collecting cases).

Eventbrite, the party seeking to compel arbitration, "bears the burden of proving the existence of an agreement to arbitrate by a preponderance of the evidence." *Norcia v. Samsung Telecommunications Am., LLC*, 845 F.3d 1279, 1283 (9th Cir. 2017).

**A. Adequacy of the Evidence Previously Presented**

Eventbrite maintains (albeit in a footnote) that the evidence in its initial motion was sufficient. Mot. 5 n.1. For that it cites two cases, *Lee v. Ticketmaster L.L.C.*, No. 18-CV-05987-VC, 2019 WL 9096442 (N.D. Cal. Apr. 1, 2019), *aff'd*, 817 F. App'x 393 (9th Cir. 2020), and *Dickey v. Ticketmaster LLC*, No. CV 18-9052, 2019 WL 9096443, at *1 (C.D. Cal. Mar. 12, 2019). But all that it gets from those cases is that they granted motions to compel arbitration based on averments that the "look and feel" of the webpages changed "slightly" over time from the one presented to the court. Mot. 5 n.1.

As an initial matter, neither court actually addressed that issue; the "slightly changed" language is pulled from declarations in the record, not the cases. As far as either court indicated, no party disputed that the "slightly" changed pages were materially identical. More importantly, a

5

"slightly" changed page in this context is a page whose *material* or *relevant* features are *essentially identical*. Otherwise, the pages would necessarily require different analyses. *See, e.g.*, *Dohrmann v. Intuit, Inc.*, 823 F. App'x 482, 484 n.2 (9th Cir. 2020) ("One Plaintiff accessed his TurboTax account through a slightly different sign-in page. But the parties do not dispute that the page's relevant features are nearly identical.").

Eventbrite's evidence showed that the look and feel of its pages varied significantly and materially—not "slightly"—over time. To briefly reiterate, Eventbrite mostly included pages from January 2016 and the present day, which varied in many material respects. *See, e.g.*, Prior Order 7 (comparing two such images). And Eventbrite did not, anywhere, say whether there were still more variations, which of its materially different pages the plaintiffs would have seen, or which of those differing pages looked most like the pages the plaintiffs would have seen. In short, Eventbrite's prior position remains wrong. *Cf. Bernal v. Sw. & Pac. Specialty Fin., Inc.*, No. C 12-05797 SBA, 2013 WL 5539563, at *4 (N.D. Cal. Oct. 8, 2013) (denying motion to compel arbitration because the defendants did not produce a copy of the loan application that would have been given to the plaintiff, but instead produced the "current version").[3]

Eventbrite's argument is particularly strained in light of the remainder of this Order. As I discuss below, Eventbrite now admits that several of the sign-in wrap agreements it previously relied on were not what the plaintiffs would have seen. It then presents entirely different sign-in wrap agreements that it insists, with the same certainty as previously, are the real ones. As a result, its position that what the plaintiffs would have seen varied only "slightly" does not hold up even by its own lights.

**B. Whether the Plaintiffs Assented to Arbitrate**

I turn now to the key issue: whether Eventbrite has remedied the evidentiary deficiencies

---

[3] Though it does not matter to the legal analysis, the requirement that the defendant put forward an image of the webpage as the plaintiff would have encountered it (or one that is identical in all material ways) is not burdensome. The problems Eventbrite has caused for itself in producing those images in this case appear unusual. A defendant need only save an image of its agreement webpages whenever it changes the look and feel so that it can show the court what it looked like at the time. Countless defendants have done so in the cases cited in this litigation; for whatever reason, Eventbrite did not.

1 previously identified and has met its burden.  It has.

2           **i.**     **Snow**

3 Snow alleges that she purchased (through Eventbrite) four tickets to a music festival on

4 February 11, 2020, that were not refunded when the festival was rescheduled.  *See* Compl. ¶¶ 34–

5 37.  In its first motion, Eventbrite relied on the sign-in wrap agreements from Snow's initial

6 registration of an account and the orders she made.  *See* Prior Order 11–14.  Now, it has dropped

7 its original-registration argument.  *See* Mot. 9–10.

8 First, Eventbrite relies on the agreement that it says Snow would have encountered when

9 making her February 11 order.  Before delving into the details of the agreements, recall the state of

10 the evidence from the prior round of litigation.  There, Eventbrite represented, supported by sworn

11 declaration, that Snow would have encountered the following agreements each time she placed an

12 order:

 

Prior Order 13 (citations omitted).  But, as I explained, "these images are from the present day and Eventbrite has not shown what the pages would have looked like when Snow saw them."  *Id.* 14.  What was expected in the renewed motion, then, was simply a declaration supporting Eventbrite's contention that these images were indeed the agreements as they existed on February 11, 2020.

Strikingly, Eventbrite now says it was wrong and these are not what Snow would have seen.  *See* Mot. 9 & n.3.  It now presents an entirely different image that never appeared in the previous motion:



United States District Court
Northern District of California

7

1  Mot. 9; Dkt. No. 27-3 (exhibit to sworn declaration).  This image appears at the bottom of the
2  page into which a customer would have typed their information to order tickets to the music
3  festival that Snow attended.  *See* Dkt. No. 27-3 (full image).  Eventbrite's tactics are extremely
4  poorly taken, but there is no need to determine whether it is permitted to meet its burden with a
5  new image or whether I should credit its representation because I find Eventbrite's other proffered
6  agreement sufficient.

That agreement is the one that Snow would have seen when she made 13 previous orders.[4]
8  When she did so, Eventbrite's witness states in a sworn declaration that she would have
9  encountered the following agreement at the bottom of the page:



Mot. 10; Dkt. No. 27-4 (exhibit to sworn declaration).  Unlike the one just discussed, this *is* the
15  agreement that Eventbrite previously represented that Snow would have seen.  *See* Prior Order 11–
16  12.  In the Prior Order, I determined that it would put a reasonably prudent user on adequate notice
17  and incorporate that finding here.  *See id.* 12.  *Cf. Lee v. Ticketmaster L.L.C.*, 817 F. App'x 393,
18  394–95 (9th Cir. 2020) (see image at district court Dkt. No. 25); *Maynez v. Walmart, Inc.*, No. CV
19  20-0023, 2020 WL 4882414, at *3 & n.2 (C.D. Cal. Aug. 14, 2020); *Dickey v. Ticketmaster LLC*,
20  No. CV 18-9052, 2019 WL 9096443, at *7 & n.4 (C.D. Cal. Mar. 12, 2019).  The problem was
21  that Eventbrite only stated it looked that way in January 2016, not during the time that Snow
22  placed orders.  *Id.* 13.  Now, Eventbrite's director of engineering avers that this is the agreement
23  that would have existed for this event at the relevant time and explains why.  *See* Dkt. No. 27-2 ¶¶
24  34–35.  Accordingly, Eventbrite has met its burden of showing that Snow assented to the
25  agreement and that the agreement put her on adequate notice.

---

[4] Snow made 14 orders, but Eventbrite admits that it does not know what the agreement for one of the orders looked like.  *See* Mot. 10 n.4.

**ii.     Conner**

Conner alleges that she purchased (through Eventbrite) tickets to a concert on December 19, 2019, that were not refunded when the concert was rescheduled or when she requested it. *See* Compl. ¶¶ 40–43.

First, Eventbrite relies on the agreement that it alleges Conner encountered when she created her Eventbrite account. *See* Mot. 13–14. Again, it is necessary to recall what Eventbrite said the first time around. As I recounted, Eventbrite represented that its records showed that Conner created her account with the smartphone app, which means she would have seen the following agreement:



*See* Prior Order 15, 17; Dkt. No. 18 at 12 (original motion making that representation). Unlike Eventbrite's other sign-in wrap agreements, I found that this one would *not* put a user on inquiry notice. *See* Prior Order 15–16. I also pointed out that Eventbrite's evidence was contradictory because it said that this disclosure is what some plaintiffs would have seen, yet elsewhere represented that no plaintiffs would have seen an agreement that included the "Continue with Apple" button. *See id.* 9, 15.[5]

Troublingly, Eventbrite once again says it got it wrong—and once again buries its mea culpa in a footnote. *See* Mot. 13 & n.5. Now, it says that Conner really would have seen the following two agreements, not the one above:

---

[5] As discussed below, Eventbrite now claims that this image's color scheme came from using a "dark" viewing mode. Because I found that it would not put a user on sufficient notice, it seems a plausible theory that an image must put a user on notice in light or dark mode, because they may be viewing it either way. But the plaintiffs do not advance any such theory, so I do not address it.

9



*Id.* 13–14; Dkt. Nos. 27-11 (exhibit to sworn declaration), 27-12 (same).  I need not belabor the difference between these agreements and the other.  Eventbrite's bait-and-switch here is even more suspicious than the one it tried with Snow because it is in response to finding its previous agreement insufficient.  But once again, I need not address the appropriateness or merits of this argument because I find another agreement sufficient to meet Eventbrite's burden.

Eventbrite also relies on the checkout process.  Eventbrite's witness states that Conner would have encountered the following sign-in wrap agreement:



Mot. 14; Dkt. No. 27-14 (exhibit to sworn declaration).  This is essentially identical to the way Eventbrite previously represented it.  *See* Prior Order 13.  I found that it would put a user on adequate notice and incorporate that finding here.  *Id.*  *Cf. Lee*, 817 F. App'x at 394–95; *Maynez*, 2020 WL 4882414, at *3 & n.2; *Dickey*, 2019 WL 9096443, at *7 & n.4.  Accordingly, Eventbrite has met its burden of showing that Conner assented to the agreement and that the agreement put her on adequate notice.

### C.  Terms of Service

The plaintiffs, for the first time, argue that Eventbrite has not adequately demonstrated

10

1    which version of the TOS was in effect when they would have agreed to it. *See* Opposition to the

2    Mot. ("Oppo.") [Dkt. No. 50-2] 17–18.

3          First, the plaintiffs never raised this issue before and the Prior Order depended on their

4    position. *See Karasek v. Regents of Univ. of California*, 500 F. Supp. 3d 967, 983 (N.D. Cal.

5    2020) (declining to address new argument when a plaintiff "s[ought] to relitigate a settled issue

6    based on an argument that was not raised at the time."). I explained that "Eventbrite attests in a

7    sworn declaration (and the plaintiffs do not dispute) that, during the pertinent time period, the TOS

8    contained [the arbitration provisions]." Prior Order 2. The plaintiffs' original brief, in fact,

9    essentially admitted that the TOS contained that arbitration provision. *See* Dkt. No. 19 at 3–4.

10   Their entire argument was that the sign-in wrap agreements that *linked* to the TOS were not

11   sufficient to put them on notice. *See id.* at 8–14.

12         In any event, the plaintiffs' argument does not change whether they are required to

13   arbitrate. Eventbrite produced (as it did in litigating the first motion) all versions of the TOS that

14   were in effect from January 2016 to the date of the motion—which covered any period the

15   plaintiffs would have seen them. *See* Dkt. No. 18-3 (sworn declaration). All of them contain

16   arbitration provisions. *See id.*; *see also* Prior Order 2.

17         To get around this, the plaintiffs argue that Eventbrite is required, to meet its burden, to

18   produce the underlying files and metadata of those pages. Oppo. 17–18. I disagree. Absent a

19   specific reason to think otherwise, a sworn declaration authenticating the agreements is sufficient

20   to meet Eventbrite's burden. It is the type of evidence courts usually examine in these cases. *See,*

21   *e.g.*, *Brown v. Madison Reed*, No. 21-CV-01233-WHO, 2021 WL 3861457, at *5 (N.D. Cal. Aug.

22   30, 2021). To be sure, if the plaintiffs produced metadata or other evidence showing that the

23   pages were not what they are purported to be, it would be significant; but that is different than

24   requiring it for Eventbrite to meet its burden of production. The plaintiffs cite no cases to the

25   contrary. The plaintiffs also contend that there is no way to know precisely what the TOS looked

26   like without that information, Oppo. 18, but they offer no reason that a slight change in the look of

27   the *TOS itself* (not the sign-in wrap agreements) would alter the analysis.

28         The parties also get into an extended discussion about whether Eventbrite was or was not

1  required to produce these images in discovery. *Compare* Oppo. 18–19, *with* Dkt. No. 56 7–14
2  (Eventbrite's reply), *with* 59-2 (plaintiffs' sur-reply). At this posture, this dispute also does not
3  affect the analysis. If the plaintiffs believed that Eventbrite did not live up to its obligations, it
4  should have raised the issue with it then and, if the parties could not resolve it, brought it to me to
5  resolve. But the plaintiffs instead waited until their substantive briefing to make an issue of it.

## II.  MOTIONS TO SEAL

Eventbrite seeks to seal certain information in the plaintiffs' opposition, its reply, the plaintiffs' sur-reply, and the attached exhibits. *See* Dkt. Nos. 50, 51, 55, 59. Its requests are GRANTED IN PART and DENIED IN PART.

Courts "start with a strong presumption in favor of access to court records." *Foltz v. State Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003). The public possesses a right to inspect public records, including judicial records. *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096 (9th Cir. 2016). Accordingly, when a party seeks to seal judicial records connected to motions—such as the ones at issue here—that are "more than tangentially related to the underlying cause of action," it "must demonstrate that there are 'compelling reasons' to do so." *Id.* at 1096–99. "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records." *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012). This District's local rules require that requests to seal be "narrowly tailored to seek sealing only of sealable material." Civ. L. R. 79-5(b).

First, Eventbrite seeks to seal the fact that it uses Salesforce to store its TOS and several pieces of information related to it. That portion of its motions is denied. Eventbrite already revealed that fact publicly. *See* Dkt. No. 18-3 ¶ 5. Even if it had not, it has not shown what compelling reason there is to withhold the *identity* of a third-party vendor: There is nothing sensitive like specific terms of its agreement with Salesforce that could plausibly help a competitor and its supporting declaration is conclusory. *Cf. Empros Cap. LLC v. Rosenbach*, No. 3:20-CV-06788-WHO, 2020 WL 6684854, at *10 (N.D. Cal. Nov. 12, 2020) (declining to seal a third party's identity in similar circumstances).

12

Next, Eventbrite seeks to seal material (mostly in its executive's deposition but also in its Reply) that it claims would reveal confidential information to competitors about how Eventbrite's internal systems work. But the majority of what it seeks to seal are run-of-the-mill questions and answers about how Eventbrite's services are hosted and by whom. Again, Eventbrite has made no non-conclusory showing about plausible competitive harm for that sort of information. Other instances are unilluminating exchanges in which the witness gave vague and evasive answers; there is no compelling reason to seal that non-information. I will, however, seal the portions of the deposition (stated with specificity below) that concern concrete back-end operations of Eventbrite's service. There is a likelihood competitors could use that type of information and it was not material to this dispute. *Cf. Pohly v. Intuitive Surgical, Inc.*, No. 15-CV-04113-MEJ, 2017 WL 878019, at *3 (N.D. Cal. Mar. 6, 2017).

Finally, Eventbrite moves to redact exhibits that display non-public-facing information about how its TOS is stored and notes from, it appears, Eventbrite employees related to that. None of that information was relied on by either party and it might reasonably give competitors undue insight into the company. Those redactions—which do not include the public-facing information—are granted.

The motions to seal are GRANTED to the extent when it comes to the redactions in Dkt. Nos. 55-7 and 55-8 (Exhibit K), any exhibit duplicative of those documents, and the following portions of Popoff's deposition: 28:1–30:8, 31:2–37:8, 47:17–48:1. The motions are otherwise DENIED. The parties are ORDERED to file new, unsealed versions of any document that currently has redactions other than these within 21 days that redact only the information above.

The motion to remove an incorrectly filed document (Dkt. No. 61) is GRANTED. That file, Dkt. No. 58-1, was provisionally sealed at the parties' request. It will be sealed permanently.

### III.  EVENTBRITE'S AND ITS ATTORNEYS' CONDUCT

As this Order and the Prior Order make clear, Eventbrite's conduct in this litigation has been troubling.[6] As I said in the Prior Order,

---

[6] In the Prior Order, I found that "Eventbrite appears to have submitted misleading evidence; when the plaintiffs pointed it out, Eventbrite's Reply included a carefully worded argument that ducked

> Eventbrite has submitted at least one set of representations that is contradictory. In its Motion, Eventbrite states that Conner "signed up for an Eventbrite account on August 13, 2019" and "was shown the below disclosure." Mot. 12. The disclosure as it appears in Eventbrite's motion is:
>
> 
>
> *Id.* But Eventbrite's Reply states—in response to an argument the plaintiffs made about the "Continue with Apple" button—that "Eventbrite did not display the 'Continue with Apple' button in any Sign-Up flow until April 20, 2020—several months after the orders alleged in the Complaint." Reply 7 (citing Declaration of Roshni Jain [Dkt. No. 21-1] ¶ 3) (emphasis in original). Both cannot be true: Either the image above—"Continue with Apple" button and all—reflects what Conner saw or it does not. This issue is not peripheral; what precise webpages were viewed by the plaintiffs will determine whether or not they were on inquiry notice and, therefore, assented.

Prior Order 9.  I noted that "[i]t is also unclear why Eventbrite would have included these images if they were so irrelevant to the plaintiffs' claims." *Id.* 15.

In other words, Eventbrite's motion was unambiguous that one of the plaintiffs saw that image.  Eventbrite's reply was unambiguous that no plaintiff could have seen that image—which conveniently let it dodge one of the plaintiffs' counterarguments.  Eventbrite never addressed that inconsistency in its reply.  It does not address that inconsistency in its renewed motion (even to apologize for it).  And because it was asserted in a reply, it deprived the plaintiffs of a fair shot at responding.  At the very least, this strongly indicates that Eventbrite and/or its attorneys failed to perform even a basic level of investigation or fact-checking.  But it may well indicate that Eventbrite was seizing on any factual assertion, no matter how baseless, to give itself an unfair advantage and send the plaintiffs to arbitration.

---

the question" and, for reasons I explained there, that evidence *was* misleading.  Prior Order 9–11. That evidence is not the focus of this section, but the use of it is also admonished.

1   Eventbrite and its attorneys' actions only got worse from there. Eventbrite has now
2   admitted—as explained above—that several of the sign-in wrap agreements it put forward before
3   are not what Eventbrite claimed them to be. Instead, it offers completely new sign-in wrap
4   agreements that, it insists with just as much confidence as it did last time, are the real ones. The
5   details of Eventbrite's about-face are as follows.

6   As noted above, the first instance of this conduct is Snow's checkout flow. This is
7   Eventbrite's footnoted excuse for submitting an agreement last time that, apparently, has zero
8   relation to the case:

> Eventbrite's Prior Motion incorrectly asserted that Ms. Snow completed a different checkout flow in placing the order over which she brings suit. *See* Prior Motion at 10. At the time of that order, Eventbrite had transitioned its Desktop Web checkout flow from its "old" flow to a new "embedded" checkout flow. *See* Popoff Decl., ¶ 28. Eventbrite generally displayed that new checkout flow to users seeking to purchase tickets via Desktop Web after September 16, 2019. *See id*. For that reason, counsel previously understood that Ms. Snow was shown and completed that new flow on February 11, 2020. However, Eventbrite has confirmed that in February 2020 (and still today), the old flow was displayed on Desktop Web for a given event where an event-specific setting rendered that event ineligible for the embedded checkout flow. *See id*. Here, Eventbrite's investigation confirms that the Reggae Rise Up event to which Ms. Snow purchased tickets was at all times subject to such a disqualifying event, namely, that the event organizer specified AFFIRM as an accepted payment method. *See id*. at ¶ 29. As such, Ms. Snow saw and was required to complete the old flow (depicted above) rather than the new embedded flow. *See id*. at ¶¶ 28-33.

Mot. 9 n.3. And, as explained above, Eventbrite also admitted the prior account sign-up agreement shows to Conner was false. Here is its full explanation for that:

> The Sign-Up screenshot Eventbrite provided in its Prior Motion (*see* Dkt. No. 18-2 at ECF p. 14) was generated after December 2019 and using a more recent version of Eventbrite's iOS Smartphone App than that used by Ms. Conner. The flow depicted in that screenshot differed in two material respects from the screens Eventbrite has since confirmed were displayed to Ms. Conner. First, the prior screenshot included a "Continue With Apple" feature that was not available in December 19, 2019 and thus was not displayed to Ms. Conner. *See* Declaration of Roshni Jain in support of Eventbrite's Prior Motion (Dkt. No. 21-1), ¶ 3. Second, the prior screenshot was created on an iOS device with "dark mode" enabled. That feature of Apple's iOS, which inverts image color schemes (e.g., renders an otherwise white background as black and otherwise dark font as bright), was not supported by v7.0.1 of Eventbrite's iOS Smartphone App. *See* Popoff Decl., ¶¶ 61. As such, the Sign-Up flow Ms. Conner created would have appeared as a white background with black and blue font. *Id.*

Mot. 13 n.5.

15

The second instance (about Conner) shows that the evidence in the original motion was even more misleading than I originally found, in two ways. The first is that Eventbrite was, previously, crystal clear that "on August 13, 2019," Conner would have seen that image. Dkt. No. 18 at 12. But now, it admits it was "generated after December 2019 and using a more recent version" of its software, rendering it distinct. Mot. 13 n.5. The second way the evidence has now been shown to be misleading is that Eventbrite admits that it generated the image using a different operating system and a different viewing mode that dramatically changed the look and feel. Mot. 13 n.5. Eventbrite also did it without ever indicating that these the image had been altered.

At the hearing, after I laid out all of this, Eventbrite's counsel took responsibility and apologized, which I appreciate. But regardless of that, or the merits of a motion, conduct like this is not acceptable. It is admonished. And it is put on the record should it ever recur in another case.

## CONCLUSION

The motion to compel arbitration is GRANTED. *See* 9 U.S.C. § 4. This matter is STAYED pending the outcome of the arbitration. *See* 9 U.S.C. § 3. The parties shall provide status updates every three months and file a notice within 14 days of the termination of the arbitration that either seeks to dismiss the case or set a case management conference, as appropriate. The motions to seal are resolved as explained above.

**IT IS SO ORDERED.**

Dated: September 2, 2021

William H. Orrick
United States District Judge

16